**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS CATENACCI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Number: 21-cv-02852 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| LORI LIGHTFOOT, in Her Official Capacity | ) | |
| As Mayor of the City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT MAYOR LORI LIGHTFOOT'S MEMORANDUM IN SUPPORT OF HER
MOTION TO DISMISS THE AMENDED COMPLAINT**

**INTRODUCTION**

Plaintiffs Thomas Catenacci and the Daily Caller News Foundation ("DCNF") bring this action to challenge an alleged decision of Mayor Lightfoot to conduct one-on-one interviews only with journalists of color on the occasion of the second anniversary of her inauguration as Mayor of Chicago. Plaintiffs claim that their First Amendment and equal protection rights were violated because Catenacci requested an interview with the Mayor, and that, on information and belief, his request was denied based on his race due to these interview parameters. But as shown by Plaintiffs' own allegations, Catenacci's interview request did not fall within the scope of the parameters, because it did not seek an interview on the occasion of the Mayor's two-year anniversary. In addition, Catenacci's request was not made until *after* any use of the challenged parameters had ended. For both of these reasons, Plaintiffs have no injury attributable to the challenged parameters, and their lawsuit therefore fails for lack of standing. Additionally, even

if Plaintiffs had standing, their claims for injunctive and declaratory relief would be subject to dismissal as moot because the challenged parameters are no longer in effect.

## RELEVANT BACKGROUND

On May 19, 2021, and the morning of May 20, 2021, to commemorate the second anniversary of her inauguration as Mayor of Chicago, Mayor Lightfoot participated in a Press Tour with members of the Chicago Press Corps. Ex. A hereto (Second LeFurgy Declaration), ¶ 3. The Press Tour consisted of eight one-on-one interviews, six on May 19, and two on May 20. Id. The subject of each of these interviews was the Mayor's two-year anniversary as Mayor of Chicago. Id. ¶ 7. Both of the May 20 interviews were requested prior to May 20. Id. ¶ 9. The entirety of the Press Tour was completed in the twenty-four-hour period beginning at 9:30 a.m. on May 19, with the last interview concluding at approximately 9:25 a.m. on May 20. Id. ¶ 8.

On the morning of May 19, 2021, prior to the beginning of the Press Tour, Mayor Lightfoot sent a letter, via the Mayor's Press Office, to the Chicago Press Corps stating that "on the occasion of the two-year anniversary of [her] inauguration as Mayor of this great City, [she would] be exclusively providing one-on-one interviews with journalists of color." Am. Compl. ¶ 6; Ex. A hereto, ¶ 4. This statement was in reference to the Press Tour described above. Ex. A hereto, ¶ 5. The parameters in the May 19 letter have not been used for any decisions regarding interviews with the Mayor since the Press Tour. Id. ¶ 10.

On May 20, 2021, Plaintiff Catenacci sent an email requesting an interview with Mayor Lightfoot about various topics concerning the coronavirus pandemic. Am. Compl. ¶ 9. See also Ex. A hereto, Ex. 2 thereto (email seeking interview "regarding a number of topics pertaining to Chicago's handling of the coronavirus" and listing specific issues relating to the pandemic). This email was received by the Mayor's Press Office general inquiries email box at

approximately 4:23 p.m. on May 20, more than six hours after the conclusion of the Press Tour.

Ex. A hereto, Ex. 2 thereto. Catenacci's request made no mention of the Mayor's second

anniversary. Id. Nor did the request ask that the interview take place on May 20 (which was the

two-year anniversary date of the Mayor's inauguration on May 20, 2019), otherwise express

urgency about when the interview occur, or indicate a deadline that he was operating under. Id.

Instead, the email wrote: "Let me know if we can set up a time to speak." Id. Catenacci sent

follow up emails on May 21, and May 24, 2021. Am. Compl. ¶ 10; Ex. A hereto, Exs. 3 & 4

thereto. On May 27, 2021, one week after sending his first request for an interview, Catenacci

and DCNF filed the present action. Plaintiffs assert that Catenacci's request for an interview was

denied when the Mayor did not respond to it in "a timely manner," and that the denial was based

on his race under the Press Tour parameters. Am. Compl. ¶¶ 11-13. Following the denial of

Plaintiffs' Motion for Preliminary Injunction, Plaintiffs filed the present Amended Complaint on

July 2, 2021. Dkt. 22.

