# Exhibit C

# Transcript of Kathleen LeFurgy

**Date:** October 14, 2021
**Case:** Catenacci, et al. -v- Lightfoot

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---------------------------------X

| | |
|---|---|
| THOMAS CATENACCI, et al., | : |
| | : |
| Plaintiff, | : |
| v. | : 1:21-cv-02852 |
| LORI LIGHTFOOT, in Her Official Capacity as Mayor of the City of Chicago, | : |
| Defendant. | : |

---------------------------------X

Deposition of KATHLEEN LEFURGY
Conducted Virtually
October 14, 2021
10:34 a.m.

Job No.: 403647
Pages 1 - 89
Reported by: Jacalyn Mann

Deposition of KATHLEEN LEFURGY, conducted virtually.

Pursuant to agreement, before Jacalyn Mann, Notary Public in and for the State of Florida.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF, THOMAS CATENACCI, et al.:

MICHAEL BEKESHA, ESQUIRE
KATIE BLANKENBERG, ESQUIRE
JUDICIAL WATCH, INC.
425 3rd Street, SW
Suite 800
Washington, D.C. 20024
(202)646-5172

ON BEHALF OF DEFENDANT, LORI LIGHTFOOT:

ANDREW WORSEK, ESQUIRE
JOHN HENDRICKS, ESQUIRE
PETER CAVANAUGH, ESQUIRE
CITY OF CHICAGO, DEPARTMENT OF LAW
CONSTITUTIONAL AND COMMERCIAL LITIGATION DIVISION
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602
(312)744-7129

A P P E A R A N C E S (Continued)

ON BEHALF OF PLAINTIFF, THOMAS CANTENACCI, et al.

CHRISTINE SVENSON, ESQUIRE
SVENSON LAW OFFICES
345 Erie Drive
Palatine, IL 60067
(312)467-2900

ALSO PRESENT:
Nathan Kane - Planet Depos Videographer
Rachel Carrick - Planet Depos Technician

C O N T E N T S

EXAMINATION OF KATHLEEN LEFURGY

| | Page |
|---|---|
| By Mr. Bekesha | 6 |

E X H I B I T S

(Attached to the transcript.)

| DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Letter | 9 |
| Exhibit 2 | Declaration | 48 |
| Exhibit 3 | NY Times Interview | 56 |
| Exhibit 4 | June 3rd Memo | 62 |
| Exhibit 5 | Notice of Deposition | 76 |

P R O C E E D I N G S

KATHLEEN LEFURGY,

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION BY COUNSEL FOR THE

PLAINTIFF, THOMAS CATENACCI, et al.

THE VIDEOGRAPHER: Here begins disc number one in the videotaped deposition of Kathleen Lefurgy, designee of Lightfoot in Her official capacity as Mayor of City of Chicago in the matter of Thomas Catenacci, et al. versus Lori Lightfoot in Her official capacity as the Mayor of the City of Chicago, Case Number 1:21-CV-02852. 10:36:47 10:36:49 10:36:51 10:36:56 10:36:59 10:37:04 10:37:07

Today's date is Thursday October 14th, 2021. The time on the monitor is 6 -- is 10:36 a.m. The videographer today is Nathan Kane, representing Planet Depos. All parties are attending remotely. 10:37:15 10:37:17 10:37:25 10:37:28

Would counsel please voice identify themselves and state whom they represent? 10:37:32 10:37:35

MR. BEKESHA: Michael Bekesha, representing plaintiffs. Christine Svenson, representing plaintiffs. 10:37:36 10:37:39 10:37:44

THE VIDEOGRAPHER: The court reporter 10:37:49

today is Jackie Mann, representing Planet Depos. Would the reporter please swear in the witness?

COURT REPORTER: Will counsel please stipulate that in lieu of formally swearing in the witness, the reporter will instead ask the witness to acknowledge that their testimony will be true under the penalties of perjury, that counsel will not object to the admissibility of the transcript based on proceeding in this way, and that the -- the witness has verified that she is, in fact, Kathleen LeFurgy?

MR. BEKESHA: Yes.

MR. WORSEK: Yes, we stipulate.

COURT REPORTER: Okay, great. Ms. LeFurgy, will you raise your right hand, please? Do you hereby acknowledge that your testimony will be true under the penalties of perjury?

THE WITNESS: Yes.

COURT REPORTER: Okay. Thank you. You can put your hand down. All right. I'm going to be muting myself on this computer, making sure I'm ready to go on the other one. I will give you a thumbs up in about three seconds, and then you could jump in with your first question, Michael, okay?

MR. BEKESHA: Great. Thank you. 10:38:53
COURT REPORTER: Hold on. 10:38:53
BY MR. BEKESHA: 10:39:00
Q Good morning, Ms. LeFurgy. My name is Michael Bekesha. I'm one of the attorneys representing the plaintiffs in this case. Could you please state and spell your full name for the record? 10:39:03 10:39:06 10:39:09 10:39:11 10:39:13
A Kathleen LeFurgy, K-A-T-H-L-E-E-N, L-E-F-U-R-G-Y. 10:39:14 10:39:22
Q Thank you. Before we begin I'd like to go over a few ground rules. Your counsel may have already talked to you about them, but hopefully they'll make the deposition go a little bit more smoothly. 10:39:25 10:39:28 10:39:31 10:39:34 10:39:36
If you don't hear one of my questions, please let me know. I'll be happy to restate it. If you don't understand one of my questions, also please let me know, and I'll try to make myself clearer. 10:39:37 10:39:39 10:39:42 10:39:44 10:39:47
It's also important that you respond out loud as opposed to shaking your head or any type of gestures. The court reporter can only record -- the court reporter can't record, you know, anything 10:39:48 10:39:50 10:39:54 10:39:58

besides what's spoken. 10:40:01
Finally, it's important that you wait until I'm done asking questions. If Drew is going to be making any objections, please wait until he's done speaking before you give your response. I will also try to make sure that I wait until you're done speaking before I ask my next question. It's just a lot easier for the court reporter to take everything down, and it's difficult if we talk over one another. Does all that make sense? 10:40:02 10:40:04 10:40:08 10:40:12 10:40:15 10:40:17 10:40:21 10:40:24 10:40:27
A Yes. 10:40:30
Q Okay, great. Thank you. Now that we got that out of the way, are you familiar with Mayor Lightfoot's May 19th, 2020, letter in which she states that she'll be exclusively providing one-on-one interviews with journalists of color? 10:40:31 10:40:34 10:40:40 10:40:45 10:40:49
A Yes. 10:40:53
Q Okay. Why don't we -- just for ease of reference. Let's pull that up as Exhibit 1. It's entitled Mayor's letter. 10:40:54 10:41:03 10:41:08
THE TECHNICIAN: Please stand by. 10:41:13
(Exhibit 1 was marked for identification and is attached to the transcript.) 10:41:16 10:41:16
Q Ms. LeFurgy, do you see on your screen 10:41:41

what is marked as Plaintiff 1?
A Yes.
Q Are you familiar with this document?
A Yes.
Q Is this the letter we were just referring to?
MR. WORSEK: Objection to form.
Q You may answer the question.
A Yes.
Q Okay. When was this letter written?
MR. WORSEK: Objection. Michael, I think this question is going to the issue of the development of the letter, the development of the selection parameters discussed in the letter, and that are at issue in the complaint. And as you know, we have objected to that scope of the 30(B)(6) notice as being outside the bounds of discovery authorized by the Court in this case.
The Court's order authorizing limited jurisdictional discovery expressly states that the scope of this 30(B)(6) deposition is limited to the matters raised in the defendants's motion to dismiss, and the matters raised in the defendant's motion to dismiss are limited to the scope of the

challenge parameters and their duration, not their -- we did not raise arguments going to their development of their content, their rationale, and so forth. 10:43:11 10:43:15 10:43:18 10:43:20

We raised that point with you via letter prior to today's deposition, and we did not hear anything back from you taking issue with our position in this regard. I would also note that plaintiff's motion itself, seeking the limited jurisdictional discovery by its own terms sought discovery only as to the scope and duration of the challenge parameters. 10:43:22 10:43:24 10:43:27 10:43:28 10:43:31 10:43:34 10:43:38 10:43:42

So for all those reasons, this question is outside of the scope of the authorized discovery, and I would instruct the witness not to answer. 10:43:43 10:43:46 10:43:50

Q Okay. Who wrote this letter, Ms. LeFurgy? 10:43:52

MR. WORSEK: Same objection, Michael, and I instruct the witness not to answer. 10:44:04 10:44:07

Q Okay. Are you aware of -- what was the purpose of this letter, Ms. LeFurgy? 10:44:10 10:44:19

MR. WORSEK: Same objection, and I would instruct the witness not to answer. 10:44:22 10:44:24

Q Are you aware that in the letter the Mayor stated that she will be exclusively providing 10:44:39 10:44:41

one-on-one interviews for journalists of color, Ms. LeFurgy? 10:44:45 10:44:47

A Yes. 10:44:55

Q Okay. How did -- how did the Mayor seek to implement that policy? 10:44:56 10:45:02

A As stated, the way that this policy was implemented was for a short duration of time, both in subject matter as well. 10:45:07 10:45:16 10:45:21

Q But what were the mechanics of it? How -- how did the Mayor decide -- how did the Mayor implement? 10:45:24 10:45:27 10:45:30

MR. WORSEK: Objection. Vague and presupposes facts not in evidence. 10:45:32 10:45:35

Q Did the Mayor seek to implement this policy? 10:45:39 10:45:42

A Again, this policy was for a limited period of time, both in scope and in subject matter. 10:45:44 10:45:50

Q During that limited period of time, did the Mayor seek to implement it? 10:45:53 10:45:56

A Again -- 10:46:01

MR. WORSEK: Objection to form. 10:46:03

Q You can answer the question. 10:46:04

A Again, it's -- it's in the letter, that line, she'll be exclusively providing one-on-one 10:46:09 10:46:12

interviews. 10:46:15
Q Okay. Did the Mayor exclusively provide 10:46:16
one-on-one interviews? 10:46:19
MR. WORSEK: Objection to form. 10:46:23
Q You may answer the question. 10:46:26
A Yes. 10:46:28
Q Okay. How were those interviews chosen? 10:46:29
A Those interviews were chosen based on 10:46:33
members of our press corps and individuals, both who 10:46:41
sought to interview her for her one-to-one -- or 10:46:46
excuse me -- for her two-year interview [sic], as 10:46:49
well as individuals who -- who we selected. 10:46:52
Q And how -- how did those journalists that 10:47:02
sought to be interviewed seek the interviews? 10:47:05
A They requested them to our team. 10:47:08
Q And how did they request them? 10:47:12
A They reached out to an individual -- 10:47:15
individual members of our team. 10:47:18
Q What members of your team did they reach 10:47:20
out to? 10:47:22
A Myself or our interim press secretary. 10:47:24
Q Okay. And how did -- the ones that 10:47:29
reached out to you, how did they reach out to you? 10:47:31
A Via e-mail. 10:47:34

Q Okay. And what did their e-mails say? 10:47:39
A I don't have a photographic memory, so I can't say for certain what the content of the e-mail was. 10:47:44 10:47:50 10:47:52
Q Okay. Did -- did the e-mail state that they wanted to interview the Mayor specifically about her two-year anniversary? 10:47:53 10:47:56 10:48:00
A Some of them, yes. 10:48:03
Q Did all of them? 10:48:09
A Again, I don't have a photographic memory so I don't believe so. 10:48:11 10:48:16
Q Okay. Do you know who would have that information? 10:48:19 10:48:21
A I don't. 10:48:23
Q Okay. Do you think anybody in the Mayor's office would have that information? 10:48:28 10:48:31
A It's possible. 10:48:33
Q Okay. Did you speak with any of those people in preparation for today? 10:48:37 10:48:40
A No. 10:48:42
Q Okay. How did you decide who to reach out to? You said -- I'm sorry. You said some journalists your office reached out to. How did you decide who to reach out to? 10:48:43 10:48:49 10:48:52 10:48:56

A We have -- we have members of our press corps, and those individuals we -- we reached out to, as well as interviews that we thought would be pertinent for the Mayor to -- to have. 10:48:58 10:49:00 10:49:04 10:49:10
Q What do you mean by pertinent for your Mayor to have? 10:49:15 10:49:17
A As part of the two-year anniversary, which is a big celebratory mark in one's mayoral career, we wanted to make sure we had a range of folks who she spoke with. So we reached out to some individuals as well. 10:49:19 10:49:22 10:49:26 10:49:29 10:49:32
Q And how did you choose those individuals? 10:49:34
A Based on the medium with which their -- their outlet was. 10:49:37 10:49:40
Q Any other qualifications? 10:49:42
A No. 10:49:45
Q Did -- did it matter what race they were? 10:49:48
MR. WORSEK: Objection to form. 10:49:53
Q You may answer the question. 10:49:55
A It was one of many parameters. 10:49:57
Q Okay. And how did you -- how did you -- as one of the parameters -- what were the other parameters? 10:49:59 10:50:05 10:50:08
A Subject matter with medium is one of the 10:50:12

many factors that we use to evaluate any media 10:50:16
inquiry we receive. 10:50:20
Q Okay. But these are media -- these were 10:50:21
journalists you reached out to, not journalists that 10:50:24
sought an interview at this -- at that time; 10:50:26
correct? 10:50:28
A Correct. 10:50:28
Q Okay. And what subject matters were used 10:50:29
as part of the criteria? 10:50:34
A They would be talking to her about her 10:50:38
two-year anniversary, things that she'd accomplished 10:50:42
over her two years, and then looking forward to the 10:50:45
next two years, things of that nature. 10:50:47
Q Okay. And how did you -- how did you 10:50:51
decide which race -- what race each of these 10:50:53
journalists were? 10:50:57
MR. WORSEK: Objection to form. 10:50:59
Q You may answer the question. 10:51:02
A Again, it was one of many factors, and it 10:51:04
was how individuals self-identified. I'd worked 10:51:08
with many of these folks for three years. I'm 10:51:12
familiar with them, or associations that they might 10:51:15
be a part of. 10:51:18
Q Okay. Going back to the journalists that 10:51:19

sought -- sought -- sought out interviews. How did you choose which journalists to select? 10:51:30 10:51:32
A Journalists were selected first and foremost if they were members of our press corps, as well as other factors. 10:51:36 10:51:41 10:51:44
Q And what were those other factors? 10:51:46
A Again, the audience that they reach, the medium with which they have their outlet, things of that nature. 10:51:49 10:51:52 10:51:55
Q Was race one of the criteria? 10:51:57
A It was one of the many factors. 10:52:00
Q Okay. And how did you identify what race the reporters were? 10:52:02 10:52:07
A How they self-identify, the associations that they -- the professional associations that they might be a part of, or the work that I've done -- we've done with them in the past. 10:52:09 10:52:13 10:52:16 10:52:19
Q When -- when you reached -- when you reached out to some of those journalists, did you inform them that they were going to take part of -- that they were -- they were being reached out towards in part because of their race? 10:52:22 10:52:24 10:52:28 10:52:36 10:52:39
A No. 10:52:42
Q Did you inform them that you were -- that 10:52:44

they were to interview the Mayor on a limited scope? 10:52:48
MR. WORSEK: Objection to form. 10:52:54
Q You can answer the question. 10:52:57
A Can you explain what you mean by limited scope? 10:53:00 10:53:03
Q Sure. Did -- these journalists that you reached out to, could they ask questions about anything of the Mayor? 10:53:04 10:53:09 10:53:12
A Again, we put parameters around any interview that the Mayor has. So for example, this one was about the two-year anniversary. However, I don't think it's appropriate for myself or anyone else to dictate to journalists the type of questions that they then may ask the Mayor. However, there are always an overarching subject matter or issue that they would like to speak to the Mayor about. 10:53:14 10:53:17 10:53:20 10:53:24 10:53:27 10:53:28 10:53:31 10:53:36
Q Okay. Earlier in your testimony you stated that the Mayor's position that I will be exclusively be providing one-on-one interviews with journalists with color, was limited in duration. What did you -- 10:53:38 10:53:52 10:53:56 10:53:58 10:54:03
MR. WORSEK: Objection. Sorry. I thought you were finished. 10:54:07 10:54:08
Q No. I was going to ask, what did you mean 10:54:09

by that? 10:54:11
MR. WORSEK: Objection to form. 10:54:12
Q You can answer the question. 10:54:13
A It was limited in both subject matter as well as time frame. 10:54:15 10:54:18
Q Okay. And what does that mean? 10:54:19
A That means that the interviews took place on the 19th, as well as the morning of the 20th. The interviews held on the 19th were embargoed for the 20th. 10:54:22 10:54:26 10:54:29 10:54:33
Q Okay. 10:54:34
A So it was, for all intents and purposes, the time period ended the morning of May 19th. I mean, sorry, the morning of May 20th. Excuse me. 10:54:35 10:54:38 10:54:41
Q Okay. And when -- when was that time period decided on? 10:54:44 10:54:46
A The end of her last interview. 10:54:48
Q Prior -- prior to the end of her last interview, was there a time limitation on this policy? 10:54:53 10:54:56 10:55:01
MR. WORSEK: Objection to form. 10:55:03
Q You may answer the question. 10:55:06
A These interviews were set a day or so in advance, and so the understanding was always that 10:55:09 10:55:12

the end of her last interview on the 20th, that those parameters would cease being used.

Q Who's -- was that the Mayor's understanding as well?

MR. WORSEK: Objection to form. Calls for speculation.

Q You may answer the question.

A I -- I can't speculate to what the Mayor believes. However, I can tell you that at the end of her last interview on the 20th was when those parameters ceased to be used.

Q What was the Mayor's understanding of the parameters leading up to May 29th, 20 -- May 19th and May 20th?

MR. WORSEK: Objection to form, and also to the extent it would go into the issue of the development of the policy, which I earlier raised scope objections and instructed the witness not to answer. So if there's an answer that otherwise falls outside those parameters, the witness is obviously free to answer. But we do raise those objections here.

Q You may answer that -- you may answer the question.

A Again, I'm not a mind reader. But for all intents and purposes, the end of her scheduled interviews. 10:56:31 10:56:35 10:56:38
Q What do you mean you're not a mind reader? 10:56:41
A Your question was what did the Mayor think. 10:56:47 10:56:49
Q Did you speak to the Mayor in preparation for your testimony today? 10:56:52 10:56:55
A The Mayor is aware that I am -- I am participating in this deposition today. 10:56:59 10:57:03
Q Did you speak with the Mayor in preparation for -- about content or substance in preparation of your testimony today? 10:57:06 10:57:09 10:57:12
MR. WORSEK: Objection to form. 10:57:15
Q You may answer the question. 10:57:17
A No. 10:57:19
Q Okay. Who -- who was in charge of the implementation of this protocol? 10:57:20 10:57:31
A My team. 10:57:39
Q And what team is that? 10:57:41
A The communications team. 10:57:43
Q Were you instructed to implement this protocol? 10:57:48 10:57:51
A It was agreed upon. 10:57:52

Q Who agreed upon it? 10:57:59
A My team and the Mayor. 10:58:01
Q Okay. And did you have a conversation? 10:58:07
Who -- how -- how was it agreed upon? 10:58:14
A We discussed it. 10:58:18
Q In a meeting? 10:58:23
A Yes. 10:58:28
Q Okay. When was that meeting? 10:58:29
MR. WORSEK: Objection. Michael, this is 10:58:35
now going down the road of the scope issue of the 10:58:38
development of the challenge parameters, and I would 10:58:41
instruct the witness not to answer for the reasons I 10:58:45
stated previously. 10:58:49
Q During -- during that meeting, did the 10:58:56
Mayor provide you with any guidance on how to 10:59:00
implement the policy? 10:59:02
MR. WORSEK: Same objection and same 10:59:05
instruction. 10:59:08
Q Did you inform the Mayor about how you 10:59:12
were going to implement the policy? 10:59:15
MR. WORSEK: Same objection and same 10:59:20
instruction. 10:59:22
Q Did the -- is the Mayor aware that the 10:59:26
policy was going to be limited to -- during your -- 10:59:28

during your conversation did you agree that this policy was going to be limited to a two-day period? 10:59:33 10:59:35

MR. WORSEK: Same objection and same instruction. 10:59:40 10:59:42

Q Was this letter written before or after -- was the May 19th, 2021, letter written before or after this meeting you had -- you and your team had with the Mayor? 10:59:50 10:59:55 10:59:59 11:00:03

MR. WORSEK: Same objection and same instruction. Michael, you're asking a series of questions here that quite clearly go into the development of the challenge parameters, which is an issue, again, that we objected to. It's beyond the scope of the authorized discovery. And prior to today, you did not take issue with our statement in writing of our objection to this scope issue. So we just think it's, you know, it's improper at this point in time. 11:00:06 11:00:08 11:00:10 11:00:12 11:00:15 11:00:18 11:00:21 11:00:24 11:00:28 11:00:31

MR. BEKESHA: All of these are questions about the implementation and how the implementation occurred, which you did not object to. They're not about the development of policy. I am not asking about how the letter was written, who came up -- who came up with the policy. I'm asking about -- 11:00:32 11:00:34 11:00:37 11:00:40 11:00:43 11:00:45

strictly about the procedure of implementing the 11:00:47
policy once it was developed. If you continue to 11:00:50
object, that's fine. It probably makes the most 11:00:54
sense, instead of us arguing about it here, we'll 11:00:57
just go to the Court, present the transcript with 11:01:00
the Court, and let the Court decide on a motion to 11:01:02
compel whether it's outside the scope. 11:01:04

MR. WORSEK: I understand your position. 11:01:06
We disagree. I don't think these questions go to 11:01:09
implementation. They are talking -- they're asking 11:01:13
about things leading up to the events in question, 11:01:15
leading up to the application of the parameters. So 11:01:19
in that regard, they go to development rather than 11:01:24
implementation. But your point is taken. We can 11:01:27
preserve the record and move on. 11:01:29

MR. BEKESHA: Great. Thank you. 11:01:34

Q After it was decided that the Mayor would 11:01:41
exclusively be providing one-on-one interviews with 11:01:46
journalists of color, was that communicated to 11:01:49
journalists? 11:01:53

A Yes. 11:01:58

Q When was it first communicated to 11:02:00
journalists? 11:02:02

A A couple days prior. 11:02:04

Q A couple days prior to what? 11:02:11
A When the interviews began. 11:02:15
Q And what was -- how was it communicated to journalists? 11:02:17 11:02:21
A As journalists requests came in and they were not filled, we followed up with them on -- on the procedure for the two-year anniversary interviews. 11:02:26 11:02:31 11:02:36 11:02:39
Q And what did you -- what did you tell the journalists during those follow-ups? 11:02:41 11:02:44
A That we will be exclusively providing one-on-one interviews with journalists of color for the parameters set forth. 11:02:47 11:02:51 11:02:54
Q Did you tell them specifically that the interviews would happen during a limited period of time on May 19th and May 20th? 11:02:56 11:02:58 11:03:01
A I can't recall every conversation, but I -- I recall being pretty clear in either verbal conversations with many of them that it was limited to the two-year anniversary. 11:03:06 11:03:14 11:03:18 11:03:21
Q Okay. What -- does that mean it was limited to a date of Mayor Lightfoot's two-year anniversary? 11:03:24 11:03:27 11:03:31
A Correct. 11:03:32

Q So it was only -- so all the interviews had to take place on one day? 11:03:34 11:03:37

A Again, these interviews were set on the -- there were several interviews on the 19th that were embargoed for the 20th, and two that took place the morning of the 20th. So again, it was both the subject matter and that timing. The Mayor actually had a press conference later that day that was open to anyone to ask questions where she addressed this as well. 11:03:39 11:03:43 11:03:45 11:03:49 11:03:51 11:03:55 11:03:58 11:04:01

Q But, when you were reaching -- when you were talking to journalists about scheduling these interviews, did you inform them that the interviews had to take place during a limited period of time? 11:04:02 11:04:06 11:04:08 11:04:12

A Again, we're given a limited amount of time on the Mayor's schedule. As you can imagine, she's an incredibly busy person, and there was only a limited amount of time that we were given to be able to conduct those interviews on the 19th and the 20th. So that was the only time we were given and the only time that those parameters would be. 11:04:19 11:04:23 11:04:25 11:04:28 11:04:31 11:04:34 11:04:36

Q Okay. Was this policy communicated to the public? 11:04:41 11:04:47

MR. WORSEK: Objection to form. 11:04:49

Q You may answer the question. 11:04:52
A Yes. 11:04:55
Q When was -- when was it first communicated 11:04:58
to the public? 11:05:01
A I believe after this letter became public. 11:05:03
Q And how was -- how was it communicated to 11:05:10
the public? 11:05:13
A It was posted on social media. It was 11:05:15
widely reported on. 11:05:21
Q Did -- did the Mayor's office communicate 11:05:23
-- communicate this policy to the public? 11:05:24
A We communicate to the public through a 11:05:30
variety of channels, including social media, things 11:05:36
being written in the media, things of that nature. 11:05:40
Q Okay. What did you post on -- what did 11:05:42
the Mayor's office post on social media about this 11:05:47
policy? 11:05:50
A I can't recall. 11:05:52
Q Okay. Do you know who -- who would have 11:05:55
that information? 11:05:57
A I'm sure it's available on our Twitter 11:06:00
account. 11:06:02
Q Okay. Did you review the Twitter account 11:06:03
in preparation of your testimony today? 11:06:08

A No. 11:06:09
Q Did the -- did the Mayor's office communicate with the public about the scope of this policy? 11:06:13 11:06:22 11:06:25
A Can you be more specific when you mean communicate to the public? 11:06:28 11:06:32
Q Through -- you said that in a variety of ways that the Mayor's office communicates to the public. So the first one is social media. Did the Mayor's office communicate the scope of this policy to the public through social media? 11:06:35 11:06:37 11:06:40 11:06:43 11:06:46
A If I'm recalling correctly, this was -- this letter was posted on social media. 11:06:49 11:06:52
Q Okay. Was there anything else posted on social media besides the letter? 11:06:55 11:06:58
A I can't recall. 11:07:01
Q By the Mayor's office? 11:07:02
A I can't recall. 11:07:04
Q Did the Mayor post anything on social media about this policy? 11:07:05 11:07:08
A What do you mean by the Mayor? 11:07:12
Q Either the Mayor -- does the Mayor have a personal e-mail -- a personal Twitter account? 11:07:16 11:07:22
MR. WORSEK: Objection to form. 11:07:27

Q You can answer the question. 11:07:29
A The only social media account that's verified to be -- to speak on behalf of the Mayor is an account run by the communications team. 11:07:33 11:07:35 11:07:39
Q Okay. And what is -- and what is that Twitter handle? 11:07:42 11:07:44
A @ Chicago's Mayor. 11:07:45
Q Does the Mayor have another Twitter handle that she uses? 11:07:55 11:07:59
MR. WORSEK: Objection to form. 11:08:01
Q You may answer that question. 11:08:03
A I don't know. 11:08:05
Q Do you know if there's another Twitter account associated with the Mayor? 11:08:07 11:08:10
MR. WORSEK: Objection to form. 11:08:15
Q You may answer that question. 11:08:18
A I believe she has one on her political side. 11:08:20 11:08:23
Q And do you know what that Twitter account is? 11:08:24 11:08:27
A I do not. 11:08:28
Q Do you know who would know that information? 11:08:36 11:08:37
A Our political team. As you can imagine, 11:08:39

the city and -- and the political side are completely separate.