## LEGAL STANDARD

In considering motions under Rule 12(b)(1), the Court first strips away any conclusory

statements in the complaint and considers only "well-pleaded factual allegations." See Silha v.

ACT, Inc., 807 F.3d 169, 174 (7th Cir. 2015). Then the Court considers whether the well-

pleaded factual allegations "plausibly suggest a claim of subject matter jurisdiction." Id. And

when it comes to standing to sue, Plaintiffs have the burden to "clearly" allege facts

demonstrating each element of standing. Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016).

If a defendant presents a factual challenge to standing, "[t]he district court may properly look

beyond the jurisdictional allegations of the complaint and view whatever evidence has been

submitted on the issue to determine whether in fact subject matter jurisdiction exists." Apex

Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 444 (7th Cir. 2009) (citations omitted) (internal quotations marks omitted).  And once a defendant proffers evidence that calls into question standing as presented in the complaint, "[t]he presumption of correctness that we accord to a complaint's allegations falls away, and the plaintiff bears the burden of coming forward with competent proof that standing exists."  Id. (citations omitted) (internal quotation marks omitted).

## ARGUMENT

I.     **Plaintiffs Lack Standing To Bring This Lawsuit.**

To have standing, a plaintiff must show "(1) an injury in-fact; (2) fairly traceable to the defendant's action; and (3) capable of being redressed by a favorable decision from the court." Parvati Corp. v. City of Oak Forest, 630 F.3d 512, 516 (7th Cir. 2010) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "If the plaintiff lacks standing, the federal court lacks subject matter jurisdiction and the suit must be dismissed under Federal Rule of Civil Procedure 12(b)(1)."  International Union of Operating Engineers, Local 139, AFL-CIO v. Daley, 983 F.3d 287, 294 (7th Cir. 2020).  That is the case here.  Plaintiffs lack standing because Catenacci's interview request was not subject to the challenged Press Tour parameters, and Plaintiffs therefore suffered no injury fairly traceable to the parameters or redressable by a favorable decision from this Court.  This is so for two reasons.

First, the Press Tour parameters were not applicable Catenacci's interview request.  By Plaintiffs' own allegations, the parameters applied to interviews "on the occasion of [the Mayor's] two-year anniversary of [her] inauguration" as Mayor of Chicago.  Am. Compl. ¶ 6. Catenacci, however, does not allege that he asked to interview the Mayor for that occasion. Instead, Plaintiffs allege that Catenacci wanted to interview the Mayor about a list of issues concerning the coronavirus pandemic, an interview that Catenacci sought "as part of" DCNF's "regular[] coverage" of the pandemic.  Id. ¶¶ 8-9.  Plaintiffs' allegations therefore make clear

that Catenacci's request did not fall within the scope of the Press Tour parameters – he was seeking an interview with the Mayor about the coronavirus pandemic as part of DCNF's routine coverage of that topic, rather than an interview on the unique, one-time occurrence of the Mayor's second anniversary.

These allegations are confirmed by the face of Catenacci's email requesting a one-on-one interview with the Mayor.  That email stated that he wanted to interview the Mayor about "a number of topics pertaining to Chicago's handling of the coronavirus," and then listed a handful of specific issues relating to that topic.  Ex. A hereto, Ex. 2 thereto.  Moreover, the two-year anniversary of the Mayor's inauguration on May 20, 2019 was May 20, 2021, but nothing in Catenacci's May 20, 2021 email, which was sent at 4:23 p.m. in the afternoon, indicates that Catenacci was requesting an interview to occur that same day.  See id.[1]

Accordingly, Catenacci's interview request on its face was not subject to the challenged interview parameters.  Plaintiffs therefore could not have been injured by the parameters and lack standing for this reason.  See Lujan, 504 U.S. at 560, n.1 (explaining that, to have standing, an injury "must affect the plaintiff in a personal and individual way"); Allen v. Wright, 468 U.S. 737, 755 (1984) (no standing where plaintiffs "were not personally subject to the challenged discrimination"), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014); J.B. v. Woodard, 997 F.3d 714, 720 (7th Cir. 2021) (explaining that standing is lacking where plaintiff fails to allege "facts showing a causal connection between the injury and the conduct complained of"); Keep Chicago Livable v. City of Chicago, 913 F.3d 618, 625 (7th Cir. 2019) (plaintiffs lacked standing where challenged ordinance was not "tether[ed]" to "a specific harm to the organization"); Freedom from Religion

---

[1]  Indeed, the fact that Catenacci sent two follow-up emails on subsequent days makes clear that he did not expect to have the interview take place the day he requested it.