Q Yeah. Besides social media, how else was this policy communicated to the -- to the public by your office?

A It was widely reported in the media, as well as the Mayor had a press conference later that day on the 20th where she was asked about it and discussed it.

Q And what did the Mayor say about the policy during that press conference on May 20th?

MR. WORSEK: Objection to form.

Q You may answer that question.

A I -- I don't know verbatim, but she was asked about it, and -- and I believe she underscored the fact that this was exclusively for one subject for a short period of time.

Q And what was it -- and what was the subject?

A What do you mean by what was the subject?

Q You said it was limited to one subject. I'm asking what that subject is.

A Her two-year anniversary.

Q Did all questions have to be about her

two-year anniversary? 11:10:06
A No. It was a press conference. Any question can be asked of her by any reporter at a press conference. 11:10:08 11:10:11 11:10:15
Q Okay. What about during the one-on-one interviews? Were -- were questions about Covid asked of Mayor Lightfoot? 11:10:16 11:10:18 11:10:21
MR. WORSEK: Objection to form. 11:10:26
Q You may answer the question. 11:10:29
A Again, I don't have a transcript in front of me, but the -- the broad range of -- or excuse me -- the umbrella topic was the two-year anniversary. 11:10:30 11:10:34 11:10:37
Q Were -- were specific questions about Covid asked during these interviews? 11:10:42 11:10:45
MR. WORSEK: Objection to form. 11:10:48
Q You may answer the question. 11:10:50
A Again, I don't have a transcript in front of me. 11:10:52 11:10:55
Q Do you know who would have that information? 11:10:57 11:10:59
A I don't. 11:11:02
Q Okay. If questions about Covid were asked during the interview, would the Mayor have answered those questions? 11:11:06 11:11:14 11:11:17

MR. WORSEK: Objection to form. 11:11:19
Q You can answer that question. 11:11:21
A Again, from a journalistic integrity standpoint, it's not my place to dictate to a reporter the type of questions with which they can ask the Mayor at any time, whether at a press conference or a one-on-one interview. So it is possible, even though the umbrella topic was her two-year anniversary which could include her -- include a question such as that. 11:11:23 11:11:26 11:11:29 11:11:32 11:11:35 11:11:37 11:11:41 11:11:44
Q Is the -- were questions about Chicago's homicide rates asked during the interview -- any of the interviews? 11:11:47 11:11:52 11:11:57
A I -- I can't speak to that specifically, so I -- I don't know. 11:12:01 11:12:03
Q If -- if questions about homicide rates were -- were asked during these interviews, would the Mayor have answered those questions? 11:12:05 11:12:10 11:12:12
A You know, again, it's not my responsibility to tell a reporter what questions that they can ask. So if she was asked a question, she probably responded, and it could have been under the context of the past two years in office. 11:12:15 11:12:18 11:12:20 11:12:24 11:12:27
Q Did the -- did every question have to be 11:12:32

couched within the context of the past two years when the reporters were asking the questions? 11:12:35 11:12:38
A Again, I don't dictate what a reporter can and cannot ask. However, that is what we -- we asked them to do. 11:12:42 11:12:45 11:12:49
Q If -- if they were asking questions that dealt with outside of what you asked them to do, would the Mayor answer those questions? 11:12:52 11:12:55 11:12:58
A Again, we cannot dictate the questions a reporter can and cannot ask, so she will answer questions if she's asked. 11:13:02 11:13:06 11:13:09
Q What did -- what did you -- how did you prepare for today's interview -- sorry -- today's deposition? 11:13:14 11:13:22 11:13:24
A I spoke with my lawyers. 11:13:27
Q Did you speak to anyone else? 11:13:32
A No. 11:13:36
Q Did you review any documents? 11:13:39
A Yes. 11:13:43
Q What did you review? 11:13:46
A I reviewed the documents we submitted to the Court for reference, including this letter. 11:13:48 11:13:56
Q Did you review anything else? 11:13:59
A Reviewed a brief -- a couple briefs that 11:14:03

were related to this. 11:14:08
Q Did you review anything else? 11:14:11
A No. 11:14:13
Q Okay. 11:14:13
MR. BEKESHA: Why don't we take a five-minute break and then come back? Is that -- is that okay with everyone? 11:14:15 11:14:17 11:14:22
MR. WORSEK: That works for us. Will the reporter state the time on-the-record, please, or someone on the technical staff? 11:14:27 11:14:29 11:14:34
THE VIDEOGRAPHER: Oh, the time on-the-record -- we're on 38 minutes 53 seconds. 11:14:39 11:14:41
MR. WORSEK: And what time do you have, you know, clock time? 11:14:46 11:14:47
THE VIDEOGRAPHER: Oh, 11:13. 11:14:49
MR. WORSEK: Thank you. 11:14:52
MR. BEKESHA: Okay. We can go off the record. 11:14:52 11:14:52
(Whereupon, a recess was taken.) 11:14:54
THE VIDEOGRAPHER: We are back on the record at 11:26. 11:27:39 11:27:53
Q Great. Thank you. Welcome back, Ms. LeFurgy. During -- during that break, did you speak to anyone besides counsel? 11:27:57 11:27:59 11:28:03

A No. 11:28:07
Q I think you testified earlier that the policy ended at the end of the last interview on May 20th. When was it decided when the last interview would be conducted? 11:28:09 11:28:24 11:28:29 11:28:33
A It was based on the Mayor's schedule and the scheduling of the interviews, as well as the duration of her two-year anniversary with the subject matter. 11:28:36 11:28:41 11:28:44 11:28:47
Q Was that one day before? Two days before? When was -- when was it decided when that -- the last interview would be? 11:28:51 11:28:56 11:29:00
A Again, it was based on the time that we were given by scheduling. 11:29:02 11:29:05
Q Okay. And when were you given -- when were you given the times that you were able to schedule the interviews? 11:29:08 11:29:11 11:29:15
A I can't recall exactly. Probably a couple days prior. 11:29:17 11:29:23
Q Do you know who would know that information? 11:29:25 11:29:28
A I don't. 11:29:29
Q Would that be someone in the communications office? 11:29:33 11:29:37

A No. 11:29:39
Q Where -- where in the Mayor's office would somebody know about scheduling? 11:29:44 11:29:48
A The scheduling department. 11:29:50
Q Did the communications office speak with the scheduling office about the implementation of this policy? 11:29:54 11:29:59 11:30:03
MR. WORSEK: Objection to form. 11:30:05
Q You may answer the question. 11:30:08
A No. 11:30:10
Q Did the communications office inform the scheduling office that the Mayor would be providing one-on-one interviews exclusively to journalists of color on May 19th and May 20th? 11:30:15 11:30:18 11:30:24 11:30:28
A No, because it was not relevant to scheduling. 11:30:35 11:30:37
Q What is a Press Tour? 11:30:42
A A Press Tour is a loose term that our office uses to describe a set of interviews that the Mayor is going to give back to back, as well as sometimes a related subject matter. 11:30:45 11:30:50 11:30:54 11:31:00
Q Was a Press Tour used to implement this policy that's identified in the May 19th letter? 11:31:04 11:31:08
A A Press Tour was used to describe the set 11:31:13

of interviews, yes.

Q Okay. When was it decided that these set of interviews would be described as a Press Tour?

MR. WORSEK: Objection to the question on the grounds that it goes into the issue of the development of the challenge parameters, and I would instruct the witness not to answer for the reasons previously stated.

Q Was it decided that these set of interviews would be described as a Press Tour before the Mayor wrote the May 19th, 2021, letter?

MR. WORSEK: Same objection and same instruction.

Q When the -- when the Mayor wrote -- when the May 19th, 2021, letter was written, was the idea that these interviews would take place -- was the idea that the interviews would take place during a Press Tour?

MR. WORSEK: Same objection, same instruction.

Q On May 19th, 2021, did the Mayor know that she would be providing -- exclusively providing one-on-one interviews with journalists of color as part of a Press Tour?

MR. WORSEK: Objection to form. 11:32:43
Q You may answer the question. 11:32:44
A She knew that she was giving exclusive one-on-one interviews back to back, which we, as I mentioned, loosely describe as a Press Tour. 11:32:48 11:32:51 11:32:56
Q Does the Mayor describe back to back interviews as a Press Tour? 11:33:02 11:33:06
MR. WORSEK: Objection to form. 11:33:08
Q You may answer that question. 11:33:09
A It's possible. It's more of a communications team term that we use to describe that. 11:33:12 11:33:15 11:33:18
Q Did the communications office inform the Mayor that the set of interviews on May 19th and May 20th were being referred to as a Press Tour? 11:33:19 11:33:22 11:33:27
A I don't recall specifically using those -- those words. It's possible she read it in a brief that was provided to her with information on the interviews. 11:33:36 11:33:39 11:33:44 11:33:47
Q And what information was provided to the Mayor about the interviews? 11:33:49 11:33:52
A Ahead of any interview that the Mayor gives, whether it's a series of interviews or an individual interview, she gets background 11:33:58 11:34:01 11:34:03

information about the subject matter of the interview, and -- and the individuals with which she's interviewing. 11:34:05 11:34:08 11:34:10

Q On May 19th, 2021, did Mayor Lightfoot know that she'd be exclusively providing one-on-one interviews with journalists of color only as part of a limited set of interviews? 11:34:13 11:34:20 11:34:26 11:34:30

MR. WORSEK: Objection to form. 11:34:33

Q You can answer that question. 11:34:36

A Yes. 11:34:38

Q How come the May 19th, 2021, letter does not identify that -- that these interviews would be taking place during a limited set of interviews? 11:34:40 11:34:53 11:35:00

MR. WORSEK: Objection to form. 11:35:03

Q You may answer the question. 11:35:05

A I have no longer have the letter in front of me, but I believe she does say in there that she's exclusively providing one-on-one interviews to journalists of color around her two-year anniversary, which was May 20th. 11:35:08 11:35:11 11:35:14 11:35:17 11:35:20

Q Okay. 11:35:23

MR. BEKESHA: If we could pull Exhibit 1 back onto the screen, please. 11:35:25 11:35:28

Q Do you want to take an opportunity to read 11:35:41

the letter? Could you then please identify where in the letter it says that this policy was limited to a series of interviews on May 19th and May 20th? 11:35:44 11:35:47 11:35:53

A In the first sentence it says, on the occasion of the two-year anniversary of my inauguration, which is May 20th, which to me, it means both on the date of the 20th and the subject matter relating to it. 11:36:07 11:36:09 11:36:11 11:36:15 11:36:18

Q Is it only on the date of the anniversary? 11:36:24

A Again, as it states on the letter, it says on the occasion of. And again, we had a preset set of interviews which occurred on the 19th that were embargoed to the 20th and two interviews on the morning of the 20th, which in my mind, reads to in the occasion of. 11:36:30 11:36:33 11:36:37 11:36:40 11:36:43 11:36:47

Q Is that the position of the Mayor's office? 11:36:48 11:36:49

MR. WORSEK: Objection to form. 11:36:51

Q You may answer that question. 11:36:53

A I speak on behalf of the city, and that is -- that is my reading of it. 11:36:55 11:36:58

Q Okay. Is -- is that what the Mayor meant when she wrote in the letter on the occasion of the two-year anniversary? 11:37:01 11:37:07 11:37:10

MR. WORSEK: Objection to form. 11:37:12
Q You may answer that question. 11:37:14
A Again, I -- I can't read the Mayor's mind, but that is my interpretation. 11:37:16 11:37:19
Q Have you -- did you -- have you asked the Mayor what she meant when she wrote on the occasion of the two-year anniversary? 11:37:21 11:37:23 11:37:26
A Again, I can only speak to what's in the contents of the letter, which she has signed and says on the occasion of. 11:37:31 11:37:33 11:37:36
Q Right. And I'm asking you have you spoken with the Mayor about what she meant when she wrote that? 11:37:37 11:37:40 11:37:42
A What the Mayor has said very publicly as that it was related to the subject matter during that limited scope and time. 11:37:44 11:37:52 11:37:56
Q I think I asked a yes or no question of have you spoken with the Mayor about what she meant by on the occasion of the two-year anniversary. Please answer that question. 11:37:58 11:38:01 11:38:05 11:38:08
A I don't believe so. 11:38:10
Q Okay. Is that a -- you don't believe so. Is that a no? 11:38:11 11:38:15
A No. 11:38:17

MR. WORSEK: Objection to form. The witness has answered the question. 11:38:18 11:38:19
Q Did all interviews of the Mayor on the occasion of the two-year anniversary occur on those two days? 11:38:28 11:38:32 11:38:36
A Yes. However, again, as someone who does not dictate what reporters can ask her, it's possible that she would get asked about something regarding her two years in office outside of these parameters. 11:38:38 11:38:47 11:38:51 11:38:53 11:38:57
Q If a journalist were to ask the Mayor a question today about her two-year anniversary, would you consider that to be a question on the occasion of her two-year anniversary? 11:38:59 11:39:02 11:39:06 11:39:11
MR. WORSEK: Objection to form. 11:39:14
Q You may answer that question. 11:39:17
A No. 11:39:19
Q Okay. What about on June 1st of 2021? Would questions then about her two-year anniversary be on the occasion of her two-year anniversary? 11:39:21 11:39:30 11:39:34
MR. WORSEK: Objection to form. 11:39:38
Q You may answer the question. 11:39:39
A No. 11:39:41
Q When they -- when the Mayor's office was 11:40:01

communicating to the public about the policy through social media, did the Mayor's office -- did the Mayor's office state that the policy would be only implemented through a limited series of interviews? 11:40:03 11:40:09 11:40:13 11:40:20

A Can you repeat the question? 11:40:25

Q Sure. When the Mayor -- when the Mayor's office was communicating to the public on social media about -- about this policy, did it identify to the public that it would be -- that the policy would be limited to a series of interviews on May 19th and May 20th? 11:40:27 11:40:30 11:40:34 11:40:41 11:40:46 11:40:49

A Again, I can't recall exactly what we put on social media, but if it was a letter that was posted, it does say on the occasion of her two-year anniversary. Social media would be one media on which we communicate to the public. Again, she had a media availability later in the day when this was discussed, and she's been pretty clear about that. 11:40:52 11:40:54 11:40:57 11:41:00 11:41:03 11:41:06 11:41:09

Q Okay. When did the Mayor's office first start referring to this limited serious of interviews as a Press Tour? 11:41:13 11:41:29 11:41:34

MR. WORSEK: Objection. Michael, based on the scope of the objection I raised earlier and going into the development of the parameters, and I 11:41:38 11:41:41 11:41:45

would instruct the witness not to answer for the reasons previously stated. 11:41:48 11:41:50

Q Why did the Mayor not refer to the Press Tour in her May 19th letter? 11:41:56 11:42:00

MR. WORSEK: Objection. Calls for speculation, form. 11:42:05 11:42:06

Q You can answer the question. 11:42:09

A Again, it's speculation. And as I've previously stated, it's an internal and informal use of the word that's used by my team. 11:42:13 11:42:16 11:42:19

Q And why is it speculation? 11:42:23

A Your question was why did the Mayor not include it in her letter, and I'm saying I can't speculate as to why it's not in the letter. 11:42:28 11:42:31 11:42:34

Q Okay. 11:42:36

THE TECHNICIAN: Excuse me. Nathan? I'm sorry. Nathan? Sorry, everyone I dropped off. My Internet went out. 11:43:00 11:43:02 11:43:06

MR. BEKESHA: Can we continue or do we need to -- 11:43:14 11:43:15

THE VIDEOGRAPHER: I'm sorry. I was on mute. I heard you. I was on mute. Sorry. 11:43:15 11:43:18

THE TECHNICIAN: That's all right. Yeah. Sorry, Counsel. I just need to get host back from 11:43:19 11:43:19

Nathan so that I can continue my recording. 11:43:24
THE VIDEOGRAPHER: All right. Let me -- 11:43:28
MR. BEKESHA: Okay. Can we go off the record, please, while this is done? 11:43:31 11:43:32
THE VIDEOGRAPHER: Sure. We are off the record at 11:42. 11:43:36 11:43:37
We are back on the record at 11:43. 11:44:38
BY MR. BEKESHA: 11:44:43
Q Great, thank you. Ms. LeFurgy, why didn't -- did the Mayor identify this Press Tour during her press conference on May 20th, 2021? 11:44:44 11:44:49 11:44:54
A What do you mean by identify the Press Tour? 11:44:59 11:45:01
Q Did -- did she state during the press conference that all the interviews took place during a Press Tour? 11:45:03 11:45:05 11:45:09
A Again, I don't have a transcript in front of me. However, she did address the questions, and I believe she said something about how this was limited for her two-year anniversary; that reporters get the chance to ask her questions all the time, and that it was limited in -- into that time frame, as well as the subject matter. 11:45:13 11:45:15 11:45:20 11:45:24 11:45:28 11:45:31 11:45:35
Q Are you aware that the Mayor has provided 11:45:38

interviews since May 20th, 2021, where she has talked about this policy? 11:45:44 11:45:49
A Yes. 11:45:52
Q Do you know if she referenced the Press Tour in any of these interviews? 11:45:57 11:45:59
A What do you mean by referenced the Press Tour? 11:46:02 11:46:06
Q Did -- did she state that these interviews only took place during a series of interviews that were limited to a limited period of time? 11:46:08 11:46:11 11:46:16
A I believe so. 11:46:21
Q Do -- do you know so? 11:46:28
A I don't have a transcript, and I don't have a photographic memory to -- to know every word she's given in every interview. 11:46:31 11:46:35 11:46:38
Q Are you aware that the Counsel for the Mayor spoke to plaintiffs' attorneys twice on the phone about this matter? 11:46:43 11:46:46 11:46:52
A No. 11:46:56
MR. WORSEK: Objection to form. 11:47:00
Q Do you know why the Mayor's counsel's office did not identify to plaintiffs' attorneys the existence of a Press Tour during those two calls? 11:47:04 11:47:08 11:47:13
MR. WORSEK: Objection to form. 11:47:17

Q You may answer that question. 11:47:19
A I don't want to speculate on that. 11:47:21
Q Did you ask Mayor's counsel about why they did not reference Press Tour in their letters in preparation -- I'm sorry -- in their conversations in preparation for today's testimony? 11:47:25 11:47:29 11:47:35 11:47:38
MR. WORSEK: Objection to form. And also, this question call for an answer going to matters protected by the attorney-client privilege. And so I would instruct the witness not to answer for that reason. 11:47:41 11:47:43 11:47:46 11:47:48 11:47:51
MR. BEKESHA: I asked her a question she asked of you. I did not ask for your response. They wouldn't be protected under attorney-client in that case. 11:47:53 11:47:55 11:48:01 11:48:04
MR. WORSEK: Well, I -- I disagree with that premise. Under the circumstances, it could very well be covered. 11:48:05 11:48:06 11:48:09
MR. BEKESHA: You instructed her not to answer? 11:48:13 11:48:15
MR. WORSEK: Yes. 11:48:15
MR. BEKESHA: Okay. 11:48:16
Q Ms. LeFurgy, are you aware that in the -- in the course of this litigation counsel for the 11:48:16 11:48:20

Mayor wrote a letter to plaintiffs' counsel about 11:48:28
this case? 11:48:32
A No. 11:48:38
Q Do you know why defendant -- the Mayor's 11:48:44
counsel in that letter did not identify this Press 11:48:47
Tour? 11:48:52
MR. WORSEK: Objection to form. 11:48:56
Q You may answer that question. 11:49:00
A I -- I can't speculate on that. 11:49:03
Q Okay. Do you know who would know that 11:49:06
information? 11:49:16
A No. 11:49:20
MR. WORSEK: Michael, I just want to note 11:49:23
for the record, in between questions here as well, 11:49:25
that, I mean, you've asked a series of questions 11:49:28
characterizing communications between us and you in 11:49:30
the course of the lawsuit, and obviously those 11:49:34
communications speak for themselves. I don't want 11:49:36
to argue with you now about what the letter said or 11:49:39
didn't say, or how they should be read or not read. 11:49:41
But obviously, you know, those documents speak for 11:49:42
themselves, and we do not necessarily agree with 11:49:47
your characterization of the content of those 11:49:52
communications. 11:49:55

MR. BEKESHA: Sure. Thank you. 11:49:56
Q Ms. LeFurgy, when was it decided that the 11:49:58
Press Tour would be limited to a 24-hour period? 11:50:25
MR. WORSEK: Objection. Goes to the issue 11:50:32
of the development of the challenge parameters, and 11:50:36
I would instruct the witness not to answer for the 11:50:39
reasons previously stated. 11:50:42
Q Ms. Lefurgy, did you prepare declarations 11:51:13
in conjunction with this lawsuit? 11:51:16
A Yes. 11:51:19
Q How many declarations did you prepare? 11:51:25
A I believe two. 11:51:29
Q Why did you do not include -- why, in your 11:51:33
first declaration, did you not include the 24-hour 11:51:42
period in which the Press Tour was conducted? 11:51:47
MR. WORSEK: Objection to form, and also 11:51:54
to the extent it would call for the disclosure of 11:51:57
attorney-client communications, but if the witness 11:52:01
can answer subject to that limitation, then she's 11:52:05
free to answer. 11:52:07
A Again -- again, it was the -- it was the 11:52:10
set of interviews that we had scheduled, which were 11:52:18
limited to those two sets of interview time that we 11:52:22
were given. 11:52:26