Found., Inc. v. Lew, 773 F.3d 815, 821 (7th Cir. 2014) ("Without a request, there can be no denial. And absent any personal denial of a benefit, the plaintiffs' claim amounts to nothing more than a generalized grievance . . . which does not support standing.").[2]

A second and independent reason why the Press Tour parameters caused Plaintiffs no injury is that, even if Catenacci's request fell within the scope of the parameters, any use of those parameters had terminated by the time Catenacci made his request. Catenacci's request was sent to the general inquiries email address of the Mayor's Press Office and was received at 4:23 p.m. on May 20. Ex. A hereto, ¶ 11; id. Ex. 2 thereto. Catenacci sent a follow up email the next day, May 21, and a second follow up on May 24, 2021. Ex. A hereto, Exs. 3 & 4 thereto. By the time of these requests, however, the Press Tour had ended and its parameters were not in use. As explained above, the Press Tour was of limited duration and ended on the morning of May 20, 2021, after the conclusion of the 8th interview at approximately 9:25 a.m. Ex. A ¶ 8. And the parameters have not been used in any decision by the Mayor's Press Office regarding the granting of one-on-one interviews since the Press Tour, including as to Catenacci's first request on May 20, 2021, which was made more than six hours after the Press Tour ended. Id. ¶ 10. Plaintiffs therefore lack standing for the separate reason that, because the Press Tour parameters had ended before Catenacci made his request late in the day on May 20th, he was not injured by them.[3]

---

[2] DCNF does not allege any injury that it suffered apart from the alleged denial of Catenacci's interview request. Indeed, DCNF's only link to the events challenged in the lawsuit appears to be that it employs Catenacci as a reporter. Assuming for purposes of this motion only that DCNF could assert derivative injury based on actions taken against Catenacci, it lacks standing for the same reasons that Catenacci lacks standing.

[3] As noted above, Plaintiffs allege that Catenacci's request was denied based on his race due to the Press Tour parameters. See Am. Compl. ¶¶ 12-13. Plaintiffs do not seek relief on the theory that the mere denial of a one-on-one interview request, without more, violates their rights. Indeed, there is no right to a one-on-one interview with a public official. See Velie v. Hill, No. CV 16-07839 DSF (EX), 2017 WL

For these reasons, to the extent that Catenacci alleges that his request for an interview has been denied, that denial is not fairly traceable to the challenged parameters. In essence, Plaintiffs stand in the same shoes as any other member of the public who may theoretically take issue with the parameters. That sort of generalized grievance, however, is not a basis for standing under Article III. Larkin v. Fin. Sys. of Green Bay, Inc., 982 F.3d 1060, 1064 (7th Cir. 2020). Plaintiffs seek nothing more than an impermissible advisory opinion as to the parameters' constitutionality. Sweeney v. Raoul, 990 F.3d 555, 561 (7th Cir. 2021). The Amended Complaint should therefore be dismissed for lack of standing.

## II. Plaintiffs' Claims For Injunctive And Declaratory Relief Are Moot.

Even if Plaintiffs had standing to bring their claims, their requests for declaratory and injunctive relief are moot because the challenged parameters are no longer in effect and have not been in effect since the filing of this action. Article III requires Plaintiffs to have standing to pursue their claims "at all stages of review, not merely at the time the complaint is filed." Ciarpaglini v. Norwood, 817 F.3d 541, 544 (7th Cir. 2016) (internal quotation marks omitted). "If at any point the plaintiff would not have standing to bring suit at that time, the case has become moot." Milwaukee Police Ass'n v. Board of Fire & Police Comm'rs, 708 F.3d 921, 929 (7th Cir. 2013).