MR. BEKESHA: Let's pull up for plaintiff Exhibit 2, what I have titled second declaration. 11:52:45 11:52:47
THE TECHNICIAN: Please stand by. 11:52:52
(Exhibit 2 was marked for identification and is attached to the transcript.) 11:52:55 11:52:55
Q Ms. Lefurgy, if you could take a minute and review this document. 11:53:30 11:53:33
A I'm done with the first page. I don't think I have the ability to scroll through. 11:53:50 11:53:52
THE TECHNICIAN: I can give her control, Mr. Bekesha. 11:53:55 11:53:58
MR. BEKESHA: That would be -- that would be great. Thank you. 11:53:59 11:54:01
THE TECHNICIAN: Okay, great. 11:54:02
MR. WORSEK: Michael, while the witness is reading the document, I just want to note for the record that as far as I can tell, based on what's showing up on my screen, this exhibit constitutes only the declaration itself and not the attachments that were attached to the declaration; is that right? 11:54:02 11:54:04 11:54:07 11:54:09 11:54:13 11:54:17 11:54:19
MR. BEKESHA: That's correct. 11:54:21
MR. WORSEK: Okay, thanks. 11:54:22
A Okay. I've reviewed. 11:54:47

Q Thank you. Do you recognize this document? 11:54:51 11:54:53
A Yes. 11:54:56
Q Is this your second declaration that you submitted or that was submitted in conjunction with this lawsuit? 11:54:58 11:55:02 11:55:06
A Yes. 11:55:07
Q Okay. Let's turn to Paragraph 8. Paragraph 8, the first sentence reads, the entirety of the Press Tour was conducted in the 24-hour period beginning at 9:30 a.m. on May 19th -- or May 19. Do you see that? 11:55:10 11:55:26 11:55:29 11:55:31 11:55:37
A Yes. 11:55:41
Q When was it decided that the Press Tour would be conducted in that 24-hour period? 11:55:43 11:55:46
MR. WORSEK: Objection. Michael, I think this is a question you asked a few questions ago, or similar to it. It goes to the development of the challenge parameters. And so I would instruct the witness not to answer for the reasons previously stated. 11:55:55 11:55:57 11:56:00 11:56:03 11:56:06 11:56:08
Q Looking at Paragraph 9, it says, all of the interviews that were part of the Press Tour were requested before May 20, 2021. Do you see that? 11:56:24 11:56:27 11:56:30

A Yes. 11:56:36
Q Is that an accurate statement? 11:56:37
A Yes. 11:56:45
Q Okay. I -- earlier you testified that your office reached out to some journalists about participating in the Press Tour; is that correct? 11:56:46 11:56:52 11:56:57
A Yes. 11:57:00
Q Okay. After you reached out to them, did they -- did those journalists have to send a request asking for an interview during the Press Tour? 11:57:04 11:57:07 11:57:11
A No. 11:57:18
Q Okay. So how were those interviews requested by the journalist if -- if your office reached out to them? 11:57:21 11:57:31 11:57:35
A As I mentioned previously, there were two types of ways that we determined interviews for this, one with which they were requested, and the second with which we reached out to. 11:57:41 11:57:43 11:57:46 11:57:49
Q Right. 11:57:51
A Scheduling interviews was incredibly informal. 11:57:51 11:57:54
Q Okay. And -- and referring to the ones that you reached out to you, how were they -- how were those interviews requested by those 11:57:55 11:57:57 11:58:02

journalists? 11:58:05
MR. WORSEK: Objection to form. 11:58:08
Q You may answer the question. 11:58:09
A We called them and said, would you like to interview, and they said, yes, we'd love to -- we'd love to interview the Mayor, and I -- I take that as a request. 11:58:12 11:58:19 11:58:22 11:58:25
Q A request from them or from you? 11:58:26
A A lot of times interviews are mutually agreed upon. 11:58:31 11:58:33
Q Okay. If we turn to Paragraph 10, you testified the parameters used for the Press Tour as set forth in the -- in the Mayor's May 19 letter have not been used in any decision by the Mayor's press office regarding the granting of one-on-one interviews or other interviews or events with the press since the Press Tour. Do you see that? 11:58:35 11:59:13 11:59:17 11:59:20 11:59:23 11:59:26 11:59:30
A Yes. 11:59:34
Q Is that still an accurate statement? 11:59:36
A Yes. 11:59:40
Q After May 20th, 2021, did the Mayor provide interviews about her two-year -- two-year anniversary? 12:00:20 12:00:24 12:00:31
MR. WORSEK: Objection to form. 12:00:34

A After that date the Mayor gave interviews where she could have been asked about it by a reporter. Again, I don't dictate what questions a reporter can ask. 12:00:40 12:00:43 12:00:46 12:00:49
Q Did your office sit up -- set up interviews in which the reporters were going to ask questions about the two-year anniversary? 12:00:51 12:00:53 12:00:58
A Can you be more specific? 12:01:03
Q Sure. Since May 20th, 2021, has -- has the communications office set up interviews with journalists about the two-year anniversary? 12:01:05 12:01:11 12:01:15
A No. 12:01:23
Q If you were to set up interviews, would they be on the occasion of the two-year anniversary? 12:01:29 12:01:31
MR. WORSEK: Objection to form. 12:01:37
A No. 12:01:40
Q And would it -- so I guess I'm trying to understand. You said on the occasion of the two-year anniversary was a limited scope; that they had meaning, but the interviews were supposed to be in a limited scope; is that correct? 12:01:43 12:01:47 12:01:50 12:01:55 12:01:58
A What do you mean by limited scope? 12:02:03
Q I'm sorry. I thought that was your testimony? 12:02:06 12:02:08

A By limited scope, I mean time and subject matter, yes. 12:02:11 12:02:15
Q By subject matter, okay. So what is the subject matter as you see it contained within the phrase on the occasion of the two-year anniversary? 12:02:16 12:02:20 12:02:27
A Subjects relating to her two-year anniversary. 12:02:32 12:02:35
Q Okay. So are all questions about her two-year anniversary part of that subject? 12:02:36 12:02:43
MR. WORSEK: Objection to form. 12:02:51
Q You may answer that question. 12:02:53
A Yeah. Yes. 12:02:56
Q Okay. 12:02:58
MR. WORSEK: I'm sorry could -- I didn't catch the witness's full answer, I don't think. It died out toward the end. Could the reporter read it back, please? 12:03:04 12:03:07 12:03:09 12:03:11
COURT REPORTER: (Answer read back.) 12:03:17
MR. WORSEK: Okay, thank you. 12:03:22
Q Let's -- can we pull up as -- actually, before we go there, let's turn to Paragraph 16 of your declaration. In Paragraph 16 you testify, at the time the complaint was filed, the parameters used for the Press Tour were not in use, they have 12:03:36 12:03:40 12:03:46 12:04:10 12:04:13

not been used since at any time since the filing of the complaint, and there are no plans to use them in the future. Do you see that? 12:04:16 12:04:19 12:04:21
A Yes. 12:04:24
Q Okay. As of today, have the parameters used for the Press Tour not been in -- have not been used at any time prior to -- sorry. Let me rephrase that. Have the parameters used for the Press Tour been used at any time since the filing of the complaint and today? 12:04:25 12:04:33 12:04:39 12:04:43 12:04:49 12:04:53
A No. 12:04:56
Q Are there any plans to use the parameters in the future? 12:05:03 12:05:06
A No. 12:05:10
Q Is it possible that the -- that the parameters will be used in the future? 12:05:19 12:05:23
MR. WORSEK: Objection to form. 12:05:26
Q You may answer that question. 12:05:28
A I can't speak in to -- in hypotheticals, or I don't have a magic ball to look into the future, but what I can tell you is, from my perspective, no. 12:05:32 12:05:36 12:05:38 12:05:41
Q Are you aware that the Mayor sat down for an interview with the New York Times that was 12:05:47 12:05:50

published on May 19th, 2021? 12:05:53
A Yes. 12:05:59
Q Are you aware -- 12:06:00
MR. WORSEK: I'm sorry. Michael, just to clarify, you said May 19th, 2021? 12:06:02 12:06:05
MR. BEKESHA: Yes. 12:06:09
MR. WORSEK: Okay. 12:06:10
MR. BEKESHA: And I think that's the wrong date, so -- 12:06:12 12:06:13
MR. WORSEK: Right. 12:06:15
MR. BEKESHA: It's July 26th, 2021. Thank you -- thank you, Drew. 12:06:17 12:06:21
MR. WORSEK: Sure. 12:06:23
Q Are you aware that the Mayor sat down for an interview with the New York Times that was published on July 26th, 2021? 12:06:24 12:06:26 12:06:28
A Yes. 12:06:32
Q All right. Are you aware that during that interview when asked about the May 19th letter and the policy, the Mayor responded, I would absolutely do it again, I would absolutely do it again? 12:06:34 12:06:36 12:06:40 12:06:44
MR. WORSEK: Objection to form. 12:06:49
Q You may answer that question. 12:06:50
A I don't have the transcript in front of 12:06:53

me, but I am familiar with that. 12:06:55
Q Okay. Would it be helpful to have the transcript in front of you? 12:06:58 12:07:00
A Yes, please. 12:07:01
Q Okay. 12:07:04
MR. WORSEK: If we can mark as Exhibit 3, New York -- marked as New York Times or NYT interview transcript. 12:07:05 12:07:06 12:07:14
THE TECHNICIAN: Please stand by. 12:07:19
(Exhibit 3 was marked for identification and is attached to the transcript.) 12:07:20 12:07:20
Q Ms. Lefurgy, if you could take a moment and look at this. I had a real difficult time trying to get it into some type of printed form, and so this was my best ability. But just curious if you -- if you recognize this interview, and if it -- if it helps refresh your recollection. 12:07:45 12:07:47 12:07:51 12:07:54 12:07:59 12:08:04
MR. WORSEK: Michael, I'm going to object to the document, you know, insofar as the foundation for it is not apparent to me. I'm not sure. I'm not saying it's not an accurate representation of the transcript, but I don't know that it is. So I'm noting that for the record. You can proceed to ask the witness about it, but I do want to state that 12:08:09 12:08:10 12:08:14 12:08:17 12:08:20 12:08:24 12:08:28

foundation objection. 12:08:31
MR. BEKESHA: Sure. Absolutely. 12:08:33
Q More specifically, if you just want to turn to Page 3? 12:08:36 12:08:38
MR. WORSEK: And sorry, Michael. Just add a final point in my objection. As far as I could tell from the document, there's nothing on its face that would indicate it's an official transcript published by the New York Times either. 12:08:48 12:08:52 12:08:55 12:08:58 12:09:01
MR. BEKESHA: Sure. 12:09:07
Q If you could just take a moment and read that page. Ms. Lefurgy, does this help refresh your memory about this interview? 12:09:10 12:09:13 12:09:37
A Yes. 12:09:38
Q Okay. Do you -- do you -- do you now recall the Mayor stating that she would absolutely do it again? I would absolutely do it again? 12:09:43 12:09:52 12:09:55
MR. WORSEK: Objection to form. 12:09:59
Q You may answer that question. 12:10:00
A Yes. 12:10:03
Q Okay. 12:10:05
MR. BEKESHA: We can take that exhibit down. Thank you. 12:10:06 12:10:08
Q Did the Mayor mean that when she said it? 12:10:13

MR. WORSEK: Objection to form. Calls for speculation. 12:10:17 12:10:19
Q You may answer the question. 12:10:21
A Well, I can't speculate the meaning of -- of her words. My reading of it is, if asked if she would have done it again on May 19th and 20th, I would view it as a past description as opposed to forward-looking. 12:10:23 12:10:26 12:10:32 12:10:35 12:10:39
Q And is that you speculating, or is that what the Mayor told you? 12:10:41 12:10:43
A That's my reading of those words. 12:10:48
Q Okay. Have you spoken with the Mayor about what she meant when -- in the -- in the New York Times interview? 12:10:51 12:10:53 12:10:57
A No. 12:11:01
Q Okay. Do you -- do you know if anyone -- do you know who would know what the Mayor meant in that interview? 12:11:02 12:11:07 12:11:10
MR. WORSEK: Objection to form. 12:11:12
Q You may answer the question. 12:11:15
A No. 12:11:17
Q Do you think, would the Mayor know what the Mayor meant when she said those words in the interview? 12:11:19 12:11:21 12:11:24

MR. WORSEK: Objection to form. 12:11:33
Q You can answer the question. 12:11:36
A Yes. 12:11:38
Q All right. If the Mayor ordered the 12:11:38
communications department to -- to set up another 12:11:45
series of interviews with journalists -- exclusively 12:11:52
with journalists of color, would the office 12:11:56
implement that instruction? 12:12:00
MR. WORSEK: Objection to form. 12:12:04
Q You may answer the question. 12:12:18
A I can't speculate. 12:12:21
Q Does the communications office work for 12:12:25
the Mayor? 12:12:28
A Yes. 12:12:30
Q If the Mayor orders the communications 12:12:35
department to do something, does the communications 12:12:38
department do it? 12:12:41
A Not always. 12:12:44
Q If the Mayor were to order the 12:12:53
communications department to implement a policy to 12:12:55
exclusively provide interviews to journalists of 12:13:02
color, would the communications department implement 12:13:06
the policy? 12:13:11
MR. WORSEK: Objection to form. 12:13:14

Q You may answer the question. 12:13:15
A I can't speculate on that. 12:13:17
Q Who is the head of the communications 12:13:22
department? 12:13:24
A I am. 12:13:26
Q All right. If the Mayor ordered you to do 12:13:29
that, would you -- would you do it? 12:13:32
MR. WORSEK: Objection to form. 12:13:35
Q You may answer that question. 12:13:37
MR. WORSEK: And asked and answered. This 12:13:39
is about the third or fourth time you've asked this 12:13:41
question. 12:13:43
Q You can answer the question. 12:13:45
A I don't work in hypotheticals. 12:13:48
Q Okay. What reasons would you not follow 12:13:52
the order? 12:13:57
MR. WORSEK: Objection to form. 12:14:00
Q You may answer the question. 12:14:02
A Again, this is a hypothetical situation, 12:14:05
and I can't speculate. 12:14:08
Q Have you thought about whether or not this 12:14:21
policy should be implemented again? 12:14:24
MR. WORSEK: Objection to form. 12:14:28
Q You may answer the question. 12:14:30

A No. 12:14:33
Q Does the Mayor intend to provide exclusively -- to exclusively provide interviews to journalists of color again? 12:14:52 12:14:55 12:14:59
MR. WORSEK: Objection to form. 12:15:02
A Again, that's a hypothetical question. 12:15:05
Q It's not a -- I -- I asked does the Mayor intend to do so. 12:15:08 12:15:12
MR. WORSEK: Same objection. 12:15:15
Q You can answer the question. 12:15:16
A Again, I can't read her mind, and I can't speak in hypotheticals. 12:15:19 12:15:22
Q I'm not asking you to speak in hypotheticals. I'm asking you if the Mayor intends to do something, does -- does the Mayor intend to exclusively provide interviews to journalists of color in the future? 12:15:24 12:15:26 12:15:29 12:15:37 12:15:40
MR. WORSEK: Objection to form. 12:15:44
Q You may answer that question. 12:15:44
A I can't read her mind, but this was -- this particular event that we're discussing was limited in scope and subject matter to the 19th and 20th. 12:15:51 12:15:53 12:15:58 12:16:03
Q Have you asked the -- have you spoken to 12:16:04

the Mayor about whether or not she intends to exclusively provide one-on-one interviews with journalists of color in future? 12:16:05 12:16:08 12:16:14

A No. 12:16:16

Q Who would know whether or not -- who would know whether the Mayor intends to provide -- to exclusively provide one-on-one interviews to journalists of color in the future? 12:16:16 12:16:25 12:16:28 12:16:32

A I don't know. 12:16:35

Q Would the Mayor know her intentions? 12:16:37

MR. WORSEK: Objection to form. 12:16:43

Q You may answer the question. 12:16:45

MR. WORSEK: Michael, I would just note for the record, you know, this is a 30(B)(6) deposition, and this is, I don't know, the fourth or fifth, or sixth time you've asked this witness about what -- who would know what the Mayor might be doing. I just think these are kind of -- you've asked them. You've gotten answers, and you keep asking the same question, and it's really sort of getting outside of the scope of what is this deposition was authorized to be about. But the witness can answer. 12:16:46 12:16:49 12:16:51 12:16:52 12:16:56 12:16:57 12:16:59 12:17:03 12:17:06 12:17:09 12:17:13

Q You may answer that question. 12:17:14

A Yes. 12:17:16
Q Would -- would anybody else? 12:17:19
A I don't know. 12:17:21
MR. BEKESHA: Let's mark as the next exhibit what I have entitled starting June 3rd. 12:17:29 12:17:46
COURT REPORTER: Please stand by. 12:17:51
MR. BEKESHA: Thank you. 12:17:53
(Exhibit 4 was marked for identification and is attached to the document.) 12:17:54 12:17:54
MR. BEKESHA: And if you want to give control of the document to the witness so she can scroll through the three pages, that would be great. Thank you. 12:18:14 12:18:15 12:18:18 12:18:21
Q Ms. Lefurgy, do you recognize this document? 12:18:43 12:18:45
A Yes. 12:18:47
Q And what is this document? 12:18:50
A It's a memo for the Mayor. 12:18:53
Q And who is this memo from? 12:18:57
A The communications team. 12:19:00
Q Okay. And what is the purpose of this memo? 12:19:05 12:19:08
A To provide the Mayor background on interviews she's going to give. 12:19:10 12:19:15

Q Okay. And if you see under purpose, it says, you are participating in an interview with Craig Dellimore regarding your two-year anniversary and follow-up media inquiries with August Weekly and Chicago Defender. Do you see that? 12:19:17 12:19:24 12:19:28 12:19:32 12:19:36
A Yes. 12:19:40
MR. WORSEK: Michael, I just want to jump in here and make a foundation objection to the document. There's been no document production in the case, so I'm not clear of the derivation of this document. So I make that objection. 12:19:41 12:19:43 12:19:47 12:19:53 12:19:56
MR. BEKESHA: Okay. 12:19:59
Q Does the communications office respond to Freedom of Information Act requests on behalf of -- of the Mayor? 12:20:04 12:20:07 12:20:11
A Yes. 12:20:16
Q Do you recall producing this document? Does the communication office -- as the head of the communications office, are you aware that this document was produced to Judicial Watch in response to a Freedom of Information Act request? 12:20:18 12:20:25 12:20:27 12:20:29 12:20:35
A I -- I'm aware that there were documents produced in response to a FOIA request, yes. 12:20:40 12:20:43
Q Okay. Do you know if this document was 12:20:47

one of them? 12:20:48
A I can't speak for certain, but I believe so. 12:20:51 12:20:56
Q Going -- going back to -- to the purpose line of the memo, was this interview with Mr. Dellimore -- what was that interview -- what were the parameters of that interview? 12:20:58 12:21:02 12:21:07 12:21:16
A Mr. Dellimore has a weekly radio show, and he had originally asked to speak with the Mayor back in the end of April, I believe. So it was going to be an interview with Craig about today's events. 12:21:20 12:21:22 12:21:27 12:21:31
Q Was the -- was the interview -- sorry. 12:21:36
A As in not today as in this date, but in the state of affairs at the time, like the day -- the news of the day. 12:21:40 12:21:45 12:21:47
Q Okay. So being June 3rd? Is that a yes? 12:21:49
A Yes. That's a yes. 12:21:55
Q Thank you. I just wanted to make sure it was clear for the court reporter. 12:21:57 12:21:59
And that interview was going to be about her two-year -- the Mayor's two-year anniversary; is that correct? 12:22:01 12:22:04 12:22:06
MR. WORSEK: Objection to form. 12:22:09
Q You may answer the question. 12:22:11

A I believe the original request, as it came in, was around back in April or early May -- was around the two-year anniversary. And it might have been a question that he asked about in the interview. 12:22:14 12:22:18 12:22:23 12:22:27 12:22:29
Q Okay. If the -- if the interview wasn't focused on the Mayor's two-year anniversary, why did the communications department send the Mayor a memo stating that she had an interview with Craig Dellimore regarding your two-year anniversary? 12:22:30 12:22:38 12:22:41 12:22:45 12:22:49
A Is an inartful description of what the actual interview was about. These are created for -- for the Mayor with very basic information, and I don't think it's quite an accurate description of what the interview was -- was to be about. 12:22:53 12:22:56 12:23:01 12:23:05 12:23:08
Q Was the interview -- did Mr. Dellimore request an interview on the occasion of her two-year anniversary? 12:23:11 12:23:15 12:23:19
A Mr. Dellimore reached out to our office, as I mentioned, end of April, early May to interview the Mayor. 12:23:22 12:23:27 12:23:30
Q And -- and he ended up interviewing her on June 3rd of 2021? 12:23:32 12:23:37
A That is correct. He -- we tried to 12:23:41

schedule him. We had some scheduling conflicts. He had some flexibility, and we were able to accommodate him on June 3rd. 12:23:47 12:23:51 12:23:53
Q Were the criteria outlined in the May 19th, 2021, letter -- did they apply to this interview with Mr. Dellimore? 12:23:55 12:23:58 12:24:02
A When he had originally reached out around the two-year anniversary, we were trying to plan it for the -- the two-year anniversary. However, that didn't work out because of scheduling, given the Mayor's limited amount of time. This interview happened, I believe, two, three weeks later. So it was less about that -- it was not about -- that on the occasion of. It was more of a generic interview about the news of the day. 12:24:07 12:24:11 12:24:14 12:24:16 12:24:19 12:24:22 12:24:25 12:24:29 12:24:32
Q So going into the interview, did the Mayor know that this memo didn't really mean what it said when it said regarding your two-year anniversary? 12:24:35 12:24:45 12:24:48
MR. WORSEK: Objection to form. 12:24:52
Q You may answer that question. 12:24:55
A You know, again, I can't read the Mayor's mind. She gets a lot of memos, many of which she does not read. So I -- I don't know if that was -- if that was explained to her or not. 12:24:55 12:25:00 12:25:03 12:25:06

Q Did the -- did the communications office explain to her that this memo was inaccurate? 12:25:09 12:25:12
MR. WORSEK: Objection to form. 12:25:15
Q You may answer the question. 12:25:16
A I don't recall if those were the exact words. However, someone on my team likely ran through with her that it would be the news of the day. 12:25:20 12:25:22 12:25:26 12:25:28
Q The follow-up -- the follow-up media inquiries with the August Weekly and Chicago Defender, what were those follow ups to? 12:25:43 12:25:45 12:25:46
A Michael Romain reached out directly to the Mayor, and he was actually one of the first people who interviewed the Mayor when she was seeking office. And the publisher of the Defender had reached out for an interview as well. The term follow-up media inquiries is a term that we use when we get a lot of media inquiries and we need to use some dedicated time on the Mayor's calendar to go through some of those interviews. 12:25:54 12:25:57 12:26:01 12:26:03 12:26:07 12:26:12 12:26:16 12:26:16 12:26:23
Q And when did -- when did Ms. Sanders and Mr. Romain ask for those interviews? 12:26:26 12:26:31
A I don't recall. 12:26:39
Q Would it be prior to May 19th or May 20th? 12:26:42