As this Court has already held, there is no "ongoing or future conduct to be enjoined" and therefore any claim for injunctive relief is moot. Dkt. 19 at 4. See also Simic v. City of Chicago, 851 F.3d 734, 738 (7th Cir. 2017) (holding that to have standing for prospective injunctive relief,

---

679648, at *3 (C.D. Cal. Jan. 23, 2017), aff'd, 736 F. App'x 165 (9th Cir. 2018) (journalists cannot "use the [First] amendment to force government officials to grant an interview or assist her in collecting information."); Raycom Nat., Inc. v. Campbell, 361 F. Supp. 2d 679, 686, 688 (N.D. Ohio 2004) ("Public officials are under no constitutional obligation to speak to the press at all. . . .") (citations and internal quotation marks omitted); Snyder v. Ringgold, 40 F. Supp. 2d 714, 718 (D. Md. 1999) ("No reporter has a right to access to a particular interview, exclusive story, or off the record statement.").

plaintiffs must demonstrate a "'real and immediate' threat of future injury"). Plaintiffs make no allegations that the Press Tour parameters are likely to be repeated or to continue in the future. Instead, they plead in entirely conclusory fashion that, "Plaintiff Catenacci will continue to be irreparably harmed unless Defendant's unlawful conduct is enjoined." FAC ¶ 21. But bare "legal conclusions and conclusory allegations merely reciting the elements of the claim are not entitled to th[e] presumption of truth" accorded to well-pleaded facts. McCauley v. City of Chicago, 671 F.3d 611, 616 (7th Cir. 2011).

The Court, moreover, has already rejected this claim of "continuing" harm as unsupported and held that the claim for injunctive relief is therefore moot. See Dkt. 19, at 3 ("the undisputed showing that Lightfoot's practice or policy of granting interview requests only to journalists of color ceased after May 20, 2021, moots [Plaintiffs'] motion for preliminary injunctive relief"). Indeed, as the Court observed in its order denying Plaintiffs' Motion for Preliminary Injunction, Plaintiffs "appear to concede that Lightfoot's policy or practice of granting interviews exclusively to journalists of color is a thing of the past." Dkt. 19 at 2. In fact, the sole additional evidence Plaintiffs cited in their Response to the City's Status Report concerning the parameters was a video of Mayor Lightfoot in a one-on-one interview with a white journalist who stated, "I by all accounts am a white guy and we are doing this interview together." See Dkt. 18 at 2, n.1 (citing https://twitter.com/NewDay/status/1403340392175706115). This interview took place after the Press Tour concluded and shows that there is no active practice of denying interviews to white reporters.

At base, Plaintiffs seek to enjoin discontinued conduct absent any indication that such conduct is likely to recur, and "[f]ederal courts do not, as a rule, enjoin conduct which has been

discontinued with no real prospect that it will be repeated." Wisconsin Right to Life, Inc. v. Schober, 366 F.3d 485, 491 (7th Cir. 2004) (quoting Ragsdale v. Turnock, 841 F.2d 1358, 1366 (7th Cir. 1988)). Accordingly, Plaintiffs' claim for injunctive relief should be dismissed as moot. Similarly, a plaintiff cannot get a declaration that past conduct violated the Constitution when that conduct is not ongoing; thus the claim for declaratory relief is moot as well. See UWM Student Ass'n v. Lovell, 888 F.3d 854, 860-62 (7th Cir. 2018) (affirming dismissal of claim for declaratory relief as moot where the challenged conduct was over, as declaratory relief "could do the plaintiffs no practical good"). Plaintiffs' claims for injunctive and declaratory relief based on the Press Tour parameters should be dismissed as moot.

## CONCLUSION

For the foregoing reasons, Defendant asks the Court to dismiss the Amended Complaint in its entirety for lack of standing, or in the alternative to dismiss Plaintiffs' claims for injunctive and declaratory relief as moot.


Dated: August 2, 2021          Respectfully submitted,

CELIA MEZA,
Corporation Counsel for the City of Chicago

By:     /s/   Peter H. Cavanaugh

John Hendricks
Andrew Worseck
Peter Cavanaugh
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312) 744-6975, -7129, -0897
*Attorneys for Defendant*

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS CATENACCI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Number: 21-cv-02852 |
| v. | ) | |
| | ) | |
| LORI LIGHTFOOT, in Her Official Capacity | ) | |
| As Mayor of the City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SECOND DECLARATION OF KATHLEEN LEFURGY

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1.　　My name is Katheen LeFurgy. I am over 18 years of age. I have personal knowledge of the facts set forth in this Declaration, and if called upon to testify to those facts I could and would competently do so.