A I -- I don't recall the exact date or time. 12:26:51 12:26:53
Q Were there interview requests on the occasion of the Mayor's two-year anniversary? 12:26:56 12:27:01
A What do you mean? 12:27:06
Q Earlier you testified that many journalists reached out asking to interview the Mayor on the occasion of her two-year anniversary. Was Ms. Sanders and Mr. Romain two of those journalists? 12:27:14 12:27:16 12:27:19 12:27:22 12:27:26
MR. WORSEK: Objection to form. 12:27:27
Q You may answer that question. 12:27:30
A These interviews were unrelated to the previously-scheduled interviews on the 19th and 20th. 12:27:34 12:27:38 12:27:41
Q Was the -- was the interview with Mr. Dellimore -- I'm sorry. How do you pronounce his name? There's an extra R, so I just wanted to make sure I was saying it correctly. 12:27:45 12:27:47 12:27:52 12:27:56
A It's Dellimore. It's Dellimore. That's actually a typo in the -- in the brief. 12:27:59 12:28:02
Q Oh, okay. Thank you. I just didn't want to get his name incorrectly. Was Mr. Dellimore's interview related to the interviews that took place 12:28:06 12:28:09 12:28:13

on May 19th and May 20th? 12:28:16
A As I previously stated, his interview 12:28:19
request came in end of April, early May. It was 12:28:23
converging at the same time of the two-year 12:28:27
anniversary, which we tried to schedule. However, 12:28:30
you know, he still was interested after the time had 12:28:32
passed to do an interview with the Mayor, which is 12:28:37
why we scheduled it after June 3rd -- or on June 12:28:41
3rd. 12:28:43
Q Okay. 12:28:45
MR. BEKESHA: Why don't we take a 12:29:06
ten-minute break. 12:29:08
MR. WORSEK: Sure. 12:29:10
MR. BEKESHA: We can go off the record. 12:29:13
Come back at 11:40 your time. 12:29:13
MR. WORSEK: Sure, that works. If -- 12:29:23
Nathan, can you read the time into the record, 12:29:27
please? 12:29:29
THE VIDEOGRAPHER: Oh, sorry. I was on 12:29:29
mute, sorry. Let me go back on real quick. Sorry 12:29:36
about that. Yeah, let me -- sorry about that. I 12:29:47
was on mute. We are off the record at 12:28. 12:29:48
(Whereupon, a recess was taken.) 12:29:53
THE VIDEOGRAPHER: We are back on the 12:43:28

record at 12:42. 12:43:56

MR. BEKESHA: I -- I'm hoping only 30 12:43:58
minutes more or so. So hopefully, you know, that 12:44:01
always depends, but that's my -- that's my rough 12:44:04
estimate. 12:44:07

MR. WORSEK: Yeah. 12:44:08

MR. BEKESHA: Are we all set? Okay, 12:44:13
great. 12:44:15

Q During that break, Ms. LeFurgy, did you 12:44:15
speak to anyone except for counsel in this case? 12:44:19

A No. 12:44:24

Q Did you review any documents during the 12:44:25
break? 12:44:29

A No. 12:44:31

Q How large is the communications office? 12:44:34
How many employees? 12:44:42

A I believe we're about 13. 12:44:44

Q Okay. And what are -- just generally, 12:44:50
what's the structure of the department? 12:44:58

A We're broken up into press, digital, and 12:45:02
speech writing. 12:45:09

Q And do you oversee all three departments? 12:45:11

A Yes. 12:45:15

Q And who do you report to? 12:45:17

A The Chief of Staff. 12:45:21
Q And who's the Chief of Staff? 12:45:26
A Sybil Madison. 12:45:27
Q Is it the same Chief of Staff as it was on May 19th and May 20th of 2021? 12:45:37 12:45:40
A No. 12:45:44
Q Who -- who was the Chief of Staff then? 12:45:46
A Maurice Classen. 12:45:48
Q How frequently do you communicate with the Mayor? 12:45:55 12:45:58
A On a daily basis. 12:45:59
Q Okay. Does anyone else in your office frequently communicate with the Mayor? 12:46:04 12:46:08
MR. WORSEK: Objection to form. 12:46:10
Q You may answer the question. 12:46:13
A Yes. 12:46:15
Q Who else in your office frequently communicates with the Mayor? 12:46:17 12:46:20
A Our press secretary. 12:46:23
Q Anyone else? 12:46:28
A No. 12:46:32
Q And what is --what is the role of a press secretary? 12:46:35 12:46:38
A They're the day-to-day media contact. 12:46:42

Q When journalists submit a request for an interview, who receives those requests? 12:46:52 12:46:55
A It depends how that request comes in. It could be a variety of people. 12:47:00 12:47:04
Q Okay. Who decides -- who is the ultimate decision-maker in deciding who's granted an interview? 12:47:06 12:47:10 12:47:16
A It can be a combination of individuals. Often times, we review the requests as a team. 12:47:17 12:47:22
Q Okay. And does one person have the final say in who grants an interview request? 12:47:28 12:47:33
A As I said, the decisions are made as a team. 12:47:39 12:47:44
Q And who's part of that team that makes the decisions? 12:47:45 12:47:48
A Oftentimes it's myself, my deputy director of communications, our press secretary, a subject matter expert who could be a part of that. 12:47:50 12:47:56 12:47:59
Q Okay. And who -- who made the decisions to grant the interviews on the occasion of the Mayor's second year anniversary? 12:48:03 12:48:09 12:48:16
A It was a group decision. 12:48:20
Q And the members of those group were the members you just identified? 12:48:26 12:48:30

A At the time it was a different set of people on our team. 12:48:33 12:48:36
Q Okay. Was there anybody outside of the communications team that made the decisions? 12:48:39 12:48:47
A Part of those decisions were made likely made in conjunction with our Chief of Staff as well. 12:48:50 12:48:57
Q And how were those -- did your communications teams have discussions with the Chief of Staff about the interview requests? 12:49:02 12:49:06 12:49:09
A Can you be more specific? 12:49:14
Q Sure. Did -- did the communications team communicate with the Chief of Staff about interviews that were being granted as part of the policy to exclusively provide one-on-one interviews with journalists of color? 12:49:19 12:49:24 12:49:27 12:49:31 12:49:34
A Yes. 12:49:37
Q When did those -- how many discussions took place? 12:49:38 12:49:42
A I -- I can't recall. Maybe one or two. 12:49:45
Q When did those discussions take place? 12:49:50
A Probably a week or two prior. 12:49:53
Q Prior to what? 12:50:01
A When they were scheduled. 12:50:02
Q And what were those conversations about? 12:50:08

A How many interviews she would give, the timing of them, the set up. 12:50:17 12:50:20
Q Did the Chief of Staff inform the communications department about how many interviews would be conducted? 12:50:24 12:50:26 12:50:31
A No. That was a decision based on the amount of time we were given, because we had a very limited amount of time with the Mayor. 12:50:35 12:50:39 12:50:41
Q Did -- during -- during those meetings did the Chief of Staff provide the communications department with times in which the Mayor was available to sit down with journalists of color? 12:50:45 12:50:47 12:50:50 12:50:53
A No. We received time from scheduling. 12:51:00
Q And when did you receive those times? 12:51:05
A I -- I can't recall. Likely a week -- a week probably prior. 12:51:07 12:51:13
Q And what time -- what was -- what times were provided to the communications department? 12:51:15 12:51:18
A We received a block of times for the 19th and a block of time for the 20th. 12:51:23 12:51:27
Q Did you receive any times outside of the 19th and 20th? 12:51:29 12:51:32
A For this specific set of interviews, no. 12:51:35
Q How come? 12:51:40

MR. WORSEK: Objection to form. 12:51:43
Q You may answer the question. 12:51:46
A Because this set of interviews was limited to time and subject matter, which was her two-year anniversary of the 20th, in addition to the Mayor is incredibly busy, and so we were given what we felt was an appropriate amount of time to balance her schedule. 12:51:49 12:51:52 12:51:56 12:51:59 12:52:03 12:52:06
Q Who decided that the interviews would be limited to the 19th and the 20th? 12:52:10 12:52:13
A On the 19th, those interviews were conducted so they'd be embargoed for the 20th, which was her actual two-year anniversary. So that is how that time was decided. 12:52:14 12:52:21 12:52:24 12:52:27
Q And who made that decision? 12:52:30
A We did, as a team. 12:52:33
Q Could interviews have been conducted on the 18th and been embargoed until the 20th? 12:52:36 12:52:41
A Again, the Mayor has an incredibly busy schedule, and this is the time we were given. 12:52:48 12:52:51
Q Did you ask the Mayor -- was the Mayor's scheduling office asked to provide times outside of May 19th and May 20th? 12:52:54 12:52:57 12:53:00
A I don't know. 12:53:04

Q Who -- who would know that information? 12:53:07
A I don't know. 12:53:10
Q Okay. 12:53:12
MR. BEKESHA: Let's pull up as the next exhibit, which I have identified as Notice. 12:53:28 12:53:29
THE TECHNICIAN: Please stand by. 12:53:35
MR. BEKESHA: Not that document. There should be another one just marked Notice, not a response to Notice. 12:53:57 12:54:02 12:54:08
THE TECHNICIAN: Okay. Sorry about that. Give me just one second. 12:54:10 12:54:13
MR. BEKESHA: No problem. 12:54:16
THE TECHNICIAN: There it is. Okay, we're all set. Sorry about that. 12:54:18 12:54:33
(Exhibit 5 was marked for identification and is attached to the transcript.) 12:54:35 12:54:35
Q Perfect. Ms. LeFurgy, do you recognize what's been marked as Plaintiff Exhibit 5? 12:54:37 12:54:43
A Yes. 12:54:47
Q And what is this? 12:54:49
A This is the Notice of Deposition. 12:54:51
Q Okay. Have you seen this document before? 12:54:55
A Yes. 12:55:00
Q Let's look at Paragraph 1. It states, the 12:55:05

policy to exclusively provide one-on-one interviews 12:55:19
with journalists of color, as outlined in 12:55:23
defendant's May 19, 2021, letter, including, but not 12:55:25
limited to, the development of the policy, the scope 12:55:30
of the policy, the duration of the policy, the 12:55:33
implementation of the policy, and the communication 12:55:36
of the policy to staff, journalists, and public. Do 12:55:39
you see that? 12:55:43
A Yes. 12:55:44
Q Did you prepare to testify today about the 12:55:46
scope of the policy? 12:55:49
A Yes. 12:55:52
Q How did you prepare to testify on that? 12:55:58
A I spoke with my lawyers. 12:56:02
Q Are you prepared -- are you prepared to 12:56:14
testify today to testify about the duration of the 12:56:16
policy? 12:56:20
A Yes. 12:56:23
Q And how did you prepare to testify about 12:56:26
that? 12:56:28
A I spoke with my lawyers. 12:56:29
Q Same question for the implementation of 12:56:35
the policy. Are you prepared to testify about that 12:56:38
today? 12:56:41

A Yes. 12:56:43
Q And how did you prepare to testify about that? 12:56:46 12:56:49
A I spoke with my lawyers. 12:56:51
Q What about the communication of the policy to staff, journalists, and the public? Were you prepared to testify that about today? 12:56:58 12:57:04 12:57:07
A Yes. 12:57:10
Q And how did you prepare to testify about that? 12:57:14 12:57:17
A I spoke with my lawyers. 12:57:19
Q Do you believe you have been adequately prepared -- do you believe you are -- you were adequately prepared to answer questions on those topics? 12:57:24 12:57:26 12:57:30 12:57:34
A Yes. 12:57:35
Q Is there anything that you wish you would have done in preparation to testify on those topics? 12:57:37 12:57:40
MR. WORSEK: Objection to form. 12:57:45
Q You may answer the question. 12:57:47
A No. 12:57:49
Q Do you think you should have spoken with the Mayor in preparation of your testimony today to answer questions on these topics? 12:57:51 12:58:03 12:58:08

MR. WORSEK: Objection to form. 12:58:11
Q You may answer the question. 12:58:12
A No. 12:58:15
Q Why not? 12:58:18
A This was in regards to the occasion of the two-year anniversary and a group of interviews we set up. I didn't think it was necessary. 12:58:20 12:58:35 12:58:39
Q Was it the Mayor's decision to provide exclusively one-on-one interviews to journalists of color? 12:58:44 12:58:47 12:58:51
A It was a decision -- 12:58:52
MR. WORSEK: Objection to form. You can answer. 12:58:58 12:58:59
A It was a decision that we made. 12:59:04
Q Who -- who is we? 12:59:07
A The Mayor and myself. 12:59:10
Q Was anybody else involved in making that decision? 12:59:21 12:59:23
A No. 12:59:25
Q When you made that decision, did you and the Mayor discuss the scope of the policy? 12:59:29 12:59:31
MR. WORSEK: Objection. The question goes to the issue of the development of the policy, and so I would instruct the witness not to answer for 12:59:38 12:59:42 12:59:45

the reasons previously stated. 12:59:49
Q Did you and the Mayor discuss the duration 12:59:53
of the policy? 12:59:56
MR. WORSEK: Same objection and same 12:59:58
instruction. 13:00:00
Q Did you and the Mayor discuss the 13:00:01
implementation of the policy? 13:00:04
MR. WORSEK: Same objection and same 13:00:06
instruction. 13:00:08
Q Did you and the Mayor discuss the 13:00:10
communication of the policy to staff, journalists, 13:00:11
and the public? 13:00:15
MR. WORSEK: Same objection. Same 13:00:16
instruction. 13:00:17
Q Let's go down to Number 2. Were you 13:00:19
prepared to testify today about the scope of the 13:00:28
Press Tour as Press Tour was identified in your 13:00:31
declarations? 13:00:35
A Yes. 13:00:38
Q And how did you prepare for testimony on 13:00:39
that subject? 13:00:42
A I spoke with my lawyers. 13:00:44
Q Okay. Were you prepared to testify today 13:00:47
about the duration of the Press Tour? 13:00:50

A Yes. 13:00:53
Q And how did you -- how did you prepare for that testimony? 13:00:56 13:00:59
A I spoke with my lawyers. 13:01:01
Q Okay. Were you prepared to testify about the implementation of the Press Tour? 13:01:04 13:01:09
A Yes. 13:01:13
Q And how -- how did you prepare for that testimony? 13:01:14 13:01:16
A I spoke with my lawyers. 13:01:18
Q Okay. And were you prepared to testify about the communication for the Press Tour to staff, journalists, and the public? 13:01:19 13:01:23 13:01:27
A Yes. 13:01:29
Q And how did you prepare for that testimony? 13:01:30 13:01:32
A I spoke with my lawyers. 13:01:33
Q Do you believe that you were adequately prepared to testify on those topics? 13:01:35 13:01:38
A Yes. 13:01:41
Q Do you believe you should have looked -- spoken to anybody -- any additional people about those topics in preparation for today? 13:01:43 13:01:46 13:01:50
A No. 13:01:54

Q Okay. Why? 13:01:55
A Again, this was related to the two-year 13:01:58
anniversary, with which this information is being 13:02:07
provided. I didn't think it was necessary. 13:02:10
Q I guess, what do you -- what do you mean 13:02:18
by that? 13:02:20
A I didn't think it was necessary to consult 13:02:22
anyone outside of my lawyers. 13:02:26
Q Turning to Number 3, were you prepared to 13:02:33
testify today about whether Defendant's policy to 13:02:40
exclusively provide one-on-one interviews with 13:02:45
journalists of color as outlined in the May 19, 13:02:48
2021, letter will be used in the future? 13:02:50
A Yes. 13:02:56
Q And how -- how did you prepare for that 13:02:57
testimony? 13:02:59
A I spoke with my lawyers. 13:03:01
Q Okay. Do you -- do you think you were 13:03:03
adequately prepared to testify on that topic? 13:03:05
A Yes. 13:03:09
Q And why do you think that? 13:03:10
A Again, as the information laid out here, I 13:03:12
feel as though that was adequate information. 13:03:19
Q Do -- do you think you should have spoken 13:03:30

to anyone else in preparation of your testimony on 13:03:33
Number 3? 13:03:37
A No. 13:03:38
Q Do you think it would be -- would have 13:03:41
been helpful to speak with the Mayor to find out 13:03:43
whether or not she intended to use her policy in the 13:03:47
future? 13:03:51
A No. 13:03:52
MR. WORSEK: Objection to form. Objection 13:03:54
to form, and objection in that it mischaracterizes 13:03:56
the topic. 13:03:59
Q Do you think it would have been helpful to 13:04:05
speak with the Mayor about whether the Mayor's 13:04:08
policy to exclusively provide one-on-one interviews 13:04:10
to journalists of color as outlined in the Mayor's 13:04:14
May 19, 2021, letter will be used in the future? 13:04:17
A No. 13:04:24
Q Why? 13:04:29
A As laid out in her May 19th letter, it 13:04:30
was on the occasion of the two-year anniversary, 13:04:38
which, again, refers to the timing and the subject 13:04:41
matter. 13:04:44
Q And when you spoke to the Mayor -- when 13:04:49
you and the Mayor decided on this policy, you 13:04:52

specifically discussed the timing and subject matter of the policy? 13:04:55 13:04:59
MR. WORSEK: Objection in that the question goes to the development of the policy, and I would instruct the witness not to answer for the reasons previously stated. 13:05:02 13:05:06 13:05:09 13:05:12
Q When the Mayor wrote her letter, was it her intention that the policy would only be implemented for a 24-hour period from May 19th to May 20th? 13:05:25 13:05:27 13:05:31 13:05:36
MR. WORSEK: Objection to form. 13:05:38
Q You may answer the question. 13:05:42
A Again, in the letter it states, on the occasion of, which again, refers to the subject matter and the timing of the interviews. 13:05:44 13:05:48 13:05:52
Q Where in the letter does -- does it state that on the occasion of refers to subject matter of the interviews? 13:06:09 13:06:12 13:06:16
A Again, I don't have the letter in front of me, but it says on the occasion of. I believe it says on the occasion of the two-year anniversary. 13:06:19 13:06:25 13:06:28
MR. BEKESHA: We can -- if you could pull up Exhibit 1 again, please. 13:06:32 13:06:34
THE TECHNICIAN: Please stand by. 13:06:37

Q The letter is now in front of you, if that helps you answer the question of where in the letter does it indicate that on the occasion of the two-year anniversary refers to the scope of the interviews? 13:06:53 13:06:56 13:07:00 13:07:03 13:07:09
A The first line reads, on the occasion of the two-year anniversary of my inauguration, which is May 20th; that is the two-year anniversary of her inauguration; that is May 20th. 13:07:11 13:07:14 13:07:17 13:07:22
Q Were -- were you in -- well, strike that. Are you aware that, I don't know, car dealerships provide specials around holiday weekends? 13:08:06 13:08:12 13:08:18
MR. WORSEK: Objection. Beyond the scope. 13:08:29
Q You can answer the question. 13:08:32
A I'm -- I'm vaguely familiar with that. 13:08:34
Q Okay. Have you seen commercials either on TV or in print that says, you know, Labor Day sale? 13:08:38 13:08:41
A I'm familiar with that. 13:08:52
Q Okay. Are you aware that sometimes those deals last for longer than Labor Day? 13:08:54 13:08:58
MR. WORSEK: Michael, I just want to make a standing objection for the record here. And just so I'm understanding correctly, you're asking the city's 30(B)(6) witness on the topics outlined in 13:09:03 13:09:08 13:09:11 13:09:15

your notice a series of questions about what car -- car dealerships do as part of their sales promotions? 13:09:17 13:09:21 13:09:24
MR. BEKESHA: Yes. 13:09:26
MR. WORSEK: Okay. 13:09:27
Q You can answer the -- answer the question. 13:09:32
A I'm not intimately familiar with -- with deals from car dealerships. 13:09:36 13:09:41
Q Okay. I guess my question -- my question is, in those instances where there are deals on the occasion of Labor Day, does that mean the car dealer -- is it your understanding that the car dealerships are only providing sales on that specific day and only related to labor? 13:09:43 13:09:50 13:09:55 13:09:58 13:10:02 13:10:06
A I've never purchased a car, so I -- I don't know the answer to that, of what car dealerships do or do not do. 13:10:09 13:10:15 13:10:17
Q Okay. Have you ever -- have you purchased anything related in which there were sales on the occasion of certain holidays? 13:10:20 13:10:22 13:10:27
A Possibly. 13:10:30
Q Okay. How long have you worked at the Mayor's office? 13:10:35 13:11:06
A Since February of -- excuse me. Since May 13:11:07

of 2020. 13:11:11
Q Okay. And who hired you at your job? 13:11:12
A The previous communications director. 13:11:19
Q Did you interview with the Mayor during that process? 13:11:24 13:11:26
A Yes. 13:11:29
Q How many times did you interview with her? 13:11:33
A Once. 13:11:36
Q When you communicated this policy to journalists and the public, were you concerned about what reaction you would receive to the policy? 13:12:01 13:12:04 13:12:09
A No. 13:12:14
Q When you were implementing the policy, did you think about whether or not the policy was constitutional? 13:12:17 13:12:20 13:12:23
MR. WORSEK: Objection to the extent it calls for a legal inclusion, and to the extent it goes into the subject matter of the development of the policy. And to that extent, I would instruct the witness not to answer. 13:12:25 13:12:28 13:12:32 13:12:35 13:12:38
MR. BEKESHA: Why don't we take a five-minute break. Let me check my notes, and then we should be able to wrap up. 13:12:39 13:12:43 13:12:46
MR. WORSEK: Okay. 13:12:49

THE VIDEOGRAPHER: We are off -- 13:12:52
MR. WORSEK: Sorry. Go ahead. 13:12:56
THE VIDEOGRAPHER: We are off the record at 1:11. 13:12:56 13:12:56
(Whereupon, a recess was taken.) 13:12:58
THE VIDEOGRAPHER: We are back on the record at 1:22. 13:23:23 13:23:24
Q Besides Counsel, did you speak with anyone during that break, Ms. LeFurgy? 13:23:26 13:23:32
A No. 13:23:34
Q Did you review any documents during that break? 13:23:35 13:23:38
A No. 13:23:39
Q Is there any additional testimony that you would like to add that we didn't cover today? 13:23:40 13:23:44
A No. 13:23:48
Q Okay. I have no further questions at this time. 13:23:51 13:23:54
MR. WORSEK: We have no questions, but we will reserve signature. 13:23:56 13:23:58
MR. BEKESHA: Okay. We are -- we are all set. 13:24:06 13:24:07
THE VIDEOGRAPHER: We are off the record at 1:22. 13:24:08 13:24:09

(Off the record at 1:22 p.m.) 13:24:11

ACKNOWLEDGMENT OF DEPONENT 13:24:11

I, KATHLEEN LEFURGY, do hereby acknowledge 10:34:13
that I have read and examined the foregoing 10:35:08
testimony, and the same is a true, correct and 10:35:13
complete transcription of the testimony given by me 10:35:20
and any corrections appear on the attached Errata 10:35:25
sheet signed by me. 10:35:31

10:35:34

10:35:34

-------------- -------------------- 10:35:34

(DATE) (SIGNATURE) 10:35:34

CERTIFICATE OF REPORTER - NOTARY PUBLIC 13:24:11
I, Jacalyn Mann, the officer before whom 13:24:11
the foregoing deposition was taken, do hereby 13:24:11
certify that the foregoing transcript is a true and 13:24:11
correct record of the testimony given; that said 13:24:11
testimony was taken by me and thereafter reduced to 13:24:11
typewriting under my direction; that reading and 13:24:11
signing was requested; and that I am neither counsel 13:24:11
for, related to, nor employed by any of the parties 13:24:11
to this case and have no interest, financial or 13:24:11
otherwise, in its outcome. 13:24:11
IN WITNESS WHEREOF, I have hereunto set my 13:24:11
hand and affixed my notarial seal this 18th day of 13:24:11
OCTOBER, 2021. 13:24:11
My Commission Expires: December 22, 2024. 13:24:11