2.　　I am the Communications Director for the Office of the Mayor of Chicago, a position I have held since February 1, 2021. In my current role, I lead the Mayors Press Office, which is responsible for all communications of the Mayor and Mayor's Office, including but not limited to, press communications; social media; and speechwriting. My duties include, but are not limited to, reviewing and approving press inquiries, including requests for interviews, and press statements; reviewing and approving remarks; and reviewing and approving social media content.

3.　　On May 19, 2021, and the morning of May 20, 2021, to commemorate the Second Anniversary of Mayor Lightfoot's inauguration as Mayor of Chicago, Mayor Lightfoot participated in a Press Tour (the "Press Tour") which consisted of eight one-on-one interviews, six on May 19, 2021, and two on May 20, 2021, with Mayor Lightfoot and members of the Chicago

Press Corp. All of the interviews that took place on May 19, 2021, were subject to a "press embargo," which means they were not to be publicly released until May 20, 2021.

4.     On the morning of May 19, 2021, prior to the Press Tour, the Mayor sent a letter, via the Mayor's Press Office, to members of the Chicago Press Corp stating, among other things, that "on the occasion of the two-year anniversary of my inauguration as Mayor of this great City, I will be exclusively providing one-on-one interviews with journalists of color." A true and correct copy of the letter is attached hereto at Exhibit 1.

5.     This statement was in reference to the Press Tour described above.

6.     Each of the interviews was scheduled for approximately 15 to 20 minutes, although some of them lasted longer.

7.     The subject of each interview was Mayor Lightfoot's two-year anniversary as Mayor of Chicago.

8.     The entirety of the Press Tour was conducted in the twenty-four-hour period beginning at 9:30 a.m. on May 19.   The last interview on the Press Tour concluded at approximately 9:25 a.m. on May 20.

9.     All of the interviews that were part of the Press Tour were requested before May 20, 2021.

10.     The Press Tour was of limited duration, as described above, and ended at the conclusion of the eighth interview.  The parameters used for the Press Tour, as set forth in the Mayor's May 19 letter, have not been used in any decision by the Mayor's Press Office regarding the granting of one-on-one interviews or other interviews or events with the press since the Press Tour.

11.     On May 20, 2021, at approximately 4:23 p.m. and more than six hours after the conclusion of the Press Tour, the Mayor's Press Office general inquiries email inbox received an

email from Plaintiff Catenacci's email account requesting an interview with Mayor Lightfoot "regarding a number of topics pertaining to Chicago's handling of the coronavirus," and listing specific issues relating to the pandemic. Catenacci also wrote: "Let me know if we can set up a time to speak." A true and correct copy of this email is attached hereto at Exhibit 2.

12.     The staff member for the Mayor's Press Office responsible for monitoring the general inquiries email inbox forwarded this email to me at 4:51 p.m. on May 20, 2021.

13.     The general inquiries email box received follow up emails from Catenacci's email address on May 21, and May 24, 2021. True and correct copies of these emails are attached hereto at Exhibits 3 and 4 respectively.

14.     The Mayor's Press Office did not apply the parameters outlined in the Mayor's May 19th letter to Catenacci's request, as the Press Tour had ended by the time of Catenacci's request.

15.     I have reviewed the Complaint in the above captioned matter that was filed on May 27, 2021. I have also reviewed the Amended Complaint in the above captioned matter that was filed on July 2, 2021.

16.     At the time the Complaint was filed, the parameters used for the Press Tour were not in use, they have not been used at any time since the filing of the Complaint, and there are no plans to use them in the future.

17.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the foregoing is true and correct.

Executed this ___2___ day of August, 2021.

Kathleen LeFurgy

# Exhibit 1



## OFFICE OF THE MAYOR

### CITY OF CHICAGO

**LORI E. LIGHTFOOT**
MAYOR

May 19, 2021

Good morning,

By now, you may have heard the news that on the occasion of the two-year anniversary of my inauguration as Mayor of this great City, I will be exclusively providing one-on-one interviews with journalists of color. As a person of color, I have throughout my adult life done everything that I can to fight for diversity and inclusion in every institution that I have been a part of and being Mayor makes me uniquely situated to shine a spotlight on this most important issue. I wanted to reach out to you directly to ensure you understand my thinking behind that decision.

As the first Black woman mayor of Chicago, and the first openly gay mayor, my election in 2019 was hailed for breaking barriers to the halls of power that had existed in our city for generations. I ran to break up the status quo that has failed so many residents across our city. And that failing status quo did not apply simply to City Hall and City government. It pertains and exists in all public and private institutions.