**A**

**ability**
50:9, 58:15
**able**
26:19, 35:16, 69:2, 90:23
**about**
7:23, 8:13, 14:7, 16:10, 18:7, 18:11, 18:16, 21:12, 22:19, 23:20, 23:22, 23:23, 23:24, 24:1, 24:4, 24:11, 26:12, 27:16, 28:3, 28:20, 30:8, 30:10, 30:15, 30:24, 31:5, 31:6, 31:13, 31:22, 32:11, 32:16, 36:3, 36:6, 38:21, 39:1, 41:12, 41:18, 42:8, 42:12, 42:18, 42:19, 43:1, 43:8, 43:18, 45:19, 46:2, 46:18, 47:3, 48:1, 48:19, 52:5, 53:22, 54:2, 54:7, 54:11, 55:8, 57:19, 58:24, 59:13, 60:13, 62:11, 62:21, 64:1, 64:16, 64:22, 67:11, 67:20, 68:4, 68:12, 68:15, 69:13, 69:15, 72:21, 73:17, 76:9, 76:12, 76:24, 77:4, 79:10, 79:14, 80:10, 80:16, 80:19, 80:23, 81:2, 81:5, 81:7, 81:9, 83:16, 83:24, 84:5, 84:12, 84:22, 85:10, 86:13, 89:1, 90:10, 90:14
**absolutely**
57:20, 57:21, 59:2, 59:16, 59:17
**accommodate**
69:3
**accomplished**
16:11
**account**
27:22, 27:23, 28:23, 29:2, 29:4, 29:14, 29:19
**accurate**
52:2, 53:19, 58:21, 68:14
**acknowledge**
7:6, 7:16, 93:2
**acknowledgment**
93:1
**act**
66:14, 66:21
**actual**
68:12, 78:13
**actually**
26:7, 55:20, 70:13, 71:21
**add**
59:5, 91:15
**addition**
78:5
**additional**
84:22, 91:14
**address**
45:18
**addressed**
26:9
**adequate**
85:23
**adequately**
81:12, 81:14, 84:18, 85:19
**admissibility**
7:8
**advance**
19:24
**affairs**
67:14
**affixed**
94:13
**after**
23:5, 23:7, 24:17, 27:5, 52:8, 53:21, 54:1, 72:6, 72:8
**again**
12:16, 12:20, 12:23, 14:10, 16:19, 17:7, 18:9, 21:1, 23:13, 26:3, 26:6, 26:15, 31:10, 31:17, 32:3, 32:19, 33:3, 33:9, 35:13, 40:10, 40:11, 41:3, 41:8, 42:6, 43:12, 43:16, 44:8, 45:17, 49:21, 54:3, 57:21, 59:17, 60:6, 62:19, 62:22, 63:4, 63:6, 63:11, 69:21, 78:19, 85:2, 85:22, 86:21, 87:13, 87:14, 87:19, 87:23
**ago**
51:17
**agree**
23:1, 48:22
**agreed**
21:24, 22:1, 22:4, 53:10
**agreement**
2:8
**ahead**
38:22, 91:2
**al**
1:5, 3:4, 4:4, 6:7, 6:12
**all**
6:18, 7:20, 9:10, 11:13, 14:9, 19:12, 21:1, 23:19, 26:1, 30:24, 42:3, 44:23, 45:2, 45:15, 45:21, 51:22, 55:8, 57:18, 61:4, 62:6, 73:7, 73:22, 79:14, 91:21
**already**
8:13
**also**
4:12, 8:18, 8:21, 9:6, 11:8, 20:15, 47:7, 49:16
**always**
18:15, 19:24, 61:18, 73:4
**amount**
26:15, 26:18, 69:11, 77:7, 77:8, 78:7
**andrew**
3:14
**anniversary**
14:7, 15:7, 16:11, 18:11, 25:7, 25:20, 25:23, 30:23, 31:1, 31:12, 32:9, 35:8, 39:20, 40:5, 40:9, 40:24, 41:7, 41:19, 42:4, 42:12, 42:14, 42:19,

42:20, 43:15, 45:20, 53:23, 54:7, 54:11, 54:14, 54:19, 55:5, 55:7, 55:9, 66:3, 67:21, 68:3, 68:7, 68:10, 68:18, 69:8, 69:9, 69:18, 71:4, 71:8, 72:5, 75:21, 78:5, 78:13, 82:6, 85:3, 86:20, 87:21, 88:4, 88:7, 88:8
**another**
9:10, 29:8, 29:13, 61:5, 79:8
**answer**
10:8, 11:15, 11:18, 11:22, 12:22, 13:5, 15:19, 16:18, 18:3, 19:3, 19:22, 20:7, 20:19, 20:21, 20:23, 21:15, 22:12, 27:1, 29:1, 29:11, 29:16, 30:13, 31:9, 31:16, 32:2, 33:8, 33:10, 36:9, 37:7, 38:2, 38:9, 39:9, 39:15, 40:19, 41:2, 41:20, 42:16, 42:22, 44:1, 44:7, 47:1, 47:8, 47:10, 47:20, 48:8, 49:6, 49:19, 49:20, 51:20, 53:3, 55:11, 55:15, 55:18, 56:18, 57:23, 59:19, 60:3, 60:20, 61:2, 61:10, 62:1, 62:9, 62:13, 62:18, 62:24, 63:10, 63:19, 64:12, 64:23, 64:24, 67:24, 69:20, 70:4, 71:12, 74:15, 78:2, 81:14, 81:20, 81:24, 82:2, 82:13, 82:24, 87:5, 87:12, 88:2, 88:14, 89:6, 89:16, 90:20
**answered**
31:23, 32:18, 42:2, 62:10
**answers**
64:19
**any**
8:22, 9:4, 14:18, 15:15, 16:1, 18:9, 22:15, 31:2, 31:3, 32:6, 32:12, 33:18, 38:22, 46:5, 53:14, 56:1, 56:7, 56:9, 56:12, 73:12, 77:21, 84:22, 91:11, 91:14, 93:6, 94:9
**anybody**
14:15, 65:2, 76:3, 82:17, 84:22
**anyone**
18:12, 26:9, 33:16, 34:24, 60:16, 73:10, 74:12, 74:20, 85:8, 86:1, 91:8
**anything**
8:24, 11:7, 18:8, 28:14, 28:19, 33:23, 34:2, 81:17, 89:19
**apparent**
58:20
**appear**
93:6
**application**
24:12
**apply**
69:5
**appropriate**
18:12, 78:7
**april**
67:10, 68:2, 68:20, 72:3
**argue**
48:19
**arguing**
24:4
**arguments**
11:2
**around**
18:9, 39:19, 68:2, 68:3, 69:7, 88:12
**asked**
30:8, 30:15, 31:3, 31:7, 31:14, 31:22, 32:12, 32:17, 32:21, 33:5, 33:7, 33:11, 41:5, 41:17, 42:8, 47:12, 47:13, 48:15, 51:17, 54:2, 57:19, 60:5, 62:10, 62:11, 63:7, 63:24, 64:16, 64:19, 67:9, 68:4, 78:22
**asking**
9:3, 23:10, 23:22, 23:24, 24:10, 30:22, 33:2, 33:6, 41:11, 52:10, 63:13, 63:14, 64:20, 71:7, 88:23
**associated**
29:14
**associations**
16:22, 17:14, 17:15
**attached**
5:11, 9:23, 50:5, 50:20, 58:11, 65:9, 79:16, 93:6
**attachments**
50:19
**attending**
6:18
**attorney-client**
47:9, 47:14, 49:18
**attorneys**
8:5, 46:17, 46:22
**audience**
17:7
**august**
66:4, 70:10
**authorized**
10:18, 11:14, 23:14, 64:22
**authorizing**
10:19
**availability**
43:17
**available**
27:21, 77:12
**aware**
11:19, 11:23, 21:9, 22:23, 45:24, 46:16, 47:23, 56:23, 57:3, 57:14, 57:18, 66:19, 66:22, 88:11, 88:19

**B**

**b)(6**
10:16, 10:21,

64:14, 88:24
**back**
11:7, 16:24, 34:6, 34:20, 34:22, 36:20, 38:4, 38:6, 39:23, 44:24, 45:7, 55:17, 55:18, 67:4, 67:9, 68:2, 72:15, 72:20, 72:24, 91:6
**background**
38:24, 65:23
**balance**
78:7
**ball**
56:20
**based**
7:9, 13:8, 15:13, 35:6, 35:13, 43:22, 50:17, 77:6
**basic**
68:13
**basis**
74:11
**became**
27:5
**because**
17:22, 36:15, 69:10, 77:7, 78:3
**been**
6:3, 32:22, 43:18, 53:14, 54:2, 56:1, 56:6, 56:9, 66:9, 68:4, 78:17, 78:18, 79:18, 81:12, 86:5, 86:12
**before**
2:8, 8:11, 9:5, 9:7, 23:5, 23:6, 35:10, 37:10, 51:24, 55:21, 79:22, 94:2
**began**
25:2
**begin**
8:11
**beginning**
51:11
**begins**
6:8
**behalf**
3:3, 3:13, 4:3, 29:3, 40:20, 66:14
**being**
10:17, 17:21, 20:2, 25:18, 27:14, 38:15, 67:16, 76:13, 85:3
**bekesha**
3:5, 5:4, 6:21, 7:12, 8:1, 8:3, 8:5, 23:19, 24:16, 34:5, 34:17, 39:22, 44:19, 45:3, 45:8, 47:12, 47:19, 47:22, 49:1, 50:1, 50:11, 50:12, 50:22, 57:6, 57:8, 57:11, 59:2, 59:10, 59:22, 65:4, 65:7, 65:10, 66:12, 72:11, 72:14, 73:2, 73:7, 79:4, 79:7, 79:12, 87:22, 89:4, 90:21, 91:21
**believe**
14:11, 27:5, 29:17, 30:15, 39:17, 41:21, 41:22, 45:19, 46:11, 49:12, 67:2, 67:10, 68:1, 69:12, 73:17, 81:12, 81:13, 84:18, 84:21, 87:20
**believes**
20:9
**besides**
9:1, 28:15, 30:3, 34:24, 91:8
**best**
58:15
**between**
48:14, 48:16
**beyond**
23:13, 88:13
**big**
15:8
**bit**
8:14
**blankenberg**
3:6
**block**
77:19, 77:20
**both**
12:7, 12:17, 13:9, 19:4, 26:6, 40:7
**bounds**
10:17
**break**
34:6, 34:23, 72:12, 73:9, 73:13, 90:22, 91:9, 91:12
**brief**
33:24, 38:17, 71:21
**briefs**
33:24
**broad**
31:11
**broken**
73:20
**busy**
26:17, 78:6, 78:19
**C**
**calendar**
70:19
**call**
47:8, 49:17
**called**
53:4
**calls**
20:5, 44:5, 46:23, 60:1, 90:17
**came**
23:23, 23:24, 25:5, 68:1, 72:3
**can't**
8:24, 14:3, 20:8, 25:17, 27:18, 28:16, 28:18, 32:14, 35:18, 41:3, 43:12, 44:13, 48:9, 56:19, 60:4, 61:11, 62:2, 62:20, 63:11, 63:20, 67:2, 69:21, 76:19, 77:15
**cannot**
33:4, 33:9, 33:10
**cantenacci**
4:3
**capacity**
1:10, 6:11, 6:13
**car**
88:11, 89:1, 89:2, 89:8, 89:11, 89:12, 89:15, 89:16
**career**
15:8
**carrick**
4:14
**case**
6:14, 8:6, 10:18, 47:15, 48:2, 66:10, 73:10, 94:10
**catch**
55:15

**catenacci**
1:5, 3:3, 6:7, 6:12
**cavanaugh**
3:16
**cease**
20:2
**ceased**
20:11
**celebratory**
15:8
**certain**
14:3, 67:2, 89:20
**certificate**
94:1
**certify**
94:4
**challenge**
11:1, 11:12, 22:11, 23:12, 37:6, 49:5, 51:19
**chance**
45:21
**channels**
27:13
**characterization**
48:23
**characterizing**
48:16
**charge**
21:17
**check**
90:22
**chicago**
1:11, 3:17, 3:21, 6:11, 6:14, 66:5, 70:10
**chicago's**
29:7, 32:11
**chief**
74:1, 74:2, 74:4, 74:7, 76:6, 76:8, 76:12, 77:3, 77:10
**choose**
15:12, 17:2
**chosen**
13:7, 13:8
**christine**
4:5, 6:22
**circumstances**
47:17
**city**
1:10, 3:17, 6:11, 6:13, 30:1, 40:20
**city's**
88:24
**clarify**
57:5
**classen**
74:8
**clear**
25:18, 43:18, 66:10, 67:19
**clearer**
8:20
**clearly**
23:11
**clock**
34:14
**color**
9:16, 12:1, 18:20, 24:19, 25:12, 36:14, 37:23, 39:6, 39:19, 61:7, 61:22, 63:4, 63:17, 64:3, 64:8, 76:15, 77:12, 80:2, 82:10, 85:12, 86:15
**combination**
75:8
**come**
34:6, 39:11, 72:15, 77:24
**comes**
75:3
**commercial**
3:18
**commercials**
88:16
**commission**
94:15
**communicate**
27:10, 27:11, 27:12, 28:3, 28:6, 28:10, 43:16, 74:9, 74:13, 76:12
**communicated**
24:19, 24:22, 25:3, 26:22, 27:3, 27:6, 30:4, 90:9
**communicates**
28:8, 74:18
**communicating**
43:1, 43:7
**communication**
66:18, 80:6, 81:5, 83:11, 84:12
**communications**
21:21, 29:4, 35:24, 36:5, 36:11, 38:11, 38:13, 48:16, 48:18, 48:24, 49:18, 54:10, 61:5, 61:12, 61:15, 61:16, 61:20, 61:22, 62:3, 65:20, 66:13, 66:19, 68:8, 70:1, 73:15, 75:17, 76:4, 76:8, 76:11, 77:4, 77:10, 77:18, 90:3
**compel**
24:7
**complaint**
10:15, 55:23, 56:2, 56:10
**complete**
93:5
**completely**
30:2
**computer**
7:21
**concerned**
90:10
**conduct**
26:19
**conducted**
1:16, 2:1, 35:5, 49:15, 51:10, 51:15, 77:5, 78:12, 78:17
**conference**
26:8, 30:7, 30:11, 31:2, 31:4, 32:7, 45:11, 45:15
**conflicts**
69:1
**conjunction**
49:9, 51:5, 76:6
**consider**
42:13
**constitutes**
50:18
**constitutional**
3:18, 90:15
**consult**
85:7
**contact**
74:24
**contained**
55:4
**content**
11:3, 14:3, 21:12, 48:23
**contents**
41:9
**context**
32:23, 33:1
**continue**
24:2, 44:19, 45:1
**continued**
4:1

**control**
50:10, 65:11
**converging**
72:4
**conversation**
22:3, 23:1, 25:17
**conversations**
25:19, 47:5, 76:24
**corps**
13:9, 15:2, 17:4
**correct**
16:6, 16:7, 25:24, 50:22, 52:6, 54:21, 67:22, 68:24, 93:4, 94:5
**corrections**
93:6
**correctly**
28:12, 71:19, 88:23
**couched**
33:1
**could**
7:23, 8:6, 18:7, 32:9, 32:22, 39:22, 40:1, 47:17, 50:6, 54:2, 55:14, 55:16, 58:12, 59:6, 59:11, 75:4, 75:18, 78:17, 87:22
**counsel**
6:6, 6:19, 7:3, 7:7, 8:12, 34:24, 44:24, 46:16, 47:3, 47:24, 48:1, 48:5, 73:10, 91:8, 94:8
**counsel's**
46:21
**couple**
24:24, 25:1, 33:24, 35:18
**course**
47:24, 48:17
**court**
1:1, 6:24, 7:3, 7:14, 7:19, 8:2, 8:23, 8:24, 9:8, 10:18, 24:5, 24:6, 33:22, 55:18, 65:6, 67:19
**court's**
10:19
**cover**
91:15
**covered**
47:18
**covid**
31:6, 31:14, 31:22
**craig**
66:3, 67:11, 68:9
**created**
68:12
**criteria**
16:9, 17:10, 69:4
**curious**
58:15

**D**

**daily**
74:11
**date**
6:15, 25:22, 40:7, 40:9, 54:1, 57:9, 67:13, 71:1, 93:11
**day**
19:23, 26:2, 26:8, 30:8, 35:10, 43:17, 67:14, 67:15, 69:15, 70:8, 88:17, 88:20, 89:11, 89:13, 94:13
**day-to-day**
74:24
**days**
24:24, 25:1, 35:10, 35:19, 42:5
**dealer**
89:11
**dealerships**
88:11, 89:2, 89:8, 89:12, 89:17
**deals**
88:20, 89:8, 89:10
**dealt**
33:7
**december**
94:15
**decide**
12:10, 14:21, 14:24, 16:15, 24:6
**decided**
19:16, 24:17, 35:4, 35:11, 37:2, 37:9, 49:2, 51:14, 78:9, 78:14, 86:24
**decides**
75:5
**deciding**
75:6
**decision**
53:14, 75:22, 77:6, 78:15, 82:8, 82:11, 82:14, 82:18, 82:20
**decision-maker**
75:6
**decisions**
75:12, 75:15, 75:19, 76:4, 76:5
**declaration**
5:14, 49:14, 50:2, 50:19, 50:20, 51:4, 55:22
**declarations**
49:8, 49:11, 83:18
**dedicated**
70:19
**defendant**
1:12, 3:13, 48:4
**defendant's**
10:23, 80:3, 85:10
**defendants's**
10:22
**defender**
66:5, 70:11, 70:15
**dellimore**
66:3, 67:6, 67:8, 68:10, 68:16, 68:19, 69:6, 71:17, 71:20
**dellimore's**
71:23
**department**
3:17, 36:4, 61:5, 61:16, 61:17, 61:20, 61:22, 62:4, 68:8, 73:19, 77:4, 77:11, 77:18
**departments**
73:22
**depends**
73:4, 75:3
**deponent**
93:1
**depos**
4:13, 4:14, 6:18, 7:1
**deposition**
1:15, 2:1, 5:12, 5:17, 6:9, 8:14, 10:21,

11:6, 21:10, 33:14, 64:15, 64:22, 79:21, 94:3
**deputy**
75:16
**derivation**
66:10
**describe**
36:19, 36:24, 38:5, 38:6, 38:11
**described**
37:3, 37:10
**description**
60:7, 68:11, 68:14
**designee**
6:10
**determined**
52:16
**developed**
24:2
**development**
10:13, 11:3, 20:17, 22:11, 23:12, 23:22, 24:13, 37:6, 43:24, 49:5, 51:18, 80:4, 82:23, 87:4, 90:18
**dictate**
18:13, 32:4, 33:3, 33:9, 42:7, 54:3
**died**
55:16
**different**
76:1
**difficult**
9:9, 58:13
**digital**
73:20
**direction**
94:7
**directly**
70:12
**director**
75:16, 90:3
**disagree**
24:9, 47:16
**disc**
6:8
**disclosure**
49:17
**discovery**
10:17, 10:20, 11:10, 11:11, 11:14, 23:14
**discuss**
82:21, 83:2, 83:6, 83:10
**discussed**
10:14, 22:5, 30:9, 43:18, 87:1
**discussing**
63:21
**discussions**
76:8, 76:17, 76:20
**dismiss**
10:23, 10:24
**district**
1:1, 1:2
**division**
1:3, 3:19
**document**
10:3, 50:7, 50:16, 51:2, 58:19, 59:7, 65:9, 65:11, 65:15, 65:17, 66:9, 66:11, 66:17, 66:20, 66:24, 79:7, 79:22
**documents**
33:18, 33:21, 48:21, 66:22, 73:12, 91:11
**doing**
64:18
**done**
9:3, 9:5, 9:6, 17:16, 17:17, 45:4, 50:8, 60:6, 81:18
**down**
7:20, 9:9, 22:10, 56:23, 57:14, 59:23, 77:12, 83:15
**drew**
9:3, 57:12
**drive**
4:7
**dropped**
44:17
**duly**
6:3
**duration**
11:1, 11:11, 12:7, 18:20, 35:8, 80:5, 80:16, 83:2, 83:24
**during**
12:18, 22:14, 22:24, 23:1, 25:10, 25:15, 26:14, 30:11, 31:5, 31:14, 31:23, 32:12, 32:17, 34:23, 37:17, 39:13, 41:15, 45:10, 45:14, 45:15, 46:9, 46:23, 52:10, 57:18, 73:9, 73:12, 77:9, 90:4, 91:9, 91:11

**E**

**e-mail**
13:24, 14:3, 14:5, 28:23
**e-mails**
14:1
**each**
16:15
**earlier**
18:17, 20:17, 35:2, 43:23, 52:4, 71:6
**early**
68:2, 68:20, 72:3
**ease**
9:18
**easier**
9:8
**eastern**
1:3
**either**
25:18, 28:22, 59:9, 88:16
**else**
18:13, 28:14, 30:3, 33:16, 33:23, 34:2, 65:2, 74:12, 74:17, 74:20, 82:17, 86:1
**embargoed**
19:9, 26:5, 40:13, 78:12, 78:18
**employed**
94:9
**employees**
73:16
**end**
19:17, 19:18, 20:1, 20:9, 21:2, 35:3, 55:16, 67:10, 68:20, 72:3
**ended**
19:13, 35:3, 68:22
**entirety**
51:9
**entitled**
9:20, 65:5
**erie**
4:7
**errata**
93:6
**esquire**
3:5, 3:6, 3:14,

3:15, 3:16, 4:5
**estimate**
73:5
**et**
1:5, 3:4, 4:4, 6:7, 6:12
**evaluate**
16:1
**even**
32:8
**event**
63:21
**events**
24:11, 53:16, 67:11
**ever**
89:18
**every**
25:17, 32:24, 46:14, 46:15
**everyone**
34:7, 44:17
**everything**
9:8
**evidence**
12:13
**exact**
70:5, 71:1
**exactly**
35:18, 43:12
**examination**
5:2, 6:6
**examined**
93:3
**example**
18:10
**except**
73:10
**exclusive**
38:3
**exclusively**
9:15, 11:24, 12:24, 13:2, 18:19, 24:18, 25:11, 30:16, 36:13, 37:22, 39:5, 39:18, 61:6, 61:21, 63:3, 63:16, 64:2, 64:7, 76:14, 80:1, 82:9, 85:11, 86:14
**excuse**
13:11, 19:14, 31:11, 44:16, 89:24
**exhibit**
5:12, 5:13, 5:14, 5:15, 5:16, 5:17, 9:19, 9:22, 39:22, 50:2, 50:4, 50:18, 58:6, 58:10, 59:22, 65:5, 65:8, 79:5, 79:15, 79:18, 87:23
**existence**
46:23
**expert**
75:18
**expires**
94:15
**explain**
18:4, 70:2
**explained**
69:24
**expressly**
10:20
**extent**
20:16, 49:17, 90:16, 90:17, 90:19
**extra**
71:18

**F**

**face**
59:7
**fact**
7:10, 30:16
**factors**
16:1, 16:19, 17:5, 17:6, 17:11
**facts**
12:13
**falls**
20:20
**familiar**
9:13, 10:3, 16:22, 58:1, 88:15, 88:18, 89:7
**far**
50:17, 59:6
**february**
89:24
**feel**
85:23
**felt**
78:7
**few**
8:12, 51:17
**fifth**
64:16
**filed**
55:23
**filing**
56:1, 56:9
**filled**
25:6
**final**
59:6, 75:10
**finally**
9:2
**financial**
94:10
**find**
86:5
**fine**
24:3
**finished**
18:23
**first**
6:3, 7:24, 17:3, 24:22, 27:3, 28:9, 40:4, 43:19, 49:14, 50:8, 51:9, 70:13, 88:6
**five-minute**
34:6, 90:22
**flexibility**
69:2
**florida**
2:9
**focused**
68:7
**foia**
66:23
**folks**
15:9, 16:21
**follow**
62:15, 70:11
**follow-up**
66:4, 70:9, 70:17
**follow-ups**
25:10
**followed**
25:6
**follows**
6:5
**foregoing**
93:3, 94:3, 94:4
**foremost**
17:4
**form**
10:7, 12:21, 13:4, 15:18, 16:17, 18:2, 19:2, 19:21, 20:5, 20:15, 21:14, 26:24, 28:24, 29:10, 29:15, 30:12, 31:8, 31:15, 32:1, 36:8, 38:1, 38:8, 39:8, 39:14, 40:18, 41:1, 42:1, 42:15, 42:21, 44:6, 46:20, 46:24, 47:7, 48:7, 49:16, 53:2, 53:24, 54:15,

55:10, 56:17, 57:22, 58:14, 59:18, 60:1, 60:19, 61:1, 61:9, 61:24, 62:8, 62:17, 62:23, 63:5, 63:18, 64:11, 67:23, 69:19, 70:3, 71:11, 74:14, 78:1, 81:19, 82:1, 82:12, 86:9, 86:10, 87:11
**formally**
7:4
**forth**
11:4, 25:13, 53:13
**forward**
16:12
**forward-looking**
60:8
**foundation**
58:19, 59:1, 66:8
**fourth**
62:11, 64:15
**frame**
19:5, 45:22
**free**
20:21, 49:20
**freedom**
66:14, 66:21
**frequently**
74:9, 74:13, 74:17
**front**
31:10, 31:17, 39:16, 45:17, 57:24, 58:3, 87:19, 88:1
**full**
8:7, 55:15
**further**
91:17
**future**
56:3, 56:13, 56:16, 56:21, 63:17, 64:3, 64:8, 85:13, 86:7, 86:16