In the time since I was elected, our country has faced an historic reckoning around systemic racism. Organizations, corporations, educational institutions and more all across our city, our state and our country have declared new efforts to address the deep-seated legacies of institutionalized racism. In looking at the absence of diversity across the City Hall press corps and other newsrooms, sadly it does not appear that many of the media institutions in Chicago have caught on and truly have not embraced this moment.

I have been struck since my first day on the campaign trail back in 2018 by the overwhelming whiteness and maleness of Chicago media outlets, editorial boards, the political press corps, and yes, the City Hall press corps specifically. In the year 2021, with a Black, lesbian Mayor, a Black woman City Treasurer, a Latinx woman City Clerk and a majority Black and Latinx City Council, the group of reporters assigned to cover City Hall is practically all white. Many of them are smart and hard-working, savvy and skilled. But mostly white, nonetheless. Indeed, there are only a handful of beat reporters of color in the City Hall press corps. While there are women of color who sometimes cover my administration, there are zero women of color assigned to the City Hall beat. Zero. I find this unacceptable and I hope you do too.

The press corps is the filter through which much of what we do in government is dissected and explained to the public. It is essential for a healthy democratic society and an accountable government. And yet, despite the many talents and skills of our reporting corps, I fear this arm of our democratic system is on life support. The Chicago media leadership must evolve with the times, in order to be a true reflection of the vibrant, vast diversity of our city. Diversity matters and without it, how can you as the media truly speak to the needs and interests of the diverse and nuanced constituency you claim to serve until you do the work necessary to reflect that constituency.

There is almost no one in the editorial board rooms or in the City Hall press corps who has themselves lived the experience of a woman of color in the City of Chicago. The Crain's Chicago Business editorial board is entirely white. There are zero women of color on the Chicago Tribune editorial board. Almost all the major television networks in Chicago covering City Hall are led by white News Directors.

It is impossible for this glaring lack of diversity not to be reflected in the daily coverage of government, politics and city life every single day.

We are working hard to do our part. We host ethnic media roundtables, and work hard to prioritize outlets led by people of color. I or others from my administration regularly appear on Black and Latinx TV and radio stations, and we've also focused paid public service media ad dollars in that direction. We have worked to build diversity into our own communications team--our Digital Director is a Latinx woman and our lead Digital Strategist is an African American woman; our Deputy Communications Director is African American; our lead speechwriter is an African American woman; and two of our Deputy Press Secretaries are African American.

We have more to do, but as I always have said, equity and inclusion are the north stars of this administration, and that includes our own communications efforts.

Still, Black or Brown community leaders often reach out to me or my team to call our attention to implicit--or explicit--bias in one piece of coverage or another from your outlets. For the past two years, more often than not, we have debated internally, then chosen to say nothing, to let it go, lest we be accused of whining about negative coverage or of "playing the race card." And the truth is, it is too heavy a burden to bear, on top of all the other massive challenges our city faces in this moment, to also have to take on the labor of educating white, mostly male members of the news media about the perils and complexities of implicit bias. This isn't my job. It shouldn't be. I don't have time for it. But as with so many festering problems, it has only gotten worse with time. So here I am, like so many other Black women before me, having to call your attention to this problem. I have no power to make you change, but I hope that you will not just cover and express your opinion about the great and historic racial awakening that is rippling across all parts of our society. I hope that you too will see it for the opportunity that it is and embrace it by reflecting the change across your organizations.

We'll start here. At the two-year anniversary of my inauguration, I am issuing a challenge to you. Hire reporters of color--and especially women of color--to cover Chicago politics, and City Hall in particular. If you only have a white reporter covering City Hall, make sure there's a person of color working with them as well.

There are plenty of talented women reporters of color in Chicago for you to hire from, and that pool of talent is growing all the time.

Does your institution have an initiative set up to intentionally cultivate, recruit, support and retain young reporters of color in your ranks? Are there any people of color in your leadership teams or on your editorial boards? Are there qualified people of color on your team that could cover City Hall, but simply haven't been given the chance? Have you analyzed your own coverage to identify and root out implicit bias?

My team will always be responsive to your inquiries. We will always be transparent. But if the answer to these questions is no, be advised that I will continue to press for that to change.

I look forward to hearing your response as to what you plan to do to address this concern.