**G**

**gave**
54:1
**generally**
73:18
**generic**
69:14
**gestures**
8:23
**getting**
64:21
**give**
7:22, 9:5, 36:20, 50:10, 65:10, 65:24, 77:1, 79:11
**given**
26:15, 26:18, 26:20, 35:14, 35:15, 35:16, 46:15, 49:24, 69:10, 77:7, 78:6, 78:20, 93:5, 94:5
**gives**
38:23
**giving**
38:3
**go**
7:22, 8:11, 8:14, 20:16, 23:11, 24:5, 24:9, 24:13, 34:17, 45:3, 55:21, 70:19, 72:14, 72:20, 83:15, 91:2
**goes**
37:5, 49:4, 51:18, 82:22, 87:4, 90:18
**going**
7:20, 9:3, 10:12, 11:2, 16:24, 17:20, 18:24, 22:10, 22:20, 22:24, 23:2, 36:20, 43:24, 47:8, 54:6, 58:18, 65:24, 67:4, 67:10, 67:20, 69:16
**good**
8:4
**gotten**
64:19
**grant**
75:20
**granted**
75:6, 76:13
**granting**
53:15
**grants**
75:11
**great**
7:14, 8:1, 9:12, 24:16, 34:22, 45:9, 50:13, 50:14, 65:12, 73:8
**ground**
8:12
**grounds**
37:5
**group**
75:22, 75:23, 82:6
**guess**
54:17, 85:5, 89:9
**guidance**
22:15

**H**

**hand**
7:15, 7:20, 94:13
**handle**
29:6, 29:8
**happen**
25:15
**happened**
69:12
**happy**
8:17
**head**
8:22, 62:3, 66:18
**hear**
8:16, 11:6
**heard**
44:22
**held**
19:9
**help**
59:12
**helpful**
58:2, 86:5, 86:12
**helps**
58:17, 88:2
**hendricks**
3:15
**here**
6:8, 20:22, 23:11, 24:4, 48:14, 66:8, 85:22, 88:22
**hereby**
7:16, 93:2, 94:3
**hereunto**
94:12
**hired**
90:2
**hold**
8:2
**holiday**
88:12
**holidays**
89:20
**homicide**
32:12, 32:16
**hopefully**
8:13, 73:3
**hoping**
73:2
**host**
44:24

**hour**
49:3, 49:14, 51:10, 51:15, 87:9
**however**
18:11, 18:14, 20:9, 33:4, 42:6, 45:18, 69:9, 70:6, 72:5
**hypothetical**
62:19, 63:6
**hypotheticals**
56:19, 62:14, 63:12, 63:14

**I**

**idea**
37:15, 37:17
**identification**
9:22, 50:4, 58:10, 65:8, 79:15
**identified**
36:23, 75:24, 79:5, 83:17
**identify**
6:19, 17:12, 39:12, 40:1, 43:8, 45:10, 45:12, 46:22, 48:5
**il**
4:8
**illinois**
1:2, 3:21
**imagine**
26:16, 29:24
**implement**
12:5, 12:11, 12:14, 12:19, 21:22, 22:16, 22:20, 36:22, 61:8, 61:20, 61:22
**implementation**
21:18, 23:20, 24:10, 24:14, 36:6, 80:6, 80:22, 83:7, 84:6
**implemented**
12:7, 43:4, 62:22, 87:9
**implementing**
24:1, 90:13
**important**
8:21, 9:2
**improper**
23:17
**inaccurate**
70:2
**inartful**
68:11
**inauguration**
40:6, 88:7, 88:9
**inc**
3:7
**include**
32:9, 32:10, 44:13, 49:13, 49:14
**including**
27:13, 33:22, 80:3
**inclusion**
90:17
**incorrectly**
71:23
**incredibly**
26:17, 52:20, 78:6, 78:19
**indicate**
59:8, 88:3
**individual**
13:17, 13:18, 38:24
**individuals**
13:9, 13:12, 15:2, 15:11, 15:12, 16:20, 39:2, 75:8
**inform**
17:20, 17:24, 22:19, 26:13, 36:11, 38:13, 77:3
**informal**
44:9, 52:21
**information**
14:13, 14:16, 27:20, 29:23, 31:20, 35:21, 38:18, 38:20, 39:1, 48:11, 66:14, 66:21, 68:13, 79:1, 85:3, 85:22, 85:23
**inquiries**
66:4, 70:10, 70:17, 70:18
**inquiry**
16:2
**insofar**
58:19
**instances**
89:10
**instead**
7:5, 24:4
**instruct**
11:15, 11:18, 11:22, 22:12, 37:7, 44:1, 47:10, 49:6, 51:19, 82:24, 87:5, 90:19
**instructed**
20:18, 21:22, 47:19
**instruction**
22:18, 22:22, 23:4, 23:10, 37:13, 37:20, 61:8, 83:5, 83:9, 83:14
**integrity**
32:3
**intend**
63:2, 63:8, 63:15
**intended**
86:6
**intends**
63:14, 64:1, 64:6
**intention**
87:8
**intentions**
64:10
**intents**
19:12, 21:2
**interest**
94:10
**interested**
72:6
**interim**
13:21
**internal**
44:9
**internet**
44:18
**interpretation**
41:4
**interview**
5:15, 13:10, 13:11, 14:6, 16:5, 18:1, 18:10, 19:17, 19:19, 20:1, 20:10, 31:23, 32:7, 32:12, 33:13, 35:3, 35:5, 35:12, 38:22, 38:24, 39:2, 46:15, 49:23, 52:10, 53:5, 53:6, 56:24, 57:15, 57:19, 58:8, 58:16, 59:13, 60:14, 60:18, 60:24, 66:2, 67:5, 67:6, 67:7, 67:11, 67:12, 67:20, 68:5, 68:6, 68:9, 68:12, 68:15, 68:16, 68:17, 68:20, 69:6, 69:11, 69:14, 69:16, 70:16, 71:3,

71:7, 71:16, 71:24, 72:2, 72:7, 75:2, 75:7, 75:11, 76:9, 90:4, 90:7
**interviewed**
13:14, 70:14
**interviewing**
39:3, 68:22
**intimately**
89:7
**involved**
82:17
**issue**
10:12, 10:15, 11:7, 18:15, 20:16, 22:10, 23:13, 23:15, 23:16, 37:5, 49:4, 82:23
**itself**
11:9, 50:19

**J**

**jacalyn**
1:22, 2:8, 94:2
**jackie**
7:1
**job**
1:20, 90:2
**john**
3:15
**journalist**
42:11, 52:13
**journalistic**
32:3
**journalists**
9:16, 12:1, 13:13, 14:23, 16:4, 16:16, 16:24, 17:2, 17:3, 17:19, 18:6, 18:13, 18:20, 24:19, 24:20, 24:23, 25:4, 25:5, 25:10, 25:12, 26:12, 36:13, 37:23, 39:6, 39:19, 52:5, 52:9, 53:1, 54:11, 61:6, 61:7, 61:21, 63:4, 63:16, 64:3, 64:8, 71:7, 71:10, 75:1, 76:15, 77:12, 80:2, 80:7, 81:6, 82:9, 83:11, 84:13, 85:12, 86:15, 90:10
**judicial**
3:7, 66:20
**july**
57:11, 57:16
**jump**
7:24, 66:7
**june**
5:16, 42:18, 65:5, 67:16, 68:23, 69:3, 72:8
**jurisdictional**
10:20, 11:10

**K**

**k-a-t-h-l-e-e-n**
8:9
**kane**
4:13, 6:17
**kathleen**
1:15, 2:1, 5:2, 6:2, 6:9, 7:10, 8:9, 93:2
**katie**
3:6
**keep**
64:19
**kind**
64:18
**knew**
38:3
**know**
8:17, 8:19, 8:24, 10:16, 14:12, 23:17, 27:19, 29:12, 29:13, 29:19, 29:22, 30:14, 31:19, 32:15, 32:19, 34:14, 35:20, 36:3, 37:21, 39:5, 46:4, 46:12, 46:14, 46:21, 48:4, 48:10, 48:21, 58:19, 58:22, 60:16, 60:17, 60:22, 64:5, 64:6, 64:9, 64:10, 64:14, 64:15, 64:17, 65:3, 66:24, 69:17, 69:21, 69:23, 72:6, 73:3, 78:24, 79:1, 79:2, 88:11, 88:17, 89:16

**L**

**l-e-f-u-r-g-y**
8:10
**l2**
72:22
**labor**
88:17, 88:20, 89:11, 89:14
**laid**
85:22, 86:19
**large**
73:15
**lasalle**
3:20
**last**
19:17, 19:18, 20:1, 20:10, 35:3, 35:4, 35:12, 88:20
**later**
26:8, 30:7, 43:17, 69:12
**law**
3:17, 4:6
**lawsuit**
48:17, 49:9, 51:6
**lawyers**
33:15, 80:14, 80:21, 81:4, 81:11, 83:22, 84:4, 84:10, 84:17, 85:8, 85:17
**leading**
20:13, 24:11, 24:12
**lefurgy**
1:15, 2:1, 5:2, 6:2, 6:10, 7:11, 7:15, 8:4, 8:9, 9:24, 11:16, 11:20, 12:2, 34:23, 45:9, 47:23, 49:2, 49:8, 50:6, 58:12, 59:12, 65:14, 73:9, 79:17, 91:9, 93:2
**legal**
90:17
**less**
69:13
**let's**
9:19, 50:1, 51:8, 55:20, 55:21, 65:4, 79:4, 79:24, 83:15
**letter**
5:13, 9:14, 9:20, 10:5, 10:10, 10:13, 10:14, 11:5, 11:16, 11:20, 11:23, 12:23, 23:5, 23:6, 23:23, 27:5, 28:13, 28:15, 33:22, 36:23, 37:11, 37:15,

39:11, 39:16, 40:1, 40:2, 40:10, 40:23, 41:9, 43:13, 44:4, 44:13, 44:14, 48:1, 48:5, 48:19, 53:13, 57:19, 69:5, 80:3, 85:13, 86:16, 86:19, 87:7, 87:13, 87:16, 87:19, 88:1, 88:2
**letters**
47:4
**lieu**
7:4
**lightfoot**
1:9, 3:13, 6:10, 6:12, 31:7, 39:4
**lightfoot's**
9:14, 25:22
**likely**
70:6, 76:5, 77:15
**limitation**
19:19, 49:19
**limited**
10:19, 10:21, 10:24, 11:9, 12:16, 12:18, 18:1, 18:4, 18:20, 19:4, 22:24, 23:2, 25:15, 25:19, 25:22, 26:14, 26:15, 26:18, 30:21, 39:7, 39:13, 40:2, 41:16, 43:4, 43:10, 43:20, 45:20, 45:22, 46:10, 49:3, 49:23, 54:19, 54:21, 54:22, 55:1, 63:22, 69:11, 77:8, 78:3, 78:10, 80:4
**line**
12:24, 67:5, 88:6
**litigation**
3:18, 47:24
**little**
8:14
**long**
89:22
**longer**
39:16, 88:20
**look**
56:20, 58:13, 79:24
**looked**
84:21
**looking**
16:12, 51:22
**loose**
36:18
**loosely**
38:5
**lori**
1:9, 3:13, 6:12
**lot**
9:8, 53:9, 69:22, 70:18
**loud**
8:22
**love**
53:5, 53:6

**M**

**made**
75:12, 75:19, 76:4, 76:5, 76:6, 78:15, 82:14, 82:20
**madison**
74:3
**magic**
56:20
**make**
8:14, 8:19, 9:6, 9:10, 15:9, 66:8, 66:11, 67:18, 71:19, 88:21
**makes**
24:3, 75:14
**making**
7:21, 9:4, 82:17
**mann**
1:22, 2:8, 7:1, 94:2
**many**
15:20, 16:1, 16:19, 16:21, 17:11, 25:19, 49:11, 69:22, 71:6, 73:16, 76:17, 77:1, 77:4, 90:7
**mark**
15:8, 58:6, 65:4
**marked**
9:22, 10:1, 50:4, 58:7, 58:10, 65:8, 79:8, 79:15, 79:18
**matter**
6:11, 12:8, 12:17, 15:17, 15:24, 18:15, 19:4, 26:7, 35:9, 36:21, 39:1, 40:8, 41:15, 45:23, 46:18, 55:2, 55:3, 55:4, 63:22, 75:18, 78:4, 86:22, 87:1, 87:15, 87:17, 90:18
**matters**
10:22, 10:23, 16:8, 47:8
**maurice**
74:8
**maybe**
76:19
**mayor's**
9:20, 14:15, 18:18, 20:3, 20:12, 26:16, 27:10, 27:16, 28:2, 28:8, 28:10, 28:17, 35:6, 36:2, 40:16, 41:3, 42:24, 43:2, 43:3, 43:6, 43:19, 46:21, 47:3, 48:4, 53:13, 53:14, 67:21, 68:7, 69:11, 69:21, 70:19, 71:4, 75:21, 78:21, 82:8, 86:13, 86:15, 89:23
**mayoral**
15:8
**mean**
15:5, 18:4, 18:24, 19:6, 19:14, 21:4, 25:21, 28:5, 28:21, 30:20, 45:12, 46:6, 48:15, 54:22, 55:1, 59:24, 69:17, 71:5, 85:5, 89:11
**meaning**
54:20, 60:4
**means**
19:7, 40:7
**meant**
40:22, 41:6, 41:12, 41:18, 60:13, 60:17, 60:23
**mechanics**
12:9
**media**
16:1, 16:3, 27:8, 27:13, 27:14, 27:16,

28:9, 28:11, 28:13, 28:15, 28:20, 29:2, 30:3, 30:6, 43:2, 43:8, 43:13, 43:15, 43:17, 66:4, 70:9, 70:17, 70:18, 74:24
**medium**
15:13, 15:24, 17:8
**meeting**
22:6, 22:8, 22:14, 23:7
**meetings**
77:9
**members**
13:9, 13:18, 13:19, 15:1, 17:4, 75:23, 75:24
**memo**
5:16, 65:18, 65:19, 65:22, 67:5, 68:8, 69:17, 70:2
**memory**
14:2, 14:10, 46:14, 59:13
**memos**
69:22
**mentioned**
38:5, 52:15, 68:20
**michael**
3:5, 6:21, 7:24, 8:5, 10:11, 11:17, 22:9, 23:10, 43:22, 48:13, 50:15, 51:16, 57:4, 58:18, 59:5, 64:13, 66:7, 70:12, 88:21
**might**
16:22, 17:16, 64:17, 68:3
**mind**
21:1, 21:4, 40:14, 41:3, 63:11, 63:20, 69:22
**minute**
50:6
**minutes**
34:12, 73:3
**mischaracterizes**
86:10
**moment**
58:12, 59:11
**monitor**
6:16
**more**
8:14, 28:5, 38:10, 54:8, 59:3, 69:14, 73:3, 76:10
**morning**
8:4, 19:8, 19:13, 19:14, 26:6, 40:14
**most**
24:3
**motion**
10:22, 10:24, 11:9, 24:6
**move**
24:15
**mute**
44:22, 72:20, 72:22
**muting**
7:21
**mutually**
53:9
**myself**
7:21, 8:19, 13:21, 18:12, 75:16, 82:16

**N**

**name**
8:4, 8:7, 71:18, 71:23
**nathan**
4:13, 6:17, 44:16, 44:17, 45:1, 72:17
**nature**
16:13, 17:9, 27:14
**necessarily**
48:22
**necessary**
82:7, 85:4, 85:7
**need**
44:20, 44:24, 70:18
**neither**
94:8
**never**
89:15
**new**
56:24, 57:15, 58:7, 59:9, 60:13
**news**
67:15, 69:15, 70:7
**next**
9:7, 16:13, 65:4, 79:4
**north**
3:20
**northern**
1:2
**notarial**
94:13
**notary**
2:9, 94:1
**note**
11:8, 48:13, 50:16, 64:13
**notes**
90:22
**nothing**
6:4, 59:7
**notice**
5:17, 10:17, 79:5, 79:8, 79:9, 79:21, 89:1
**noting**
58:23
**number**
6:8, 6:14, 83:15, 85:9, 86:2
**ny**
5:15
**nyt**
58:7

**O**

**object**
7:8, 23:21, 24:3, 58:18
**objected**
10:16, 23:13
**objection**
10:7, 10:11, 11:17, 11:21, 12:12, 12:21, 13:4, 15:18, 16:17, 18:2, 18:22, 19:2, 19:21, 20:5, 20:15, 21:14, 22:9, 22:17, 22:21, 23:3, 23:9, 23:16, 26:24, 28:24, 29:10, 29:15, 30:12, 31:8, 31:15, 32:1, 36:8, 37:4, 37:12, 37:19, 38:1, 38:8, 39:8, 39:14, 40:18, 41:1, 42:1, 42:15, 42:21, 43:22, 43:23, 44:5, 46:20, 46:24, 47:7, 48:7, 49:4, 49:16, 51:16, 53:2, 53:24, 54:15, 55:10, 56:17,

57:22, 59:1, 59:6, 59:18, 60:1, 60:19, 61:1, 61:9, 61:24, 62:8, 62:17, 62:23, 63:5, 63:9, 63:18, 64:11, 66:8, 66:11, 67:23, 69:19, 70:3, 71:11, 74:14, 78:1, 81:19, 82:1, 82:12, 82:22, 83:4, 83:8, 83:13, 86:9, 86:10, 87:3, 87:11, 88:13, 88:22, 90:16
**objections**
9:4, 20:18, 20:22
**obviously**
20:21, 48:17, 48:21
**occasion**
40:5, 40:11, 40:15, 40:23, 41:6, 41:10, 41:19, 42:4, 42:13, 42:20, 43:14, 54:14, 54:18, 55:5, 68:17, 69:14, 71:4, 71:8, 75:20, 82:5, 86:20, 87:14, 87:17, 87:20, 87:21, 88:3, 88:6, 89:11, 89:20
**occur**
42:4
**occurred**
23:21, 40:12
**october**
1:17, 6:15, 94:14
**office**
14:16, 14:23, 27:10, 27:16, 28:2, 28:8, 28:10, 28:17, 30:5, 32:23, 35:24, 36:2, 36:5, 36:6, 36:11, 36:12, 36:19, 38:13, 40:17, 42:9, 42:24, 43:2, 43:3, 43:7, 43:19, 46:22, 52:5, 52:13, 53:15, 54:5, 54:10, 61:7, 61:12, 66:13, 66:18, 66:19, 68:19, 70:1, 70:15, 73:15, 74:12, 74:17, 78:22, 89:23
**officer**
94:2
**offices**
4:6
**official**
1:9, 6:10, 6:13, 59:8
**often**
75:9
**oftentimes**
75:16
**oh**
34:11, 34:15, 71:22, 72:19
**on-the-record**
34:9, 34:12
**once**
24:2, 90:8
**one**
6:9, 7:22, 8:5, 8:16, 8:18, 9:9, 15:20, 15:22, 15:24, 16:19, 17:10, 17:11, 18:11, 26:2, 28:9, 29:17, 30:16, 30:21, 35:10, 43:15, 52:17, 67:1, 70:13, 75:10, 76:19, 79:8, 79:11
**one's**
15:8
**one-on-one**
9:16, 12:1, 12:24, 13:3, 18:19, 24:18, 25:12, 31:5, 32:7, 36:13, 37:23, 38:4, 39:5, 39:18, 53:15, 64:2, 64:7, 76:14, 80:1, 82:9, 85:11, 86:14
**one-to-one**
13:10
**ones**
13:22, 52:22
**only**
8:23, 11:11, 26:1, 26:17, 26:20, 26:21, 29:2, 39:6, 40:9, 41:8, 43:3, 46:9, 50:19, 73:2, 87:8, 89:13, 89:14
**open**
26:8
**opportunity**
39:24
**opposed**
8:22, 60:7
**order**
10:19, 61:19, 62:16
**ordered**
61:4, 62:6
**orders**
61:15
**original**
68:1
**originally**
67:9, 69:7
**other**
7:22, 15:15, 15:22, 17:5, 17:6, 53:16
**otherwise**
20:19, 94:11
**out**
8:21, 9:13, 13:17, 13:20, 13:23, 14:21, 14:23, 14:24, 15:2, 15:10, 16:4, 17:1, 17:19, 17:21, 18:7, 44:18, 52:5, 52:8, 52:14, 52:18, 52:23, 55:16, 68:19, 69:7, 69:10, 70:12, 70:16, 71:7, 85:22, 86:5, 86:19
**outcome**
94:11
**outlet**
15:14, 17:8
**outlined**
69:4, 80:2, 85:12, 86:15, 88:24
**outside**
10:17, 11:14, 20:20, 24:7, 33:7, 42:9, 64:21, 76:3, 77:21, 78:22, 85:8
**over**
8:12, 9:9, 16:12
**overarching**
18:15
**oversee**
73:22

**own**
11:10

**P**

**page**
5:3, 5:12, 50:8, 59:4, 59:12
**pages**
1:21, 65:12
**palatine**
4:8
**paragraph**
51:8, 51:9, 51:22, 53:11, 55:21, 55:22, 79:24
**parameters**
10:14, 11:1, 11:12, 15:20, 15:22, 15:23, 18:9, 20:2, 20:11, 20:13, 20:20, 22:11, 23:12, 24:12, 25:13, 26:21, 37:6, 42:10, 43:24, 49:5, 51:19, 53:12, 55:23, 56:5, 56:8, 56:12, 56:16, 67:7
**part**
15:7, 16:9, 16:23, 17:16, 17:20, 17:22, 37:24, 39:6, 51:23, 55:9, 75:14, 75:18, 76:5, 76:13, 89:2
**participating**
21:10, 52:6, 66:2
**particular**
63:21
**parties**
6:18, 94:9
**passed**
72:7
**past**
17:17, 32:23, 33:1, 60:7
**penalties**
7:7, 7:17
**people**
14:19, 70:13, 75:4, 76:2, 84:22
**perfect**
79:17
**period**
12:17, 12:18, 19:13, 19:16, 23:2, 25:15, 26:14, 30:17, 46:10, 49:3, 49:15, 51:11, 51:15, 87:9
**perjury**
7:7, 7:17
**person**
26:17, 75:10
**personal**
28:23
**perspective**
56:22
**pertinent**
15:4, 15:5
**peter**
3:16
**phone**
46:18
**photographic**
14:2, 14:10, 46:14
**phrase**
55:5
**place**
19:7, 26:2, 26:5, 26:14, 32:4, 37:16, 37:17, 39:13, 45:15, 46:9, 71:24, 76:18, 76:20
**plaintiff**
1:7, 3:3, 4:3, 6:7, 10:1, 50:1, 79:18
**plaintiff's**
11:9
**plaintiffs**
6:22, 6:23, 8:6, 46:17, 46:22, 48:1
**plan**
69:8
**planet**
4:13, 4:14, 6:18, 7:1
**plans**
56:2, 56:12
**please**
6:19, 7:2, 7:3, 7:15, 8:7, 8:17, 8:19, 9:4, 9:21, 34:9, 39:23, 40:1, 41:20, 45:4, 50:3, 55:17, 58:4, 58:9, 65:6, 72:18, 79:6, 87:23, 87:24
**point**
11:5, 23:18, 24:14, 59:6
**policy**
12:5, 12:6, 12:15, 12:16, 19:20, 20:17, 22:16, 22:20, 22:24, 23:2, 23:22, 23:24, 24:2, 26:22, 27:11, 27:17, 28:4, 28:10, 28:20, 30:4, 30:11, 35:3, 36:7, 36:23, 40:2, 43:1, 43:3, 43:8, 43:9, 46:2, 57:20, 61:20, 61:23, 62:22, 76:13, 80:1, 80:4, 80:5, 80:6, 80:7, 80:11, 80:17, 80:23, 81:5, 82:21, 82:23, 83:3, 83:7, 83:11, 85:10, 86:6, 86:14, 86:24, 87:2, 87:4, 87:8, 90:9, 90:11, 90:13, 90:14, 90:19
**political**
29:17, 29:24, 30:1
**position**
11:8, 18:18, 24:8, 40:16
**possible**
14:17, 32:8, 38:10, 38:17, 42:8, 56:15
**possibly**
89:21
**post**
27:15, 27:16, 28:19
**posted**
27:8, 28:13, 28:14, 43:14
**premise**
47:17
**preparation**
14:19, 21:7, 21:12, 21:13, 27:24, 47:5, 47:6, 81:18, 81:23, 84:23, 86:1
**prepare**
33:13, 49:8, 49:11, 80:10, 80:13, 80:19, 81:2, 81:9, 83:20, 84:2,