Sincerely,

Lori E. Lightfoot

Mayor

# Exhibit 2

## Press Inquiry

**Thomas Catenacci** <tcatenacci@dailycallernewsfoundation.org>

Thu 5/20/2021 4:23 PM

**To:** Mayor's Press Office <Mayor's.PressOffice@cityofchicago.org>

[Warning: External email]

Hello,

I'm a reporter with the Daily Caller News Foundation. I'm requesting a one-on-one interview with Mayor Lightfoot regarding a number of topics pertaining to Chicago's handling of the coronavirus. Specifically, I'd like to discuss how her administration plans to encourage more residents to receive the coronavirus vaccine considering that less than 50% of the city's residents have been administered a single dose. I'd also like to discuss why she believes Chicago is behind other large cities, such as New York and Los Angeles.

I'd also like to ask Mayor Lightfoot about how her administration handled the coronavirus pandemic compared to other major U.S. cities and how she plans to encourage residents to eat and shop locally as Chicago's vaccinated population grows.

Let me know if we can set up a time to speak.

Thank you very much.

Best,

**Thomas Catenacci**
Reporter | Daily Caller News Foundation
e: tcatenacci@dailycallernewsfoundation.org
c: 203-517-5730
twitter: @ThomasCatenacci

# Exhibit 3

Re: Press Inquiry

## Thomas Catenacci <tcatenacci@dailycallernewsfoundation.org>

Fri 5/21/2021 11:35 AM

**To:** Mayor's Press Office <Mayor's.PressOffice@cityofchicago.org>

[Warning: External email]

Hello,

Wanted to follow up on this request.

Thank you!

Best,
Thomas

On Thu, May 20, 2021 at 5:23 PM Thomas Catenacci <tcatenacci@dailycallernewsfoundation.org> wrote:

Hello,

I'm a reporter with the Daily Caller News Foundation. I'm requesting a one-on-one interview with Mayor Lightfoot regarding a number of topics pertaining to Chicago's handling of the coronavirus. Specifically, I'd like to discuss how her administration plans to encourage more residents to receive the coronavirus vaccine considering that less than 50% of the city's residents have been administered a single dose. I'd also like to discuss why she believes Chicago is behind other large cities, such as New York and Los Angeles.

I'd also like to ask Mayor Lightfoot about how her administration handled the coronavirus pandemic compared to other major U.S. cities and how she plans to encourage residents to eat and shop locally as Chicago's vaccinated population grows.

Let me know if we can set up a time to speak.

Thank you very much.

Best,

**Thomas Catenacci**
Reporter | Daily Caller News Foundation
e: tcatenacci@dailycallernewsfoundation.org
c: 203-517-5730
twitter: @ThomasCatenacci

# Exhibit 4

Re: Press Inquiry

## Thomas Catenacci <tcatenacci@dailycallernewsfoundation.org>

Mon 5/24/2021 12:58 PM

**To:** Mayor's Press Office <Mayor's.PressOffice@cityofchicago.org>

> [Warning: External email]

Hi,

Following up again on this. Thank you.

Best,
Thomas

On Fri, May 21, 2021 at 12:35 PM Thomas Catenacci <tcatenacci@dailycallernewsfoundation.org> wrote:

> Hello,
>
> Wanted to follow up on this request.
>
> Thank you!
>
> Best,
> Thomas

On Thu, May 20, 2021 at 5:23 PM Thomas Catenacci <tcatenacci@dailycallernewsfoundation.org> wrote:

> Hello,
>
> I'm a reporter with the Daily Caller News Foundation. I'm requesting a one-on-one interview with Mayor Lightfoot regarding a number of topics pertaining to Chicago's handling of the coronavirus. Specifically, I'd like to discuss how her administration plans to encourage more residents to receive the coronavirus vaccine considering that less than 50% of the city's residents have been administered a single dose. I'd also like to discuss why she believes Chicago is behind other large cities, such as New York and Los Angeles.
>
> I'd also like to ask Mayor Lightfoot about how her administration handled the coronavirus pandemic compared to other major U.S. cities and how she plans to encourage residents to eat and shop locally as Chicago's vaccinated population grows.
>
> Let me know if we can set up a time to speak.
>
> Thank you very much.
>
> Best,
>
> **Thomas Catenacci**

Reporter | Daily Caller News Foundation
e: tcatenacci@dailycallernewsfoundation.org
c: 203-517-5730
twitter: @ThomasCatenacci