84:8, 84:15, 85:15
**prepared**
80:15, 80:23, 81:7, 81:13, 81:14, 83:16, 83:23, 84:5, 84:11, 84:19, 85:9, 85:19
**present**
4:12, 24:5
**preserve**
24:15
**preset**
40:11
**press**
13:9, 13:21, 15:1, 17:4, 26:8, 30:7, 30:11, 31:2, 31:4, 32:6, 36:17, 36:18, 36:22, 36:24, 37:3, 37:10, 37:18, 37:24, 38:5, 38:7, 38:15, 43:21, 44:3, 45:10, 45:11, 45:12, 45:14, 45:16, 46:4, 46:6, 46:23, 47:4, 48:5, 49:3, 49:15, 51:10, 51:14, 51:23, 52:6, 52:10, 53:12, 53:15, 53:17, 55:24, 56:6, 56:8, 73:20, 74:19, 74:22, 75:17, 83:17, 83:24, 84:6, 84:12
**presupposes**
12:13
**pretty**
25:18, 43:18
**previous**
90:3
**previously**
22:13, 37:8, 44:2, 44:9, 49:7, 51:20, 52:15, 72:2, 83:1, 87:6
**previously-sched-uled**
71:14
**print**
88:17
**printed**
58:14
**prior**
11:6, 19:18, 23:14, 24:24, 25:1, 35:19, 56:7, 70:24, 76:21, 76:22, 77:16
**privilege**
47:9
**probably**
24:3, 32:22, 35:18, 76:21, 77:16
**problem**
79:12
**procedure**
24:1, 25:7
**proceed**
58:23
**proceeding**
7:9
**process**
90:5
**produced**
66:20, 66:23
**producing**
66:17
**production**
66:9
**professional**
17:15
**promotions**
89:3
**pronounce**
71:17
**protected**
47:9, 47:14
**protocol**
21:18, 21:23
**provide**
13:2, 22:15, 53:22, 61:21, 63:2, 63:3, 63:16, 64:2, 64:6, 64:7, 65:23, 76:14, 77:10, 78:22, 80:1, 82:8, 85:11, 86:14, 88:12
**provided**
38:18, 38:20, 45:24, 77:18, 85:4
**providing**
9:15, 11:24, 12:24, 18:19, 24:18, 25:11, 36:12, 37:22, 39:5, 39:18, 89:13
**public**
2:9, 26:23, 27:4, 27:5, 27:7, 27:11, 27:12, 28:3, 28:6, 28:9, 28:11, 30:4, 43:1, 43:7, 43:9, 43:16, 80:7, 81:6, 83:12, 84:13, 90:10, 94:1
**publicly**
41:14
**published**
57:1, 57:16, 59:9
**publisher**
70:15
**pull**
9:19, 39:22, 50:1, 55:20, 79:4, 87:22
**purchased**
89:15, 89:18
**purpose**
11:20, 65:21, 66:1, 67:4
**purposes**
19:12, 21:2
**pursuant**
2:8
**put**
7:20, 18:9, 43:12

**Q**

**qualifications**
15:15
**question**
7:24, 9:7, 10:8, 10:12, 11:13, 12:22, 13:5, 15:19, 16:18, 18:3, 19:3, 19:22, 20:7, 20:24, 21:5, 21:15, 24:11, 27:1, 29:1, 29:11, 29:16, 30:13, 31:3, 31:9, 31:16, 32:2, 32:10, 32:21, 32:24, 36:9, 37:4, 38:2, 38:9, 39:9, 39:15, 40:19, 41:2, 41:17, 41:20, 42:2, 42:12, 42:13, 42:16, 42:22, 43:5, 44:7, 44:12, 47:1, 47:8, 47:12, 48:8, 51:17, 53:3, 55:11, 56:18, 57:23, 59:19, 60:3, 60:20, 61:2,

61:10, 62:1, 62:9, 62:12, 62:13, 62:18, 62:24, 63:6, 63:10, 63:19, 64:12, 64:20, 64:24, 67:24, 68:4, 69:20, 70:4, 71:12, 74:15, 78:2, 80:22, 81:20, 82:2, 82:22, 87:4, 87:12, 88:2, 88:14, 89:6, 89:9
**questions**
8:16, 8:18, 9:3, 18:7, 18:13, 23:11, 23:19, 24:9, 26:9, 30:24, 31:6, 31:13, 31:22, 31:24, 32:5, 32:11, 32:16, 32:18, 32:20, 33:2, 33:6, 33:8, 33:9, 33:11, 42:19, 45:18, 45:21, 48:14, 48:15, 51:17, 54:3, 54:7, 55:8, 81:14, 81:24, 89:1, 91:17, 91:19
**quick**
72:20
**quite**
23:11, 68:14

**R**

**race**
15:17, 16:15, 17:10, 17:12, 17:22
**rachel**
4:14
**radio**
67:8
**raise**
7:15, 11:2, 20:21
**raised**
10:22, 10:23, 11:5, 20:17, 43:23
**ran**
70:6
**range**
15:9, 31:11
**rates**
32:12, 32:16
**rather**
24:13
**rationale**
11:3
**reach**
13:19, 13:23, 14:21, 14:24, 17:7
**reached**
13:17, 13:23, 14:23, 15:2, 15:10, 16:4, 17:18, 17:19, 17:21, 18:7, 52:5, 52:8, 52:14, 52:18, 52:23, 68:19, 69:7, 70:12, 70:16, 71:7
**reaching**
26:11
**reaction**
90:11
**read**
38:17, 39:24, 41:3, 48:20, 55:16, 55:18, 59:11, 63:11, 63:20, 69:21, 69:23, 72:17, 93:3
**reader**
21:1, 21:4
**reading**
40:21, 50:16, 60:5, 60:11, 94:7
**reads**
40:14, 51:9, 88:6
**ready**
7:22
**real**
58:13, 72:20
**really**
64:20, 69:17
**reason**
47:11
**reasons**
11:13, 22:12, 37:7, 44:2, 49:7, 51:20, 62:15, 83:1, 87:6
**recall**
25:17, 25:18, 27:18, 28:16, 28:18, 35:18, 38:16, 43:12, 59:16, 66:17, 70:5, 70:23, 71:1, 76:19, 77:15
**recalling**
28:12
**receive**
16:2, 77:14, 77:21, 90:11
**received**
77:13, 77:19
**receives**
75:2
**recess**
34:19, 72:23, 91:5
**recognize**
51:1, 58:16, 65:14, 79:17
**recollection**
58:17
**record**
8:8, 8:23, 8:24, 24:15, 34:18, 34:21, 45:4, 45:6, 45:7, 48:14, 50:17, 58:23, 64:14, 72:14, 72:17, 72:22, 73:1, 88:22, 91:3, 91:7, 91:23, 92:1, 94:5
**recording**
45:1
**reduced**
94:6
**refer**
44:3
**reference**
9:19, 33:22, 47:4
**referenced**
46:4, 46:6
**referred**
38:15
**referring**
10:5, 43:20, 52:22
**refers**
86:21, 87:14, 87:17, 88:4
**refresh**
58:17, 59:12
**regard**
11:8, 24:13
**regarding**
42:9, 53:15, 66:3, 68:10, 69:18
**regards**
82:5
**related**
34:1, 36:21, 41:15, 71:24, 85:2, 89:14, 89:19, 94:9
**relating**
40:8, 55:6
**relevant**
36:15

**remotely**
6:18
**repeat**
43:5
**rephrase**
56:7
**report**
73:24
**reported**
1:22, 27:9, 30:6
**reporter**
6:24, 7:2, 7:3, 7:5, 7:14, 7:19, 8:2, 8:23, 8:24, 9:8, 31:3, 32:5, 32:20, 33:3, 33:10, 34:9, 54:3, 54:4, 55:16, 55:18, 65:6, 67:19, 94:1
**reporters**
17:13, 33:2, 42:7, 45:20, 54:6
**represent**
6:20
**representation**
58:21
**representing**
6:17, 6:22, 6:23, 7:1, 8:6
**request**
13:16, 52:9, 53:7, 53:8, 66:21, 66:23, 68:1, 68:17, 72:3, 75:1, 75:3, 75:11
**requested**
13:15, 51:24, 52:13, 52:17, 52:24, 94:8
**requests**
25:5, 66:14, 71:3, 75:2, 75:9, 76:9
**reserve**
91:20
**respond**
8:21, 66:13
**responded**
32:22, 57:20
**response**
9:5, 47:13, 66:20, 66:23, 79:9
**responsibility**
32:20
**restate**
8:17
**review**
27:23, 33:18, 33:20, 33:23, 34:2, 50:7, 73:12, 75:9, 91:11
**reviewed**
33:21, 33:24, 50:24
**right**
7:15, 7:20, 41:11, 44:23, 45:2, 50:21, 52:19, 57:10, 57:18, 61:4, 62:6
**road**
22:10
**role**
74:22
**romain**
70:12, 70:22, 71:9
**rough**
73:4
**rules**
8:12
**run**
29:4

**S**

**said**
14:22, 28:7, 30:21, 41:14, 45:19, 48:19, 53:4, 53:5, 54:18, 57:5, 59:24, 60:23, 69:17, 69:18, 75:12, 94:5
**sale**
88:17
**sales**
89:2, 89:13, 89:19
**same**
11:17, 11:21, 22:17, 22:21, 23:3, 23:9, 37:12, 37:19, 63:9, 64:20, 72:4, 74:4, 80:22, 83:4, 83:8, 83:13, 93:4
**sanders**
70:21, 71:9
**sat**
56:23, 57:14
**say**
14:1, 14:3, 30:10, 39:17, 43:14, 48:20, 75:11
**saying**
44:13, 58:21, 71:19
**says**
40:2, 40:4, 40:10, 41:10, 51:22, 66:2, 87:20, 87:21, 88:17
**schedule**
26:16, 35:6, 35:17, 69:1, 72:5, 78:8, 78:20
**scheduled**
21:2, 49:22, 72:8, 76:23
**scheduling**
26:12, 35:7, 35:14, 36:3, 36:4, 36:6, 36:12, 36:16, 52:20, 69:1, 69:10, 77:13, 78:22
**scope**
10:16, 10:21, 10:24, 11:11, 11:14, 12:17, 18:1, 18:5, 20:18, 22:10, 23:14, 23:16, 24:7, 28:3, 28:10, 41:16, 43:23, 54:19, 54:21, 54:22, 55:1, 63:22, 64:21, 80:4, 80:11, 82:21, 83:16, 88:4, 88:13
**screen**
9:24, 39:23, 50:18
**scroll**
50:9, 65:12
**seal**
94:13
**second**
50:2, 51:4, 52:18, 75:21, 79:11
**seconds**
7:23, 34:12
**secretary**
13:21, 74:19, 74:23, 75:17
**see**
9:24, 51:12, 51:24, 53:17, 55:4, 56:3, 66:1, 66:5, 80:8
**seek**
12:4, 12:14, 12:19, 13:14
**seeking**
11:9, 70:14

**seen**
79:22, 88:16
**select**
17:2
**selected**
13:12, 17:3
**selection**
10:14
**self-identified**
16:20
**self-identify**
17:14
**send**
52:9, 68:8
**sense**
9:10, 24:4
**sentence**
40:4, 51:9
**separate**
30:2
**series**
23:10, 38:23, 40:3, 43:4, 43:10, 46:9, 48:15, 61:6, 89:1
**serious**
43:20
**set**
19:23, 25:13, 26:3, 36:19, 36:24, 37:2, 37:9, 38:14, 39:7, 39:13, 40:11, 49:22, 53:13, 54:5, 54:10, 54:13, 61:5, 73:7, 76:1, 77:2, 77:23, 78:3, 79:14, 82:7, 91:22, 94:12
**sets**
49:23
**several**
26:4
**shaking**
8:22
**she'd**
16:11, 39:5
**she'll**
9:15, 12:24
**sheet**
93:7
**short**
12:7, 30:17
**should**
48:20, 62:22, 79:8, 81:22, 84:21, 85:24, 90:23
**show**
67:8
**showing**
50:18
**sic**
13:11
**side**
29:18, 30:1
**signature**
91:20, 93:11
**signature-mig2k**
94:16
**signed**
41:9, 93:7
**signing**
94:8
**similar**
51:18
**since**
46:1, 53:17, 54:9, 56:1, 56:9, 89:24
**sit**
54:5, 77:12
**situation**
62:19
**sixth**
64:16
**smoothly**
8:15
**social**
27:8, 27:13, 27:16, 28:9, 28:11, 28:13, 28:15, 28:19, 29:2, 30:3, 43:2, 43:7, 43:13, 43:15
**some**
14:8, 14:22, 15:10, 17:19, 52:5, 58:14, 69:1, 69:2, 70:19, 70:20
**somebody**
36:3
**someone**
34:10, 35:23, 42:6, 70:6
**something**
42:8, 45:19, 61:16, 63:15
**sometimes**
36:21, 88:19
**sorry**
14:22, 18:22, 19:14, 33:13, 44:17, 44:21, 44:22, 44:24, 47:5, 54:23, 55:14, 56:7, 57:4, 59:5, 67:12, 71:17, 72:19, 72:20, 72:21, 79:10, 79:14, 91:2
**sort**
64:20
**sought**
11:10, 13:10, 13:14, 16:5, 17:1
**speak**
14:18, 18:16, 21:7, 21:11, 29:3, 32:14, 33:16, 34:24, 36:5, 40:20, 41:8, 48:18, 48:21, 56:19, 63:12, 63:13, 67:2, 67:9, 73:10, 86:5, 86:13, 91:8
**speaking**
9:5, 9:7
**specials**
88:12
**specific**
28:5, 31:13, 54:8, 76:10, 77:23, 89:13
**specifically**
14:6, 25:14, 32:14, 38:16, 59:3, 87:1
**speculate**
20:8, 44:14, 47:2, 48:9, 60:4, 61:11, 62:2, 62:20
**speculating**
60:9
**speculation**
20:6, 44:6, 44:8, 44:11, 60:2
**speech**
73:21
**spell**
8:7
**spoke**
15:10, 33:15, 46:17, 80:14, 80:21, 81:4, 81:11, 83:22, 84:4, 84:10, 84:17, 85:17, 86:23
**spoken**
9:1, 41:11, 41:18, 60:12, 63:24, 81:22, 84:22, 85:24
**staff**
34:10, 74:1, 74:2, 74:4, 74:7, 76:6, 76:9, 76:12, 77:3, 77:10, 80:7, 81:6,

83:11, 84:12
**stand**
9:21, 50:3, 58:9, 65:6, 79:6, 87:24
**standing**
88:22
**standpoint**
32:4
**start**
43:20
**starting**
65:5
**state**
2:9, 6:20, 8:7, 14:5, 34:9, 43:3, 45:14, 46:8, 58:24, 67:14, 87:16
**stated**
11:24, 12:6, 18:18, 22:13, 37:8, 44:2, 44:9, 49:7, 51:21, 72:2, 83:1, 87:6
**statement**
23:15, 52:2, 53:19
**states**
1:1, 9:15, 10:20, 40:10, 79:24, 87:13
**stating**
59:16, 68:9
**still**
53:19, 72:6
**stipulate**
7:4, 7:13
**street**
3:8, 3:20
**strictly**
24:1
**strike**
88:10
**structure**
73:19
**subject**
12:8, 12:17, 15:24, 16:8, 18:15, 19:4, 26:7, 30:16, 30:19, 30:20, 30:21, 30:22, 35:9, 36:21, 39:1, 40:7, 41:15, 45:23, 49:19, 55:1, 55:3, 55:4, 55:9, 63:22, 75:17, 78:4, 83:21, 86:21, 87:1, 87:14, 87:17, 90:18
**subjects**
55:6
**submit**
75:1
**submitted**
33:21, 51:5
**substance**
21:12
**suite**
3:9, 3:20
**supposed**
54:20
**sure**
7:21, 9:6, 15:9, 18:6, 27:21, 43:6, 45:5, 49:1, 54:9, 57:13, 58:20, 59:2, 59:10, 67:18, 71:19, 72:13, 72:16, 76:11
**svenson**
4:5, 4:6, 6:22
**sw**
3:8
**swear**
7:2
**swearing**
7:4
**sworn**
6:3
**sybil**
74:3

T

**take**
9:8, 17:20, 23:15, 26:2, 26:14, 34:5, 37:16, 37:17, 39:24, 50:6, 53:6, 58:12, 59:11, 59:22, 72:11, 76:20, 90:21
**taken**
24:14, 34:19, 72:23, 91:5, 94:3, 94:6
**taking**
11:7, 39:13
**talk**
9:9
**talked**
8:13, 46:2
**talking**
16:10, 24:10, 26:12
**team**
13:15, 13:18, 13:19, 21:19, 21:20, 21:21, 22:2, 23:7, 29:4, 29:24, 38:11, 44:10, 65:20, 70:6, 75:9, 75:13, 75:14, 76:2, 76:4, 76:11, 78:16
**teams**
76:8
**technical**
34:10
**technician**
4:14, 9:21, 44:16, 44:23, 50:3, 50:10, 50:14, 58:9, 79:6, 79:10, 79:13, 87:24
**tell**
6:3, 20:9, 25:9, 25:14, 32:20, 50:17, 56:21, 59:7
**ten-minute**
72:12
**term**
36:18, 38:11, 70:16, 70:17
**terms**
11:10
**testified**
6:4, 35:2, 52:4, 53:12, 71:6
**testify**
55:22, 80:10, 80:13, 80:16, 80:19, 80:23, 81:2, 81:7, 81:9, 81:18, 83:16, 83:23, 84:5, 84:11, 84:19, 85:10, 85:19
**testimony**
7:6, 7:16, 18:17, 21:8, 21:13, 27:24, 47:6, 54:24, 81:23, 83:20, 84:3, 84:9, 84:16, 85:16, 86:1, 91:14, 93:4, 93:5, 94:5, 94:6
**th**
6:15, 9:14, 19:8, 19:9, 19:10, 19:13, 19:14, 20:1, 20:10, 20:13, 20:14, 23:6, 25:16, 26:4, 26:5, 26:6, 26:19, 26:20, 30:8, 30:11,

35:4, 36:14, 36:23, 37:11, 37:15, 37:21, 38:14, 38:15, 39:4, 39:11, 39:20, 40:3, 40:6, 40:7, 40:12, 40:13, 40:14, 43:10, 43:11, 44:4, 45:11, 46:1, 51:11, 53:21, 54:9, 57:1, 57:5, 57:11, 57:16, 57:19, 60:6, 63:22, 63:23, 69:5, 70:24, 71:14, 71:15, 72:1, 74:5, 77:19, 77:20, 77:22, 78:5, 78:10, 78:11, 78:12, 78:18, 78:23, 86:19, 87:9, 87:10, 88:8, 88:9, 94:13
**thank**
7:19, 8:1, 8:11, 9:12, 24:16, 34:16, 34:22, 45:9, 49:1, 50:13, 51:1, 55:19, 57:11, 57:12, 59:23, 65:7, 65:13, 67:18, 71:22
**thanks**
50:23
**themselves**
6:20, 48:18, 48:22
**thereafter**
94:6
**they'd**
78:12
**things**
16:11, 16:13, 17:8, 24:11, 27:13, 27:14
**think**
10:11, 14:15, 18:12, 21:6, 23:17, 24:9, 35:2, 41:17, 50:9, 51:16, 55:15, 57:8, 60:22, 64:18, 68:14, 81:22, 82:7, 85:4, 85:7, 85:18, 85:21, 85:24, 86:4, 86:12, 90:14
**third**
62:11
**thomas**
1:5, 3:3, 4:3, 6:7, 6:12
**thought**
15:3, 18:22, 54:23, 62:21
**three**
7:23, 16:21, 65:12, 69:12, 73:22
**through**
27:12, 28:7, 28:11, 43:1, 43:4, 50:9, 65:12, 70:7, 70:20
**thumbs**
7:23
**thursday**
6:15
**time**
6:16, 12:7, 12:17, 12:18, 16:5, 19:5, 19:13, 19:15, 19:19, 23:18, 25:16, 26:14, 26:16, 26:18, 26:20, 26:21, 30:17, 32:6, 34:9, 34:11, 34:13, 34:14, 35:13, 41:16, 45:21, 45:22, 46:10, 49:23, 55:1, 55:23, 56:1, 56:7, 56:9, 58:13, 62:11, 64:16, 67:14, 69:11, 70:19, 71:2, 72:4, 72:6, 72:15, 72:17, 76:1, 77:7, 77:8, 77:13, 77:17, 77:20, 78:4, 78:7, 78:14, 78:20, 91:18
**times**
5:15, 35:16, 53:9, 56:24, 57:15, 58:7, 59:9, 60:14, 75:9, 77:11, 77:14, 77:17, 77:19, 77:21, 78:22, 90:7
**timing**
26:7, 77:2, 86:21, 87:1, 87:15
**titled**
50:2
**today**
6:17, 7:1, 14:19, 21:8, 21:10, 21:13, 23:15, 27:24, 42:12, 56:5, 56:10, 67:13, 80:10, 80:16, 80:24, 81:7, 81:23, 83:16, 83:23, 84:23, 85:10, 91:15
**today's**
6:15, 11:6, 33:13, 47:6, 67:11
**told**
60:10
**took**
19:7, 26:5, 45:15, 46:9, 71:24, 76:18
**topic**
31:12, 32:8, 85:19, 86:11
**topics**
81:15, 81:18, 81:24, 84:19, 84:23, 88:24
**tour**
36:17, 36:18, 36:22, 36:24, 37:3, 37:10, 37:18, 37:24, 38:5, 38:7, 38:15, 43:21, 44:4, 45:10, 45:13, 45:16, 46:5, 46:7, 46:23, 47:4, 48:6, 49:3, 49:15, 51:10, 51:14, 51:23, 52:6, 52:10, 53:12, 53:17, 55:24, 56:6, 56:8, 83:17, 83:24, 84:6, 84:12
**toward**
55:16
**towards**
17:22
**transcript**
5:11, 7:8, 9:23, 24:5, 31:10, 31:17, 45:17, 46:13, 50:5, 57:24, 58:3, 58:8, 58:11, 58:22, 59:8, 79:16,

94:4
**transcription**
93:5
**tried**
68:24, 72:5
**true**
7:6, 7:17,
93:4, 94:4
**truth**
6:3, 6:4
**try**
8:19, 9:6
**trying**
54:17, 58:14,
69:8
**turn**
51:8, 53:11,
55:21, 59:4
**turning**
85:9
**tv**
88:17
**twice**
46:17
**twitter**
27:21, 27:23,
28:23, 29:6,
29:8, 29:13,
29:19
**two**
16:12, 16:13,
26:5, 32:23,
33:1, 35:10,
40:13, 42:5,
42:9, 46:23,
49:12, 49:23,
52:15, 69:12,
71:9, 76:19,
76:21
**two-day**
23:2
**two-year**
13:11, 14:7,
15:7, 16:11,
18:11, 25:7,
25:20, 25:22,
30:23, 31:1,
31:12, 32:9,
35:8, 39:19,
40:5, 40:24,
41:7, 41:19,
42:4, 42:12,
42:14, 42:19,
42:20, 43:14,
45:20, 53:22,
54:7, 54:11,
54:14, 54:19,
55:5, 55:6,
55:9, 66:3,
67:21, 68:3,
68:7, 68:10,
68:17, 69:8,
69:9, 69:18,
71:4, 71:8,
72:4, 78:4,
78:13, 82:6,
85:2, 86:20,
87:21, 88:4,
88:7, 88:8
**type**
8:22, 18:13,
32:5, 58:14
**types**
52:16
**typewriting**
94:7
**typo**
71:21

**U**

**ultimate**
75:5
**umbrella**
31:12, 32:8
**under**
7:7, 7:17,
32:22, 47:14,
47:17, 66:1,
94:7
**underscored**
30:15
**understand**
8:18, 24:8,
54:18
**understanding**
19:24, 20:4,
20:12, 88:23,
89:12
**united**
1:1
**unrelated**
71:13
**until**
9:3, 9:4, 9:6,
78:18
**ups**
70:11
**use**
16:1, 38:11,
44:9, 55:24,
56:2, 56:12,
70:17, 70:18,
86:6
**uses**
29:9, 36:19
**using**
38:16

**V**

**vague**
12:12
**vaguely**
88:15
**variety**
27:13, 28:7,
75:4
**verbal**
25:18
**verbatim**
30:14
**verified**
7:10, 29:3
**versus**
6:12
**via**
11:5, 13:24
**videographer**
4:13, 6:8,
6:17, 6:24,
34:11, 34:15,
34:20, 44:21,
45:2, 45:5,
72:19, 72:24,
91:1, 91:3,
91:6, 91:23
**videotaped**
6:9
**view**
60:7
**virtually**
1:16, 2:2
**voice**
6:19

**W**

**wait**
9:2, 9:4, 9:6
**want**
39:24, 47:2,
48:13, 48:18,
50:16, 58:24,
59:3, 65:10,
66:7, 71:22,
88:21
**wanted**
14:6, 15:9,
67:18, 71:18
**washington**
3:10
**watch**
3:7, 66:20
**way**
7:9, 9:13, 12:6
**ways**
28:8, 52:16
**we'll**
24:4
**we're**
26:15, 34:12,
63:21, 73:17,
73:20, 79:13
**we've**
17:17
**week**
76:21, 77:15,
77:16
**weekends**
88:12
**weekly**
66:4, 67:8,
70:10
**weeks**
69:12

**welcome**
34:22
**went**
44:18
**whereof**
94:12
**whereupon**
34:19, 72:23, 91:5
**whether**
24:7, 32:6, 38:23, 62:21, 64:1, 64:5, 64:6, 85:10, 86:6, 86:13, 90:14
**whole**
6:4
**widely**
27:9, 30:6
**wish**
81:17
**within**
33:1, 55:4
**witness**
7:2, 7:5, 7:10, 7:18, 11:15, 11:18, 11:22, 20:18, 20:20, 22:12, 37:7, 42:2, 44:1, 47:10, 49:6, 49:18, 50:15, 51:20, 58:24, 64:16, 64:23, 65:11, 82:24, 87:5, 88:24, 90:20, 94:12
**witness's**
55:15
**word**
44:10, 46:14
**words**
38:17, 60:5, 60:11, 60:23, 70:6
**work**
17:16, 61:12, 62:14, 69:10
**worked**
16:20, 89:22
**works**
34:8, 72:16
**wouldn't**
47:14
**wrap**
90:23
**writing**
23:16, 73:21
**written**
10:10, 23:5, 23:6, 23:23, 27:14, 37:15
**wrong**
57:8
**wrote**
11:16, 37:11, 37:14, 40:23, 41:6, 41:12, 48:1, 87:7

**Y**

**yeah**
30:3, 44:23, 55:12, 72:21, 73:6
**year**
75:21
**years**
16:12, 16:13, 16:21, 32:23, 33:1, 42:9
**york**
56:24, 57:15, 58:7, 59:9, 60:14

**0**

**02852**
1:8, 6:14

**1**

**1**
91:4, 91:7, 91:24, 92:1
**10**
1:18, 6:16, 53:11
**11**
34:15, 34:21, 45:6, 45:7, 72:15, 91:4
**12**
73:1
**13**
34:15, 73:17
**14**
1:17, 6:15
**16**
55:21, 55:22
**18**
78:18, 94:13
**19**
9:14, 19:8, 19:9, 19:13, 20:13, 23:6, 25:16, 26:4, 26:19, 36:14, 36:23, 37:11, 37:15, 37:21, 38:14, 39:4, 39:11, 40:3, 40:12, 43:10, 44:4, 51:11, 51:12, 53:13, 57:1, 57:5, 57:19, 60:6, 63:22, 69:5, 70:24, 71:14, 72:1, 74:5, 77:19, 77:22, 78:10, 78:11, 78:23, 80:3, 85:12, 86:16, 86:19, 87:9
**1:-cv**
1:8, 6:14
**1st**
42:18

**2**

**20**
19:8, 19:10, 19:14, 20:1, 20:10, 20:13, 20:14, 25:16, 26:5, 26:6, 26:20, 30:8, 30:11, 35:4, 36:14, 38:15, 39:20, 40:3, 40:6, 40:7, 40:13, 40:14, 43:11, 45:11, 46:1, 51:24, 53:21, 54:9, 60:6, 63:23, 70:24, 71:15, 72:1, 74:5, 77:20, 77:22, 78:5, 78:10, 78:12, 78:18, 78:23, 87:10, 88:8, 88:9
**20024**
3:10
**202**
3:11
**2020**
9:14, 90:1
**2021**
1:17, 6:16, 23:6, 37:11, 37:15, 37:21, 39:4, 39:11, 42:18, 45:11, 46:1, 51:24, 53:21, 54:9, 57:1, 57:5, 57:11, 57:16, 68:23, 69:5, 74:5, 80:3, 85:13, 86:16, 94:14
**2024**
94:15
**21**
1:8, 6:14, 45:11, 46:1, 51:24, 53:21, 54:9, 74:5
**22**
91:7, 91:24,

92:1, 94:15
**24**
49:3, 49:14, 51:10, 51:15, 87:9
**26**
34:21, 57:11, 57:16
**28**
72:22
**29**
20:13
**2900**
4:9

**3**

**30**
10:16, 10:21, 51:11, 64:14, 73:2, 88:24
**312**
3:22, 4:9
**34**
1:18
**345**
4:7
**36**
6:16
**38**
34:12
**3rd**
3:8, 5:16, 65:5, 67:16, 68:23, 69:3, 72:8, 72:9

**4**

**40**
72:15
**403647**
1:20
**42**
45:6, 73:1
**425**
3:8
**43**
45:7
**467**
4:9
**48**
5:14

**5**

**5172**
3:11
**520**
3:20
**53**
34:12
**56**
5:15

**6**

**60067**
4:8
**60602**
3:21
**62**
5:16
**646**
3:11

**7**

**7129**
3:22
**744**
3:22
**76**
5:17

**8**

**800**
3:9
**89**
1:21

**9**

**9**
51:11

OFFICE OF THE MAYOR

CITY OF CHICAGO

LORI E. LIGHTFOOT
MAYOR

May 19, 2021

Good morning,

By now, you may have heard the news that on the occasion of the two-year anniversary of my inauguration as Mayor of this great City, I will be exclusively providing one-on-one interviews with journalists of color. As a person of color, I have throughout my adult life done everything that I can to fight for diversity and inclusion in every institution that I have been a part of and being Mayor makes me uniquely situated to shine a spotlight on this most important issue. I wanted to reach out to you directly to ensure you understand my thinking behind that decision.

As the first Black woman mayor of Chicago, and the first openly gay mayor, my election in 2019 was hailed for breaking barriers to the halls of power that had existed in our city for generations. I ran to break up the status quo that has failed so many residents across our city. And that failing status quo did not apply simply to City Hall and City government. It pertains and exists in all public and private institutions.

In the time since I was elected, our country has faced an historic reckoning around systemic racism. Organizations, corporations, educational institutions and more all across our city, our state and our country have declared new efforts to address the deep-seated legacies of institutionalized racism. In looking at the absence of diversity across the City Hall press corps and other newsrooms, sadly it does not appear that many of the media institutions in Chicago have caught on and truly have not embraced this moment.

I have been struck since my first day on the campaign trail back in 2018 by the overwhelming whiteness and maleness of Chicago media outlets, editorial boards, the political press corps, and yes, the City Hall press corps specifically. In the year 2021, with a Black, lesbian Mayor, a Black woman City Treasurer, a Latinx woman City Clerk and a majority Black and Latinx City Council, the group of reporters assigned to cover City Hall is practically all white. Many of them are smart and hard-working, savvy and skilled. But mostly white, nonetheless. Indeed, there are only a handful of beat reporters of color in the City Hall press corps. While there are women of color who sometimes cover my administration, there are zero women of color assigned to the City Hall beat. Zero. I find this unacceptable and I hope you do too.

The press corps is the filter through which much of what we do in government is dissected and explained to the public. It is essential for a healthy democratic society and an accountable government. And yet, despite the many talents and skills of our reporting corps, I fear this arm of our democratic system is on life support. The Chicago media leadership must evolve with the times, in order to be a true reflection of the vibrant, vast diversity of our city. Diversity matters and without it, how can you as the media truly speak to the needs and interests of the diverse and nuanced constituency you claim to serve until you do the work necessary to reflect that constituency.

There is almost no one in the editorial board rooms or in the City Hall press corps who has themselves lived the experience of a woman of color in the City of Chicago. The Crain's Chicago Business editorial board is entirely white. There are zero women of color on the Chicago Tribune editorial board. Almost all the major television networks in Chicago covering City Hall are led by white News Directors.

Exhibit #
Plaintiff-1
10/14/21- RC
exhibitsticker.com

It is impossible for this glaring lack of diversity not to be reflected in the daily coverage of government, politics and city life every single day.

We are working hard to do our part. We host ethnic media roundtables, and work hard to prioritize outlets led by people of color. I or others from my administration regularly appear on Black and Latinx TV and radio stations, and we've also focused paid public service media ad dollars in that direction. We have worked to build diversity into our own communications team--our Digital Director is a Latinx woman and our lead Digital Strategist is an African American woman; our Deputy Communications Director is African American; our lead speechwriter is an African American woman; and two of our Deputy Press Secretaries are African American.

We have more to do, but as I always have said, equity and inclusion are the north stars of this administration, and that includes our own communications efforts.

Still, Black or Brown community leaders often reach out to me or my team to call our attention to implicit--or explicit--bias in one piece of coverage or another from your outlets. For the past two years, more often than not, we have debated internally, then chosen to say nothing, to let it go, lest we be accused of whining about negative coverage or of "playing the race card." And the truth is, it is too heavy a burden to bear, on top of all the other massive challenges our city faces in this moment, to also have to take on the labor of educating white, mostly male members of the news media about the perils and complexities of implicit bias. This isn't my job. It shouldn't be. I don't have time for it. But as with so many festering problems, it has only gotten worse with time. So here I am, like so many other Black women before me, having to call your attention to this problem. I have no power to make you change, but I hope that you will not just cover and express your opinion about the great and historic racial awakening that is rippling across all parts of our society. I hope that you too will see it for the opportunity that it is and embrace it by reflecting the change across your organizations.

We'll start here. At the two-year anniversary of my inauguration, I am issuing a challenge to you. Hire reporters of color--and especially women of color--to cover Chicago politics, and City Hall in particular. If you only have a white reporter covering City Hall, make sure there's a person of color working with them as well.

There are plenty of talented women reporters of color in Chicago for you to hire from, and that pool of talent is growing all the time.

Does your institution have an initiative set up to intentionally cultivate, recruit, support and retain young reporters of color in your ranks? Are there any people of color in your leadership teams or on your editorial boards? Are there qualified people of color on your team that could cover City Hall, but simply haven't been given the chance? Have you analyzed your own coverage to identify and root out implicit bias?

My team will always be responsive to your inquiries. We will always be transparent. But if the answer to these questions is no, be advised that I will continue to press for that to change.

I look forward to hearing your response as to what you plan to do to address this concern.

Sincerely,

Lori E. Lightfoot

Mayor

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS CATENACCI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Number: 21-cv-02852 |
| v. | ) | |
| | ) | |
| LORI LIGHTFOOT, in Her Official Capacity | ) | |
| As Mayor of the City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SECOND DECLARATION OF KATHLEEN LEFURGY**

Pursuant to 28 U.S.C. § 1746, I hereby declare as follows:

1. My name is Katheen LeFurgy. I am over 18 years of age. I have personal knowledge of the facts set forth in this Declaration, and if called upon to testify to those facts I could and would competently do so.

2. I am the Communications Director for the Office of the Mayor of Chicago, a position I have held since February 1, 2021. In my current role, I lead the Mayors Press Office, which is responsible for all communications of the Mayor and Mayor's Office, including but not limited to, press communications; social media; and speechwriting. My duties include, but are not limited to, reviewing and approving press inquiries, including requests for interviews, and press statements; reviewing and approving remarks; and reviewing and approving social media content.

3. On May 19, 2021, and the morning of May 20, 2021, to commemorate the Second Anniversary of Mayor Lightfoot's inauguration as Mayor of Chicago, Mayor Lightfoot participated in a Press Tour (the "Press Tour") which consisted of eight one-on-one interviews, six on May 19, 2021, and two on May 20, 2021, with Mayor Lightfoot and members of the Chicago

Exhibit #
Plaintiff-2
10/14/21- RC
exhibitsticker.com

Press Corp. All of the interviews that took place on May 19, 2021, were subject to a "press embargo," which means they were not to be publicly released until May 20, 2021.

4. On the morning of May 19, 2021, prior to the Press Tour, the Mayor sent a letter, via the Mayor's Press Office, to members of the Chicago Press Corp stating, among other things, that "on the occasion of the two-year anniversary of my inauguration as Mayor of this great City, I will be exclusively providing one-on-one interviews with journalists of color." A true and correct copy of the letter is attached hereto at Exhibit 1.

5. This statement was in reference to the Press Tour described above.

6. Each of the interviews was scheduled for approximately 15 to 20 minutes, although some of them lasted longer.

7. The subject of each interview was Mayor Lightfoot's two-year anniversary as Mayor of Chicago.

8. The entirety of the Press Tour was conducted in the twenty-four-hour period beginning at 9:30 a.m. on May 19. The last interview on the Press Tour concluded at approximately 9:25 a.m. on May 20.

9. All of the interviews that were part of the Press Tour were requested before May 20, 2021.

10. The Press Tour was of limited duration, as described above, and ended at the conclusion of the eighth interview. The parameters used for the Press Tour, as set forth in the Mayor's May 19 letter, have not been used in any decision by the Mayor's Press Office regarding the granting of one-on-one interviews or other interviews or events with the press since the Press Tour.

11. On May 20, 2021, at approximately 4:23 p.m. and more than six hours after the conclusion of the Press Tour, the Mayor's Press Office general inquiries email inbox received an

email from Plaintiff Catenacci's email account requesting an interview with Mayor Lightfoot "regarding a number of topics pertaining to Chicago's handling of the coronavirus," and listing specific issues relating to the pandemic. Catenacci also wrote: "Let me know if we can set up a time to speak." A true and correct copy of this email is attached hereto at Exhibit 2.

12. The staff member for the Mayor's Press Office responsible for monitoring the general inquiries email inbox forwarded this email to me at 4:51 p.m. on May 20, 2021.

13. The general inquiries email box received follow up emails from Catenacci's email address on May 21, and May 24, 2021. True and correct copies of these emails are attached hereto at Exhibits 3 and 4 respectively.

14. The Mayor's Press Office did not apply the parameters outlined in the Mayor's May 19th letter to Catenacci's request, as the Press Tour had ended by the time of Catenacci's request.

15. I have reviewed the Complaint in the above captioned matter that was filed on May 27, 2021. I have also reviewed the Amended Complaint in the above captioned matter that was filed on July 2, 2021.

16. At the time the Complaint was filed, the parameters used for the Press Tour were not in use, they have not been used at any time since the filing of the Complaint, and there are no plans to use them in the future.

17. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that the foregoing is true and correct.

Executed this 2 day of August, 2021.

Kathleen LeFurgy
Kathleen LeFurgy

Kara Swisher

We'll be back in a minute. If you like this interview and want to hear others, follow us on your favorite podcast app. You'll be able to catch up on "Sway" episodes you may have missed, like my conversation with Miami Mayor Francis Suarez. And you'll get new ones delivered directly to you. More with Chicago Mayor Lori Lightfoot after the break.

Back in May, Mayor Lightfoot announced that on the occasion of the two-year anniversary of her inauguration, she would grant one-on-one interviews exclusively to journalists of color. She faced a lot of heat for it. How do you feel about the reaction to that? You're being sued. Some people, including prominent journalists of color, called it a stunt. Why did — tell me why you did that. Why are you talking to me? Like, I'm a white lady.

Lori Lightfoot

So here's the bottom line for me. To state the obvious, I'm a Black woman mayor. I'm the mayor of the third largest city in the country. Obviously, I have a platform. It's important to me to advocate on things that I believe are important. And going back to why I ran — to disrupt the status quo. The media is critically important to our democracy. You know this better than I do. The media is in a time of incredible upheaval and disruption. But our city hall press corps looks like it's 1950 or 1970. When I look across the podium, whether I'm in a formal press conference or I'm out in the neighborhood, the reporters who show up are invariably overwhelmingly white. Intentionality around diversity and inclusion is crucial. People that make the hiring decisions have to be focused on diversity.

In Chicago, we have a huge amount of diverse media talent. We've got schools that are of journalism that are best in class across the country, and I would say, really, across the world. So the absence of journalists of color,

Exhibit #
Plaintiff-3
10/14/21- RC
exhibitsticker.com

covering the mayor of the third largest city in a country is absolutely unacceptable. And so I decided to say something about it.

Kara Swisher

You're talking about the mainstream media.

Lori Lightfoot

Correct.

Kara Swisher

I agree with you. I just taught at the University of Chicago. You have amazing diverse journalists studying there that I taught. And I agree with the need for more diversity in media. But politicians don't get to choose who covers them. Is there a different way to do this, talking to smaller outlets —

Lori Lightfoot

It's not —

Kara Swisher

— talking to —

Lori Lightfoot

No, it's not about me choosing who covers me, right? I gave exclusive interviews. And we do get to choose who we talk to in exclusives. I gave exclusive interviews with journalists of color, right? One 24-hour period and it was like people's heads exploded. I had journalists saying, does the mayor think I'm racist? No, it's not about individuals.

It's about systemic racism. It's about calling it like I see it and challenging the heads of the media companies here in town to do a better job of

bringing journalists of color, women into the fray. That's what this is about. And so, yeah, I could have been quiet and sat back and said, well, I don't like this. I think they could do better, but kept it to myself. But why should I? If not me, who?

I have, I believe, a responsibility. These are issues that I care deeply about. And what I heard from most journalists of color and particularly Black journalists, thank you, mayor. We've been trying to have these conversations in our newsrooms with our producers, with our president. And we couldn't get traction until now. And I've seen it —

Kara Swisher

So has it worked?

Lori Lightfoot

One of the business journals here —

Kara Swisher

Would you do it again?

Lori Lightfoot

— that — I would absolutely do it again. I would absolutely do it again. I'm unapologetic about it because it spurred a very important conversation, a conversation that needed to happen, that should have happened a long time ago. But I don't want just a conversation. I want results. I want to see these networks, these companies, these producers, the decision makers take this seriously, because it's a serious issue.

Kara Swisher

100%.

Lori Lightfoot

As I said before, the media plays a very important role in our democracy. And if the only voices in the media are white guys, that's a problem because it, again —

Kara Swisher

That covers tech, so I'm aware of this problem quite substantively.

Lori Lightfoot

Yeah, so I'm just saying, we need to have a variety of voices bringing different perspectives to interpreting events of the day so that we have a balanced, diverse approach to issues. If we only have a perspective that doesn't share the lived experience of a city that's 2/3 people of color, that does a disservice to our city.

Kara Swisher

The question is whether it will work. I mean, I've been banging on this in tech, and it honestly hasn't worked. I'll tell you, it hasn't.

Lori Lightfoot

But if you're not diligent, if you don't keep banging on that door, change is never going to happen. It's too easy to say no.

.

**MEMORANDUM for Mayor Lori E. Lightfoot**

| | |
|---|---|
| **Re:** | **Press Tour** |
| Address: | City Hall, 121 N. LaSalle |
| Date and Time: | Thursday, June 3, 2021 1:00-2:00PM |
| From: | Communications |

---

**PURPOSE**
YOU are participating in an interview with Craig Dellimore regarding your two-year anniversary and follow up media inquiries with August Weekly and Chicago Defender.

**SEQUENCE OF EVENTS**
1:00 p.m. YOU participate in a radio interview with Craig Dellimore (In Person).
1:30 p.m. YOU participate in an interview with Danielle Sanders (Zoom).
1:45 p.m. YOU participate in an interview with Michael Romaine (Zoom).

**PARTICIPANTS**

- Craig Dellimore, WBBM
- Danielle Sanders, Chicago Defender
- Michael Romain, August Weekly

**Mayoral Staff:**
- Communications Director Kate Lefurgy
- Deputy Communications Director Ryan Johnson

**BIOGRAPHIES**



**Craig Dellimrore, WBBM Radio**

Dellimore is the Political Editor for Newsradio WBBM, a post he has held since 2001.
Craig joined the station in 1983 after working for several years with the Associated Press Radio Network in Washington D.C.

During his time at WBBM, Craig has performed a variety of jobs, including anchor, managing editor, legislative correspondent and suburban bureau chief.



Exhibit #
Plaintiff-4
10/14/21- RC
exhibitsticker.com

.

Some of Craig's most memorable stories have included assignments outside of the political realm. He covered the tragedy of the 1994 crash of American Eagle Flight 4184 in Roselawn, Indiana. He reported on the resilience of farmers and other Illinois residents along the Mississippi as they recovered from widespread flooding. And, over nearly two years, he periodically reported on a west suburban woman as she waited and waited for a lung transplant—and eventually received it.

Craig has won awards for his work from the Illinois Associated Press, the Chicago Society of Professional Journalists and more.



**Danielle Sanders, Chicago Defender**

Danielle Sanders is a journalist, and content creator. She is currently the Interim Managing Editor at the Chicago Defender. Member NABJ, SPJ.

With more than 15 years experience as a writer and content creator, she focuses on news, entertainment and music. She is the owner and founder of "Black Widow's Web", a website dedicated to the Chicago Music Scene and Culture. In addition to her website she also serves as the president and founder of Black Bloggers Chicago, an organization dedicated to supporting, educating and connecting Chicago Content Creators and Bloggers of Color.



**Michael Romain, August Weekly**

Michael Romain is a writer for online pubication August Weekly.

**PRESS PLAN**

The event is NOT open to the press.

.

**DETAILS**

| | |
|---|---|
| Format: | Interview |
| Setup: | *N/A* |
| Visuals: | Backdrop: LED screen |
| Attire: | Business professional |

**TALKING POINTS**

See press guidance.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS CATENACCI, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case Number: 1:21-cv-02852 |
| v. | ) | Honorable John Z. Lee |
| | ) | |
| LORI LIGHTFOOT, in Her Official Capacity As Mayor of the City of Chicago, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(B)(6)**

Please take notice that pursuant to the Rule 30(b)(6) of the Federal Rules of Civil Procedure and the Court's August 20, 2021 Order, Plaintiff will take the deposition of Defendant, on oral examination before a Notary Public, or some other official authorized by law to administer oaths, commencing at the place, date and time shown below. Defendant is requested to designate person or persons to testify on behalf of Defendant regarding:

1. The policy to exclusively provide one-on-one interviews with journalists of color as outlined in Defendant's May 19, 2021 letter, including, but not limited to, the development of the policy, the scope of the policy, the duration of the policy, the implementation of the policy, and the communication of the policy to staff, journalists, and the public;

2. The "Press Tour" as identified by the declarations of Kathleen Lefurgy, including, but not limited to, the development of the "Press Tour," the scope of the "Press Tour," the duration of the "Press Tour," the implementation of the "Press Tour," and the communication of the "Press Tour" to staff, journalists, and the public; and

3. Whether Defendant's policy to exclusively provide one-on-one interviews with journalists of color as outlined in her May 19, 2021 letter will be used in the future.

Exhibit #
Plaintiff-5
10/14/21- RC
exhibitsticker.com

The testimony of the deponent(s) will be recorded by audiovisual and stenographic means.

**DATE AND TIME:** **October 14, 2021; 9:00 am CT**

**PLACE:** **Virtual**

Also please take notice that 1) the court reporter will report the deposition from a location separate from the witness; 2) counsel for the parties and their clients will be participating from various, separate locations; 3) the court reporter will administer the oath to the witness remotely; 4) the witness may be required to provide government-issued identification satisfactory to the court reporter, and this identification must be legible on camera; 5) each participating attorney may be visible to all other participants, and their statements will be audible to all participants; 6) all exhibits will be provided simultaneously and electronically to the witness and all participants; 7) the court reporter will record the testimony; 8) the deposition may be recorded electronically; and 9) counsel for all parties will be required to stipulate on the record to their consent to this manner of deposition and to their waiver of any objection to this manner of deposition, including any objection to the admissibility at trial of this testimony based on this manner of deposition.

Dated: September 30, 2021

Respectfully submitted,

/s/ Christine Svenson
Christine Svenson
Ill. Bar No. 6230370
SVENSON LAW OFFICES
345 N. Eric Drive
Palatine, IL 60067
Tel: (312) 467-2900

/s/ Michael Bekesha
Michael Bekesha
Admitted *Pro Hac Vice*
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5172

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2021, I served the forgoing **NOTICE OF DEPOSITION PURSUANT TO FED. R. CIV. P. 30(B)(6)** by electronic mail on the following:

John Hendricks (john.hendricks@cityofchicago.org)
Andrew Worseck (andrew.worseck@cityofchicago.org)
Peter Cavanaugh (peter.cavanaugh@cityofchicago.org)
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 North LaSalle Street, Suite 520
Chicago, Illinois 60602

/s/ Michael Bekesha